ARNOLD & PORTER LLP
MICHAEL A. BERTA (No. 194650)
michael.berta@aporter.com
JONATHAN W. HUGHES (No. 186829)
Jonathan.hughes@aporter.com
SEAN CALLAGY (No. 255230)
sean.callagy@aporter.com
JOSEPH R. FARRIS (No. 263405)
joseph.farris@aporter.com
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone:     415.471.3100
Facsimile:     415.471.3400


Attorneys for MACHINE ZONE, INC.
and EPIC WAR LLC

# UNITED STATES BANKRUPTCY COURT FOR THE

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| MACHINE ZONE, INC., | Case No. |
| Plaintiff, | (Superior Court of California, County of Santa Clara No. 15-cv-288498) |
| v. | |
| PEAK WEB LLC, | (Superior Court of California, County of Santa Clara No. 15-cv-288681) |
| Defendant. | |
| PEAK WEB LLC, | **NOTICE OF REMOVAL PURSUANT TO 28 U.S.C. § 1452 AND 28 U.S.C. § 1334 BY MACHINE ZONE, INC. AND EPIC WAR, LLC** |
| Plaintiff, | |
| v. | |
| MACHINE ZONE, INC., EPIC WAR LLC, and DOES 1 through 10 inclusive, | |
| Defendants. | |

PLEASE TAKE NOTICE that Machine Zone, Inc. and Epic War LLC (together, "Removing Parties"), hereby remove the above-entitled consolidated actions from the Superior Court of the State of California, County of Santa Clara, to the United States Bankruptcy Court for the Northern District of California, San Jose Division, pursuant to 28 U.S.C. § 1452(a), 28 U.S.C. § 1334(b), and Federal Rule of Bankruptcy Procedure 9027. In support of removal, Removing Parties allege as follows:

I.    **The Consolidated State Court Cases Subject to Notice of Removal**

1.    On November 25, 2015, Machine Zone, Inc. filed a Complaint in the Superior Court for the State of California, County of Santa Clara, designated as Case No. 15-cv-288498 (the "Machine Zone Action"). Peak Web LLC ("Peak"), the sole defendant named in the Machine Zone Action, was served with the Summons and Complaint in the Machine Zone Action. A true and correct copy of the Complaint in the Machine Zone Action is attached hereto as Exhibit A.

2.    The Machine Zone Action asserts causes of action for (i) breach of contract, (ii) declaratory relief of the right to terminate a Master Services Agreement, (iii) breach of the covenant of good faith and fair dealing; (iv) fraudulent inducement and rescissions under California Civil Code Section 1688 *et. seq.*, (v) negligent misrepresentation, and (vi) promissory estoppel.

3.    On December 3, 2015, Peak filed a Complaint in the Superior Court for the State of California, County of Santa Clara, designated as Case No. 15-cv-288681 (the "Peak Action"). Machine Zone, Inc. and Epic War LLC, the defendants named in the Peak Action, were served with the Summons and Complaint in the Peak Action. A true and correct copy of the public redacted version of the Complaint in the Peak Action is attached hereto as Exhibit B (the Complaint in the Peak Action is partially under seal and Removing Parties will lodge the sealed Complaint separately).

4.    The Peak Action asserts causes of action for (i) misappropriation of trade secrets, (ii) breach of contract, (iii) breach of the covenant of good faith and fair dealing; (iv) negligent misrepresentation, (v) fraudulent inducement, (vi) unfair competition, (vii) promissory estoppel, (viii) conversion, and (ix) declaratory relief.

5.    On January 15, 2016, the court entered an Order consolidating for all purposes the

NOTICE OF REMOVAL PURSUANT TO 28 U.S.C. §1452 and 28 U.S.C. § 1334
Case 16-03083-pcm    Doc 1    Filed 07/22/16

Machine Zone Action (15-cv-288498) and the Peak Action (15-cv-288681) (collectively, the "Consolidated Action"), with the Machine Zone Action appearing as the lead case on the caption.

6.      By this Notice of Removal, Removing Parties remove all claims and causes of action in the Consolidated Action to this Court, including all claims asserted in the Machine Zone Action and all claims asserted in the Peak Action.

## II.      Grounds for Removal Exist Under 28 U.S.C. § 1452(a) and 28 U.S.C. § 1334(b)

7.      The Consolidated Action may be removed to this Court under 28 U.S.C. § 1452(a) and 28 U.S.C. 1334(b).

8.      On June 13, 2016, Peak Web LLC commenced a Chapter 11 bankruptcy case under 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") by filing a Voluntary Petition in the United States Bankruptcy Court for the District of Oregon, designated as Case No. 3:16-bk-32311 (the "Bankruptcy Case").  A true and correct copy of the Voluntary Petition in the Bankruptcy Case is attached hereto as Exhibit C.  A true and correct copy of a Transcript of a Preliminary Hearing of June 15, 2016 in the Bankruptcy Case is attached hereto as Exhibit D.

9.      The United States District Court for the Northern District of California (and the Bankruptcy Court, pursuant to Bankruptcy Local Rule 5011-1) have original jurisdiction over the Consolidated Action pursuant to 28 U.S.C. § 1334(b) because the Consolidated Action is a proceeding "related to" the Bankruptcy Case.

10.      A proceeding is subject to jurisdiction under 28 U.S.C. § 1334(b) on the grounds that it "relates to" a case under the Bankruptcy Code if the outcome of the proceeding "could conceivably have an effect" on the estate being administered in bankruptcy.  *In re Fietz*, 852 F.2d 455, 457 (9th Cir. 1988) ("The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.") (quoting *Pacor v. Higgins*, 743 F.2d 984 (3d Cir. 1984), *overruled on other grounds by Things Remembered, Inc. v. Petraca*, 516 U.S. 124 (1995)); *Jackson v. Fenway Partners, LLC*, No. C 13-00005 JSW, 2013 WL 1411223, at *2 (N.D. Cal. Apr. 8, 2013) ("[A]n action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options or freedom of action (either positively or negatively) and [it] in

any way impacts upon the handling and administration of the bankruptcy estate.") (*quoting Pacor*, 743 F.2d at 994).

11.     The Consolidated Action is "related" to the Bankruptcy Case within the meaning of 28 U.S.C. § 1334(b) because the outcome of the Consolidated Action "could conceivably have an effect" on the estate being administered in the Bankruptcy Case.  If a court grants the relief sought by either the Removing Parties in the Machine Zone Action or Peak in the Peak Action, it would have a significant impact on the estate in the Bankruptcy Case.  The Machine Zone Action seeks at least $23 million in damages from Peak (Ex. A, Prayer for Relief) and the Peak Action seeks at least $97.3 million in damages from Machine Zone (Ex. B, Prayer for Relief).   Further, Peak made statements to the Bankruptcy Judge during the "first day" hearing in the Bankruptcy Case, on June 15, 2016, to the effect that the Consolidated Action is its most significant asset and payment to its creditors depends on its outcome.  *See, e.g.,* Ex. D at 6:19-20 ("The litigation claims that the company has against Machine Zone are about a hundred million dollars.  If the company is successful in that, the creditors would get paid in full.  So that's a very valuable asset and we want to protect that asset.").   Accordingly, the result of the litigation in the Consolidated Action will have an effect on the estate and creditors.

12.     This Court has also original jurisdiction over this Consolidated Action because complete diversity exists between the parties and the amount in controversy exceeds the value of $75,000 under 28 U.S.C. § 1332(a).   Machine Zone, Inc. and Epic War LLC are Delaware Corporations with their principal places of business in California, and therefore they are citizens of California.   Upon information and belief, Peak Web LLC is a citizen of Oregon and Washington State.

III.     **Removing Party Meet the Procedural Requirements**

13.     This Court is the proper district to file this Notice of Removal because this the "district and division within which is located the state court . . . where the civil action is pending." Fed. R. Bankr. P.  9027(a)(1); N.D. Cal. B.L.R 5011-1(a).

14.     This Notice of Removal contains a short and plain statement of the facts which entitle the Removing Parties to file the notice to remove, as set forth in Paragraphs 1 – 12, *supra*. Fed. R. Bankr. P.  9027(a)(1).

15.     The claims asserted in the Consolidated Action are "non-core" proceedings within the meaning of 28 U.S.C. § 157. Fed. R. Bankr. P. 9027(a)(1). The Removing Parties do not consent to any final orders or judgments filed by the Bankruptcy Judge. Fed. R. Bankr. P. 9027(a)(1); N.D. Cal. B.L.R. 9027-1(a).

16.     A true and correct copy of all process and pleadings in the Consolidated Action (except those under seal) will be submitted concurrently with this Notice of Removal, attached to the Declaration of Joseph Farris In Support of Notice of Removal. Fed. R. Bankr. P. 9027(a)(1). Removing Parties will separately lodge the sealed pleadings in the Consolidated Action promptly.

17.     This Notice is filed within the time allowed for the removal, for at least the reason that it is filed within 90 days for the order for relief under the Bankruptcy Case. Fed. R. Bankr. P. 9027(a)(2).

18.     A copy of this Notice will be promptly served on all parties to the Action and filed with the Clerk of the Santa Clara County Superior Court. Fed. R. Bankr. P. 9027(b)-(c).

19.     Counsel for the Removing Parties signs this Notice of Removal pursuant to Fed. R. Bankr. P. 9011. Fed. R. Bankr. P. 9027(a)(1).

20.     The Removing Parties intend to file a motion with the Court seeking transfer of the removed Consolidated Action to the United States District Court for the District of Oregon, in light of the pendency of the Bankruptcy Case in that district.

21.     Nothing in this Notice of Removal shall be interpreted as a wavier or relinquishment of the Removing Parties' right to assert any claim or defense, nor shall it constitute a waiver of the Removing Parties' right to a jury trial.

Dated: June 27, 2016

                          ARNOLD & PORTER LLP
                          MICHAEL A. BERTA
                          JONATHAN W. HUGHES
                          SEAN CALLAGY
                          JOSEPH R. FARRIS

                          By: _____
                              JOSEPH FARRIS

                          Attorneys for MACHINE ZONE, INC. and
                          EPIC WAR LLC

NOTICE OF REMOVAL PURSUANT TO 28 U.S.C. §1452 and 28 U.S.C. § 1334

# EXHIBIT A

*to*

# *NOTICE OF REMOVAL*

COPY

FAXED

UNDORSED

NOV 25 2015

D. Wendel

1    ARNOLD & PORTER LLP
     MICHAEL BERTA (No. 194650)
2    michael.berta@aporter.com
     SEAN CALLAGY (No. 255230)
3    sean.callagy@aporter.com
     Three Embarcadero Center, 10th Floor
4    San Francisco, CA 94111-4024
     Telephone:    +1 415.471.3100
5    Facsimile:    +1 415.471.3400

6    Attorneys for Plaintiff
     MACHINE ZONE, INC.

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                  COUNTY OF SANTA CLARA

10                   UNLIMITED JURISDICTION

11

| | |
|---|---|
| 12 MACHINE ZONE, INC., a California corporation, | Case No.: **115CV288498** |
| 13 | **COMPLAINT FOR:** |
| Plaintiff, | |
| 14 | (1) **BREACH OF CONTRACT** |
| vs. | |
| 15 | (2) **DECLARATORY RELIEF OF RIGHT TO TERMINATE MSA** |
| PEAK WEB LLC, a California limited liability | |
| 16 corporation, | (3) **BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING** |
| 17 Defendant. | |
| 18 | (4) **FRAUDULENT INDUCEMENT; RESCISSION UNDER CIVIL CODE §§ 1688 *et seq.*** |
| 19 | |
| 20 | (5) **NEGLIGENT MISREPRESENTATION** |
| 21 | (6) **PROMISSORY ESTOPPEL** |
| 22 | |
| 23 | **JURY TRIAL DEMANDED** |

24

25

26

27

28

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff Machine Zone, Inc. ("Plaintiff" or "Machine Zone"), by and for its Complaint against Peak Web LLC dba Peak Web Hosting ("Defendant" or "Peak"), alleges as follows:

## SUMMARY OF THE ACTION

1.      Plaintiff Machine Zone—a Palo Alto based developer of multi-player, free-to-play mobile games—brings this action for monetary and declaratory judgment confirming Peak's breach, and Machine Zone's termination, of the contracts between the parties, including a Master Service Agreement, Service Level Agreement and associated Service Orders (collectively, the "MSA"), and also for breach of contract and the duty of good faith and fair dealing for Peak's failure to provide data hosting services as contracted for in the MSA.  Machine Zone also brings this action for a declaration of rescission of the MSA based on fraudulent inducement, a claim for negligent misrepresentation, and a claim for promissory estoppel, all relating to Peak's representations, which were false when made, that its services and expertise were sufficient to provide Machine Zone with the services that Peak contracted to provide.

## THE PARTIES

2.      Machine Zone is incorporated in California, with its principal place of business in Palo Alto, California, and an official address at 2225 E. Bayshore Rd., Suite 200, Palo Alto, California 94301.  Among other things, Machine Zone offers to the public free-to-play multi-player mobile games, including *Game of War: Fire Age* ("*GoW*").

3.      On information and belief, Peak Web LLC is a California Limited Liability Company with offices at 8400 N. Maple Place, Suite 108, Rancho Cucamonga, CA 91730.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction of this dispute pursuant to California Constitution, Article VI, Section 10.

5.      This Court has personal jurisdiction over Peak pursuant to California Code of Civil Procedure Section 410.10.

6.      Venue is proper pursuant to California Code of Civil Procedure Section 395.5 because Peak contracted to perform services for Machine Zone yet did not fully and properly render the contracted-for services, including at Peak's facility in Santa Clara County, thereby breaching the

- 1 -

contract, failing to fulfill its obligations thereunder and inflicting substantial liabilities upon Machine Zone in the County of Santa Clara.

**FACTS GIVING RISE TO THIS ACTION**

<u>Plaintiff's Business</u>

7.     Machine Zone creates massively multi-player online games ("MMO") for mobile devices. In July 2013, after approximately eighteen months of development, Machine Zone launched *Game of War: Fire Age* ("*GoW*")—a free-to-play MMO game where users build kingdoms and compete to "rule the [virtual] world" while interacting in real-time with other players around the globe. Following its rapid success on Apple's iOS platform, Machine Zone launched *GoW* for Android in May 2014. By November 2014, *GoW* became the second most popular mobile-app in both Google Play and the Apple App Store. *GoW* has spent substantial time as the number one mobile application in the world.

8.     *GoW* is free-to-play and Machine Zone does not make revenue on up-front purchase prices or subscription fees. Instead, Machine Zone depends on customers making purchases during gameplay, which can only happen when the game is live and operational. The unique gameplay in *GoW* also takes place 24 hours a day, 7 days a week and involves virtual battles that require players to take action in real-time in order to advance in the game. The sequential nature of the game and the many in-game actions continually taking place make interruption-free data hosting imperative, even more so than in other MMO game titles. To this end, Machine Zone uses off-site servers "in the cloud" to run its game and store players' data. Machine Zone contracts with third-party companies such as Peak for this critical service. Machine Zone places an extremely high premium on continuous gameplay, and for this reason, uses so-called Tier IV data centers, the most robust level available.[1] Machine Zone does to so that customers have a continuous and uninterrupted real-time gaming experience. This is not only critical to making gameplay fun, it also directly impacts

---

[1] Data centers are rated from Tier I to Tier IV, with each tier providing successively greater redundant capacity and equipment to ensure availability. Tier 1 guarantees 99.671% availability (which corresponds to less than 29 hours of downtime per year), while Tier 4 guarantees 99.995% availability (or less than 27 *minutes* of downtime per year). *See* http://www.cyberciti.biz/faq/data-center-standard-overview/.

players' likelihood of making in-game purchases, and thereby impacts Machine Zone's ability to profitably operate the game. Guaranteeing continuous and uninterrupted availability of *GoW* by using Tier 4 data centers is not just critical to Machine Zone's revenue stream, but also to maintaining Machine Zone's strong reputation among the gaming community.

**Defendant's Business**

9.      On information and belief, Peak provides data hosting and related services to customers, including managed hosting services, maintenance and support for hosting customer applications in Peak-managed data centers. Peak holds itself out as available to provide hosting specifically suited to the needs of mobile gaming companies.

**Machine Zone and Peak Negotiate for Services**

10.      Machine Zone and Peak entered into discussions concerning data hosting in or around January of 2015. The discussions later culminated in the execution of the MSA. The purpose of these discussions was to ascertain if Peak could provide the data hosting services at the high level required by Machine Zone. During those discussions, Peak and its representatives, including its CEO Jeffrey Papen, represented that, except with respect to dual-powered ventilating and HVAC systems, Peak operated at industry-standard best practices for Tier IV data centers, and guaranteed that network connectivity was available using Peak's services *100% of the time*. Peak specifically represented that its hosted environment would guarantee that Machine Zone's network would not go down, ever. As noted above, to be a Tier 4 center and achieve the minimum guaranteed uptime, a data center must provide full redundancy of systems and equipment, and have all necessary infrastructure on-site and in place to ensure that systems stay running. Again, Peak represented that except for providing dual-powered ventilating and HVAC systems, it operated Tier IV facilities.

**Machine Zone and Peak Enter Into The MSA**

11.      Based on Peak's representations about its capabilities and expertise, and its representations that it was capable of functioning in accordance with industry standard best practices for Tier IV data center operations (but for dual-powered ventilating and HVAC systems), on March 20, 2015, Peak and Machine Zone entered into the MSA, effective as of April 1, 2015.

- 3 -

Among the material terms, Peak committed to providing no less than 99.995% uptime, consistent with Tier IV standards. As noted above, this is the highest standard available and corresponds to less than 27 minutes of *cumulative* outage time *per year*. Well-run Tier IV operations often achieve even better performance. The parties also promulgated several Service Orders for specific Peak services, including for hosting the live runtime environment for *GoW* and other live environments associated with *GoW* and with Machine Zone's business.

12. Peak immediately had issues providing the services it had contracted to provide with industry standard best practices. For example, on or around April 24, 2015, Peak's incompetence caused an outage that persisted for nearly an hour, which Peak ultimately admitted was the result of human error. In that instance, a Peak employee working with two computer displays rebooted the wrong server by copying and pasting a command into the wrong screen. While he stopped the incorrect command from continuing to run when he realized the error, Peak failed to check what systems had already been impacted as a result of the mistake. As a result, certain critical systems were shut down, completely taking down Machine Zone's live game environment for approximately 43 minutes.

13. In or around this time, Machine Zone sought from Peak reassurances that Peak's network architecture was set up correctly to avoid causing crashes of the live game environment, for which Peak had guaranteed and represented 100% availability in inducing Machine Zone to contract with Peak for services. For example, Machine Zone's Vice President of Technical Operations expressly asked Peak to confirm that the test environment for Machine Zone services, which was used to run simulations in order to test and potentially exceed the limits of the hosted environment, was not connected to the live game environment, so that any issues that arose in the testing environment would not affect the live game environment. Peak expressly confirmed and represented that the test environment was isolated from the live game environment so that issues that arose in test could not affect the game environment.

14. Peak continued to experience problems from April 2015 to August 2015. For example, Peak failed to follow basic planning and procedural protocols with respect executing any changes to the network. Peak also repeatedly failed to follow maintenance operating protocol

("MOP"), whereby Peak is required to create a formal MOP document for any change to Machine Zone's systems and obtain Machine Zone's approval before any action is taken, with all changes being carefully documented. Instead, Peak made network changes "on the fly" without approval or documentation, causing problems and making it impossible for Machine Zone to assess what actions were taken and what changes were made.

15. In one instance in August 2015, Peak added new systems using the same IP addresses that were used for Machine Zone databases. The duplicate IP addresses, as would be expected, immediately knocked the Machine Zone databases offline, causing an outage of Machine Zone's business intelligence systems. Peak failed to follow the standard operating process of updating the IPAM (IP address management) system, and failed to have industry standard systems and processes in place to require basic diligence on its network architecture to determine if the IP addresses at issue were live and taking traffic before proceeding, directly causing an outage to Machine Zone's systems. After an approximately 39-minute outage on August 21, 2015, Machine Zone requested an on-site audit to reassess general conditions and address recent and ongoing issues experienced with Peak.

16. On September 15th and 16th, a Machine Zone representative spent two days onsite at Peak in order to investigate, observe and report upon Peak's operations. Machine Zone's auditor uncovered numerous issues with Peak's facilities and architecture that failed to meet industry minimum standards for data center operations, much less the industry standard best practices that, prior to execution, Peak had represented it practiced in order to induce Machine Zone to enter into the MSA. Peak's failure to conform to industry practices for basic network data center operations jeopardized Machine Zone's operations, and thus jeopardized Machine Zone's ability to conduct its business and generate revenue. In this audit, Machine Zone documented (1) Peak's non-compliance with Tier IV data center uptime requirements, policies, procedures and documentation; (2) extensive site contamination and mis-installation of circulation devices which increased the risk of outages beyond an acceptable level; and (3) non-industry practice compliant inadequacies with respect to structured cabling and routing for Peak's hosted services.

17. For example, despite the industry standard knowledge that particulates such as dust, dirt and debris generated from trash, boxes or paper improperly stored in an area where they can contaminate a data center can cause short circuits, overheating and or any of a number of problems that can take down data center services, Machine Zone discovered that Peak permitted old boxed cardboard to be stored inside the data center computer rooms. Machine Zone's auditor documented stacks of cardboard, which are well recognized as unacceptable in a data center because they shed particulates, sitting on the data center floor:

 

18. Standard operating procedure for an industry-acceptable data center, and especially a Tier IV facility with 99.995% uptime, as Peak had contracted to provide, would be to maintain a staging area outside of the computer room for unpacking or uncrating items, ensuring that the computer room floor remained clean and avoiding the contamination caused by Peak's practice here.

19. During the September audit, Machine Zone also discovered that Peak's distribution fans were installed incorrectly—with their fans literally facing the wrong way—such that they were blowing hot air into the server aisle, rather than pulling the hot air out. This situation was made worse by the cardboard contaminates in the data center, the debris from which could be pulled into the server aisle as a result of the incorrectly installed distribution fans. Machine Zone also discovered and documented that Peak's cabling architecture was far below industry standards and posed risk to Machine Zone's operations. Cabling architectures provide the basic the infrastructure

foundation for data center networks, and Machine Zone recommended that Peak used fiber troughs to house delicate fibers. While Peak utilized troughs initially, they later not only piled cables on top of one another, but there was no care taken to avoid bending delicate fibers that require no less than a 90 degree bend. Certain of these fibers are made of glass and must be handled accordingly. Otherwise, the integrity of the cables is jeopardized. The following images from Peak's data center show the disarray of cabling:

 

20. Despite the fact that cables were wrapped around steel poles and bent at unacceptable angles, which are not acceptable for fiber optic cables, Peak's failure to use industry minimum standards for its data center operations continue to put Machine Zone's systems at risk because any remediation of Peak's improper installation would put Machine Zone's live operations at risk for catastrophic failure.

21. After the September audit, Machine Zone conducted an in-person meeting to discuss Peak's numerous failures, including the fact that Peak did not employ properly trained personnel, consistently violated MOP protocol and failed to document changes to the network, and more generally, that its facilities and architecture failed to meet industry minimum standards for Tier IV data center operations. Peak did not dispute most of these failures, and offered in essence that "this is how we do it." This meeting only heightened Machine Zone's growing concern that Peak had

deceived Machine Zone with respect to its capabilities and that Peak was not capable of delivering the quality of services and uptime it had committed to in the MSA.

22.     On October 27, 2015, Peak had its most serious failure yet.  Peak's hosted services for *GoW* failed, resulting in a complete loss of connectivity for approximately 2 hours and 15 minutes.  Due to the manner in which Peak architected its systems and Peak's inability to locate the cause of its outages and service level failures, it took almost nine hours to rebuild and relaunch the game environment, resulting in continuing significant lost revenue and lost good will for Machine Zone as its live game environment was completely unavailable to players.

23.     At the time of the October 27, 2015 outage, Machine Zone was forced to assist Peak in restoring server and network services for the downed Peak network and servers that it had contracted to provide for Machine Zone, because Peak could not locate the source of the outage in its managed hosting system.  Because of the way Peak architected its system, Peak was unable to monitor Machine Zone's servers using an external monitoring service once the servers and network went down.  Due to Peak's failure to architect this system with industry standard monitoring safeguards, Peak caused the outage to exceed the service level specifications to which Peak had committed.  Further, Machine Zone had to direct Peak on basic testing protocols in order to isolate the issue that was causing the outage.

24.     When it was discovered that the October 27, 2015 outage had originally occurred in the testing environment for Machine Zone services, but had also affected the servers responsible for the live game environment, Machine Zone requested that Peak reconfirm that, as it had represented in May 2015, the test and live environments for Machine Zone services were isolated from one another to prevent such a catastrophic loss of servers and network connectivity.  Peak then produced a network diagram which it said showed that the test and live environments were connected, and that, based on the diagram, Machine Zone should have known that the two environments were connected, even though such a set up was not in conformance with industry best practices.  However, when Machine Zone pressed Peak, and asked when the network diagram had been created, Peak admitted that it had only created the network diagram mere minutes before showing it

to Machine Zone on October 27, 2015.  Machine Zone also learned that Peak had failed to comply with its requirement to use the correct version of the software on its network switches.

25.     Peak's October 27, 2015 failure met the requirements for Machine Zone to invoke its right to terminate the MSA.  The MSA provides Machine Zone with a right to terminate for cause where Peak fails to meet its contractually mandated service level requirements (which failures are referred to as Strikes in the MSA) three times in any calendar quarter.  As the MSA makes clear, a single outage can result in multiple Strikes, and the October 27, 2015 outage resulted in at least three Strikes under the MSA.

26.     On October 29, 2015, Machine Zone provided Peak with a notice of termination for cause of the MSA and all associated Service Orders.

27.     Peak has contested Machine Zone's right to terminate the MSA and associated Service Orders for cause.  As part of asserting that Machine Zone does not have the right to terminate, Peak then prepared and filed a "defect" report with Cisco, the manufacturer of the switches that Peak uses to provide the contracted-for managed hosting services.  Peak then obtained an identification number for the defect report that it had generated and filed with Cisco, and Peak, through its President John Biggi and other personnel, represented that the identification number for the defect report represented a finding by Cisco that there was in fact a bug in Cisco's switch software that caused Peak's outage and thus that Peak was not responsible for the outage of its managed hosting services.  Peak's representation that the report it requested to be filed reflected a confirmed Cisco bug was knowingly false when made.

28.     Confirming Machine Zone's right to terminate the MSA, Peak experienced three further outages of its managed hosting services for Machine Zone on November 1, November 2 and November 4 in its San Jose, California facility.  Peak then attempted to blame each of these outages on an alleged confirmed Cisco software bug, which Peak knew to be a false representation, since Peak knew that Cisco had never confirmed the existence of any such bug.

29.     On November 22, 2015, Peak experienced yet another outage which lasted approximately 40 minutes and caused *GoW* to go down.  Peak once again blamed the alleged Cisco bug for this outage; however, Peak also admitted that the outage occurred due to failures on

switches that were not even being utilized, but which had been staged to replace FEX (fabric extenders), a project that had been abandoned. The staged switches should have never been connected to Machine Zone's production environment, and Peak further failed in its obligations by failing to monitor these switches.

30. On November 23, 2015, in a clear breach of the Service Level Agreement, Peak refused Machine Zone access to Peak's facilities. Machine Zone required access immediately so that Machine Zone could prevent further outages due to Peak's ongoing failures. Peak's refusal to allow Machine Zone to attempt to remediate Peak's ongoing failures was a material breach of the contract, which provides that "Machine Zone shall be entitled to 24 hour a day, 7 day a week escorted access to any Peak Facility used for the Services or housing Machine Zone equipment or assets."

31. In addition to immediate revenue losses while *GoW* was inaccessible to players, Machine Zone has lost installations and incurred marketing costs as a result of Peak's failures. Peak's failures have also forced Machine Zone to devote hundreds of hours of engineering time to remediation and damaged Machine Zone's strong brand and reputation with gamers. In an attempt to mitigate damage to its brand and reputation among its customers, Machine Zone has provided free products normally available for purchase in the game, causing a further loss of revenues. Finally, Machine Zone has been forced to rush completion of a new hosting facility that had not originally been intended to provide network services for *GoW* in order to mitigate the damage from Peak's continuous and systematic failures to meet its contractual obligations and keep *GoW* running in a live real-time environment.

## CLAIMS FOR RELIEF

## COUNT I
### (Breach of Contract)

32. Plaintiff repeats and realleges paragraphs 1 through 31 above with the same force and effect as if fully set forth herein.

33. Machine Zone and Peak entered into the MSA effective as of April 1, 2015.

34.     Machine Zone has performed all of its obligations under the parties' agreements, except as excused or prevented by Peak.

35.     Machine Zone has performed all of its obligations under the MSA, except as excused or prevented by Peak.

36.     Peak has materially breached the MSA by, among other things, failing to take the required and promised steps to protect Machine Zone from service outages, such that Machine Zone has experienced numerous catastrophic outages in derogation of the standards of a Tier IV data center.

37.     As a result of Peak's numerous material breaches of the parties' agreement, Machine Zone has been damaged in an amount to be determined at trial.

38.     Further, as a result of Peak's fundamental breach of the MSA, Machine Zone is excused from further performance under the contract.

**COUNT II**
**(Declaratory Relief of Right To Terminate MSA)**

39.     Machine Zone repeats and realleges paragraphs 1 through 38 above with the same force and effect as if fully set forth herein.

40.     Machine Zone has the right to terminate the MSA in the event of a "Material Breach" thereof by Peak.  A "Material Breach" exists under Section 8(B) of the MSA if Peak fails to meet a service level agreement set forth in the Service Level Agreement three times (*i.e.*, three "Strikes") in any calendar quarter.  Under the MSA, a single outage can count as more than one "Strike."

41.     The October 27, 2015 outage, discussed in detail above, resulted in at least three Strikes under the MSA.

42.     On October 27, 2015, Machine Zone properly delivered a notice of termination of the MSA, effective sixty calendar days thereafter, or December 26, 2015, pursuant to Section 8(D) of the MSA.

43.     In written correspondence, Peak has maintained that Machine Zone did not properly invoke its termination rights under the MSA, or that Peak's non-performance is excused due to the

existence of a "bug" in Cisco's switch software, despite Cisco not having confirmed such a bug and despite Peak's failure to run the latest software recommended by Cisco. Peak seeks to invoke a clause stating that "in the event Customer terminates this Agreement or any Service Order(s) pursuant to this Section 8(D) other than for cause or default, then Customer shall pay an early termination fee (as liquidated damages and not as a penalty) to Peak in an amount equal to 100% of all monthly recurring charged that would otherwise be due but for the termination." In so asserting, Peak not only ignores the fact that a single outage can constitute multiple strikes, it also ignores that subsequent outages on November 1, 2, 4 and 22 each independently constitute additional strikes within the same calendar quarter—indeed, within the same month—and thereby give Machine Zone *additional* cause to terminate the MSA.

44. An actual controversy has arisen and now exists between Machine Zone and Peak concerning their respective rights and duties in that Machine Zone contends that it has validly given notice of its right to terminate the MSA, and further contends that the "liquidated damages" provision of Section 8(D) of the MSA is an unenforceable penalty, whereas Peak disputes these contentions and contends that Machine Zone has not validly terminated the MSA and is liable for damages under Section (D) of the MSA.

45. Machine Zone has been harmed by Peak's refusal to acknowledge its valid termination of the MSA, in that Machine Zone has been hindered in seeking out a new hosting service in light of Peak's claims that Machine Zone will be held liable for a substantial penalty for exercising its termination rights under the MSA. Machine Zone has been harmed in an amount to be determined at trial.

## COUNT III
### (Breach of Covenant of Good Faith and Fair Dealing)

46. Machine Zone repeats and realleges paragraphs 1 through 45 above with the same force and effect as if fully set forth herein.

47. Machine Zone and Peak entered into the MSA, pursuant to which Peak would provide data hosting and related services, with Peak promising to provide the required servers and related products and services in a manner which would ensure continuous and uninterrupted service

to Machine Zone, *i.e.*, uptime of no less than 99.995%, and Machine Zone promising to pay substantial agreed-upon amounts for such servers and related products and services. This agreement is reflected in the MSA itself, as well as the parties' oral communications, written emails and invoices.

48. Implied in this contractual relationship was Peak's covenant of good faith and fair dealing.

49. Machine Zone has performed all of its obligations under the parties' agreements, except as excused or prevented by Peak.

50. Peak's actions as set forth above breached this implied covenant of good faith and fair dealing. Namely, as discussed at length above, Peak has proven itself incapable of providing Tier IV data hosting systems by, among other things, its failure to provide competent staff, its failure to install equipment and cabling correctly, its failure to maintain a properly sterile work environment, and above all, its repeated and disastrous failures to maintain the continuous runtime environment which is the very purpose of the MSA itself.

51. Peak's breaches have caused substantial harm and damage to Machine Zone, in an amount to be determined at trial.

## COUNT IV
### (Fraudulent Inducement; Rescission Under Civil Code §§ 1688 *et seq.*)

52. Machine Zone repeats and realleges paragraphs 1 through 51 above with the same force and effect as if fully set forth herein.

53. As the purveyor of the highly popular mobile game *GoW*, Machine Zone requires that its data hosting and related services be performed in a manner which that ensures continuous and uninterrupted service consistent with Tier IV data hosting standards, *i.e.*, uptime of no less than 99.995%. Such continuous access is critical to Machine Zone's ability to retain players and ultimately monetize *GoW*.

54. In or around February 2015 and thereafter, Peak, via its Founder and CEO Jeffrey Papen, knowing the representations to be false and with the intent to deceive Machine Zone and to fraudulently induce it to enter into the MSA, falsely and fraudulently represented that it was capable

of providing the level of service required by Machine Zone. During those discussions prior to the execution of the MSA, Peak and its representatives, including Mr. Papen, represented that, except with respect to dual-powered ventilating and HVAC systems, Peak operated at industry standard best practices for Tier IV data centers, and reiterated their previous contractual guarantee of 100% uptime. Peak represented that its hosted environment would guarantee that Machine Zone's network would not go down, ever. Peak also made several representations about their current and future data center monitoring capabilities, stating that they could provide full monitoring and remote access to their Dallas, Texas facility. Peak also emphasized the quality of its current personnel, and made commitments to further staff up the Dallas data center in order to meet Machine Zone's growing needs. In response to an audit performed by Machine Zone prior to the contract negotiations, Peak consistently and confidently assured Machine Zone that it had made improvements and was operating at a Tier IV data center level, including industry best practices that would assure Machine Zone uninterrupted network availability. The parties spent a significant amount of time during the MSA negotiations discussing the significant consequences to Machine Zone's business if Peak could not meet its uptime commitment, and Peak assured Machine Zone time and again that was positioned to do so from a hardware, infrastructure, personnel, processes and operational perspective.

55. Peak's representations were in fact false. As discussed at length above, Peak's data centers fail to conform to industry-standard practices in many, many regards, a fact Peak concealed from Machine Zone both before and after the execution of the MSA, both as an inducement to enter into the MSA and as an inducement not to exercise Machine Zone's audit and termination rights under the MSA.

56. At the time the representations were made, at the time Machine Zone entered into the MSA, and at the time Machine Zone made payments pursuant to the MSA, Machine Zone did not know that Peak's representations were false, but believed them to be true and reasonably relied upon them. Since entering into the MSA, Machine Zone has committed significant financial and personnel resources to increase its operations in Peak's data centers, including commissioning the

addition of approximately 2,000 servers.  Had Machine Zone known the true facts, it would not have entered into the MSA and would not have rendered or accepted performance thereunder.

57.     Since execution of the MSA, Machine Zone has made substantial payments to Peak in the amount of approximately $23,000,000.

58.     From April 1, 2015, to present, as alleged in great detail above, Peak has provided hosting services that fall well short of the requirements of the MSA and the Service Level Agreement incorporated therein.

59.     Machine Zone will suffer substantial harm and injury under the MSA if it is not rescinded in that Machine Zone will be forced to pay for and use hosting services that fail to meet its clearly stated needs.

60.     Machine Zone intends service of the summons and complaint in this action to serve as notice of rescission of the MSA, and hereby demands that Peak restore to it the consideration furnished by Machine Zone, specifically $23,000,000 plus consequential damages resulting from time and resources required for Machine Zone to respond to and repair damages from the network outages caused by Peak.

61.     As a result of entering into the MSA with Peak, Machine Zone has incurred significant expenses in addition to those alleged above, in an amount  to be proven at trial.

## COUNT V
### (Negligent Misrepresentation)

62.     Plaintiff repeats and realleges paragraphs 1 through 61 above with the same force and effect as if fully set forth herein.

63.     Machine Zone and Peak's business dealings constitute a special relationship in that Peak had unique knowledge regarding its technical capabilities and protocols to support large volumes of user traffic for a massively multi-player game such as Machine Zone's *GoW*, and Machine Zone had no way to assess Peak's technical capabilities and specific protocols as that information was propriety to Peak and not disclosed.

64.     Despite claiming to have unique knowledge and expertise regarding its abilities to service a high-traffic video game such as *GoW*, Peak represented to Machine Zone that it was

capable of supporting *GoW's* high user traffic without service interruption. Both orally and within the MSA, Machine Zone specifically informed Peak that continuous uptime for *GoW* was of paramount importance to Machine Zone.

65.     In the MSA, Peak incorrectly represented to Machine Zone that Peak could and would provide continuous service at Tier IV performance levels (including no less than 99.995% uptime) for *GoW*. Peak had unique and/or special expertise regarding the information that it provided to Machine Zone, which was proprietary to Peak.

66.     Peak knew or should have known that Machine Zone would rely upon the accuracy of Peak's representations in continuing to do business with Peak and depend upon its products, services and network stability to run *GoW*, and on information and belief, Peak intended that Machine Zone rely upon its representations. Machine Zone did in fact rely upon Peak's representations regarding its capability to support *GoW* in continuing to do business with Peak.

67.     Peak knew or should have known that the information it provided to Machine Zone regarding its capability to support *GoW* was incorrect.

68.     Machine Zone reasonably relied on the assurances and suffered financial loss as a result of the extended stoppage of game play caused by Peak's inability to live up to its assurances.

### COUNT VI

### (Promissory Estoppel)

69.     Plaintiff repeats and realleges paragraphs 1 through 68 above with the same force and effect as if fully set forth herein.

70.     Throughout 2015, Peak made promises and representations to Machine Zone, including but not limited to, that it would provide continuous and uninterrupted network services to ensure the stability and continuity of Machine Zone's *GoW*.

71.     Peak knew or should have known that Machine Zone would be reasonably induced to rely on those promises and representations by continuing to do business with Peak.

72.     Machine Zone reasonably and foreseeably relied on Peak's promises by continuing to do business with Peak.

1    73.    As a result of Machine Zone's reliance, Machine Zone did not seek another service

2    provider more capable of ensuring a continuous connection.

3    74.    Peak failed to live up to its promises by, among other things, failing to devote the

4    adequate resources and failing to maintain the adequate level of support necessary to maintain

5    continuous and uninterrupted network services for *GoW*.

6    75.    As a result of Machine Zone's reasonable reliance on Peak's promises and Peak's

7    failure to satisfy those promises, Machine Zone suffered significant revenue loss and a damaged

8    reputation, as described above.

9                              **PRAYER FOR RELIEF**

10    WHEREFORE, Machine Zone demands judgment be entered against Peak and in Machine

11    Zone's favor as follows:

12    A.    Entering a declaration that Machine Zone has validly terminated the MSA;

13    B.    Entering a declaration that the MSA has been rescinded;

14    C.    Awarding compensatory and consequential damages to be determined at trial, but in

15    no event less than $23,000,000;

16    C.    Awarding punitive damages in an amount to be determined at trial;

17    D.    Awarding costs and disbursements in this action;

18    E.    Awarding prejudgment and post-judgment interest; and

19    F.    Awarding Machine Zone such additional and further relief as that the Court may

20    deem just and proper.

21                              **DEMAND FOR JURY TRIAL**

22    Plaintiff hereby demands that this matter be tried before a jury.

23

24    Dated: November 25, 2015                    ARNOLD & PORTER LLP

25

26    By: *Michael Berta*  / *by permission* SMC
       MICHAEL A. BERTA

27                              Attorneys for Plaintiff Machine Zone, Inc.

28

- 17 -
COMPLAINT

# EXHIBIT B

*to*

# *NOTICE OF REMOVAL*

MICHAEL J. IOANNOU (SBN 95208)
LITA M. VERRIER (SBN 181183)
DANIEL P. McKINNON (SBN 234749)
ROPERS, MAJESKI, KOHN & BENTLEY
50 West San Fernando Street, Suite 1400
San Jose, CA 95113-2429
Telephone: (408) 287-6262
Facsimile: (408) 918-4501
Email: michael.ioannou@rmkb.com;
lita.verrier@rmkb.com;
daniel.mckinnon@rmkb.com

Attorneys for Plaintiff
PEAK WEB LLC

**RECEIVED**

DEC 3 2015

DAVID H. YAMASAKI
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BY_____ Deputy
C. Page

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SANTA CLARA

| | |
|---|---|
| PEAK WEB LLC,<br><br>Plaintiff,<br><br>v.<br><br>MACHINE ZONE, INC., EPIC WAR LLC, and DOES 1 through 10, inclusive,<br><br>Defendants. | CASE NO: 1 1 5 C V 2 8 8 6 8 1<br><br>**COMPLAINT FOR:**<br><br>1. Misappropriation of Trade Secrets;<br>2. Breach Of Contract;<br>3. Breach Of The Implied Covenant Of Good Faith And Fair Dealing;<br>4. Negligent Misrepresentation;<br>5. Fraudulent Inducement;<br>6. Unfair Competition;<br>7. Promissory Estoppel;<br>8. Conversion; and<br>9. Declaratory Relief<br><br>**JURY TRIAL DEMANDED** |

**LODGED CONDITIONALLY UNDER SEAL**

**SUBJECT TO MOTION OR APPLICATION TO SEAL**

**DO NOT FILE WITH THE CLERK OF THE COURT**

4829-3671-4795.1

- 1 -

1  MICHAEL J. IOANNOU (SBN 95208)
   DANIEL P. MCKINNON (SBN 234749)
2  ROPERS, MAJESKI, KOHN & BENTLEY
   50 West San Fernando Street, Suite 1400
3  San Jose, CA  95113-2429
   Telephone:  (408) 287-6262
4  Facsimile:  (408) 918-4501
   Email:  michael.ioannou@rmkb.com;
5  daniel.mckinnon@rmkb.com

6  Attorneys for Plaintiff
   PEAK WEB LLC
7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9            COUNTY OF SANTA CLARA – UNLIMITED JURISDICTION

10

11  PEAK WEB LLC,                          CASE NO.

12            Plaintiff,                   **COMPLAINT FOR:**

13     v.                                  **1. Misappropriation of Trade Secrets;**
                                           **2. Breach Of Contract;**
14  MACHINE ZONE, INC., EPIC WAR           **3. Breach Of The Implied Covenant Of**
    LLC, and DOES 1 through 10, inclusive,    **Good Faith And Fair Dealing;**
15                                         **4. Negligent Misrepresentation;**
            Defendants.                    **5. Fraudulent Inducement;**
16                                         **6. Unfair Competition;**
                                           **7. Promissory Estoppel;**
17                                         **8. Conversion; and**
                                           **9. Declaratory Relief**
18
                                           **JURY TRIAL DEMANDED**
19

20

21

22  Plaintiff Peak Web LLC alleges as follows:

23                          **THE PARTIES**

24     1.     Plaintiff Peak Web LLC d/b/a Peak Hosting ("Peak Hosting") is a California

25  Limited Liability Company authorized to transact business in various jurisdictions, including the

26  State of California, and is headquartered in Rancho Cucamonga, California. Peak Hosting was

27  founded in 2001, and delivers a range of network support services to the online industry,

28  including the design, build, and management of network infrastructures for some of the largest

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1   online businesses, including large multiplayer social gaming applications ("apps") for mobile

2   devices.

3       2.     Peak Hosting is informed and believes that Defendant Machine Zone, Inc.

4   ("Machine Zone") is a Delaware corporation and is headquartered in Palo Alto, California.

5   Machine Zone was founded in 2008, and develops interactive multiplayer games for mobile

6   devices, including Game of War: Fire Age ("Game of War"), where players from around the

7   world interact, communicate, and compete with each other in real-time. Although Game of War is

8   free to download, it generates revenue through players making in-game purchases to more

9   quickly advance through the game.

10      3.     Peak Hosting is informed and believes that Defendant Epic War LLC ("Epic

11   War") is a California Limited Liability Company authorized to transact business in various

12   jurisdictions, including in the State of California, and is headquartered in Palo Alto, California.

13   Epic War was founded in 2012, and on information and belief, is owned and controlled by

14   Machine Zone and/or Machine Zone's alter ego. Epic War is currently listed as the developer of

15   the recently released Mobile Strike, an interactive online game similar to Game of War.

16      4.     Peak Hosting is ignorant of the true names and capacities of Defendants sued

17   herein as DOES 1 through 10, inclusive, and therefore sues these Defendants by such fictitious

18   names pursuant to California Code of Civil Procedure section 474. Peak Web is informed and

19   believes that each of the fictitiously named Defendants are responsible in some manner for the

20   occurrences herein alleged, and that the damages as herein alleged were proximately caused by

21   said Defendants and as such, they are jointly and severally liable for the damages caused to

22   Plaintiff. Peak Hosting will ask leave of the Court to allege their true names and capacities when

23   the same have been ascertained.

24      5.     Peak Hosting is informed and believes that each Defendant herein, at all pertinent

25   times hereto, was and is the agent, servant, employee, joint venturer, alter ego, and/or partner of

26   each of the other co-Defendants, with full knowledge, permission and consent of each and every

27   remaining defendant, and in doing the things alleged herein, each co-Defendant was acting within

28   the scope of authority conferred upon that party by consent, approval and/or ratification, whether

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

4849-9592-3755.1         - 2 -

1   said authority was actual or apparent.

2                    **JURISDICTION AND VENUE**

3          6.      Jurisdiction and venue in this Court is proper pursuant to the written contract

4   between Peak Hosting and Machine Zone.  The contract was entered into, had obligations arising

5   in, and Defendants' wrongful conduct having occurred in, the County of Santa Clara, State of

6   California, within the jurisdiction and venue of this Court.

7          7.      This matter is properly designated a case of unlimited jurisdiction because the

8   amount in controversy herein exceeds $25,000.

9                    **COMMON ALLEGATIONS**

10         8.      Machine Zone's Game of War is one of the top grossing mobile gaming apps,

11  generating [redacted] through players making in-game purchases. Game of War

12  is played simultaneously by millions of people around the world using mobile network

13  technology to interact, compete, and collaborate with each other 24 hours a day, seven days a

14  week. These types of massively multiplayer online games ("MMOG") require a complex network

15  infrastructure to support the large volume of user data that is constantly being transferred, stored,

16  and processed across the Internet.

17         9.      Peak Hosting specializes in the design, build, and management of complex

18  network architectures that support some of the largest online businesses, including mobile gaming

19  apps. Peak Hosting's proprietary network architecture supports high-speed transfer of large

20  volumes of data with incredibly low latency, zero jitter (variations in latency), and short network

21  "diameter" (number of hops between devices) to eliminate late collision and a host of other

22  network maladies that is critical to online businesses.[1]

23         10.     Through its Operation-as-a-Service ("OaaS") technology, Peak Hosting provides a

24  full service technical operations department to support its clients' network system. Peak Hosting

25

26  [1] Network architecture is the design, specifications, and configurations of a network's hardware
    and software. Complex network architectures have thousands of physical components (e.g.,
27  servers, PDU, switches, routers, fans, hard drives, SANs, controllers, power supplies, cables, etc.)
    that need to be configured to communicate with each other and to transfer and process this
28  information at high rates of speed and without corruption or failure.

    4849-9592-3755.1                          - 3 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1    uses its confidential and proprietary trade secret technology and know-how to create a network

2    architecture that can support the growth and volume of user data exchanged, stored, and

3    processed through its clients' network applications. This is particularly useful to start-up

4    companies, such as Machine Zone and Epic War, whose mobile gaming applications like Game

5    of War and Mobile Strike, need a network system that can start out small but grow with the same

6    speed and reliability if the game becomes hugely successful.

7        11.      Game of War was originally released in July 2013 for the Apple iOS mobile

8    operating system. Due to its instant success and potential for substantial growth, Machine Zone

9    needed a scalable network system capable of supporting the demands of its expanding user base.

10    In or about October 2013, Machine Zone was not satisfied with its current network hosting

11    provider and Machine Zone approached Peak Hosting regarding using its OaaS solution to

12    support Game of War.

13        12.      In February 2014, Machine Zone and Peak Hosting entered into a written network

14    servicing agreement, and Peak Hosting began providing managed network hosting to support

15    Game of War's growing user base. Shortly thereafter, in May 2014, Game of War was released

16    for the Android mobile operating system, further growing its user traffic and demand. Due to its

17    worldwide popularity and Peak Hosting's proprietary AlwaysUp Architecture®, Game of War

18    continued to grow its user base, adding ▮▮▮▮▮▮▮▮ new users per day, and further

19    increasing its revenues from in-game purchases.

20        13.      As the popularity of Game of War continued to grow, Machine Zone wanted to

21    enter into a long-term contract with Peak Hosting to provide an expanded network system

22    supported by Peak Hosting's OaaS technology. Machine Zone had been using Peak Hosting's

23    proprietary technology to support Game of War since approximately February 2014, knew it was

24    extremely valuable, and it had already proven critical to Game War's success.

25        14.      In or about March 2015, Peak Hosting and Machine Zone negotiated the terms of

26    an extended network hosting agreement for Game of War. During these discussions, and prior to

27    Peak Hosting entering into an agreement, Machine Zone's Shawn Foust, head of business

28    development at Machine Zone, and Tory Valenzuela, general counsel, represented to Peak

4849-9592-3755.1             - 4 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1   Hosting's Jeffrey Papen (CEO), John Biggi (COO), and Don Lavoie (Management Advisor and

2   Consultant), that Peak Hosting would provide Machine Zone's managed network operations

3   through October 1, 2017. Machine Zone further represented that it would not perform its own

4   network operations because they did not have the expertise, capacity, intellectual property or

5   technical capabilities to design, build and manage a network system capable of supporting the

6   Game of War network. Machine Zone represented that Peak Hosting would manage all of

7   Machine Zone's primary and back-up network operations as part of a long-term business

8   relationship, including to provide the managed network operations for Mobile Strike, which was

9   to be released in several months.

10      15.     In reliance on Machine Zone's representations, on March 20, 2015, Peak Hosting

11  entered into a Master Services Agreement ("MSA") and related Service Level Agreements

12  ("SLA") and Service Orders ("SO") (collectively, the "Agreement"). True and correct copies of

13  the MSA and SLA are collectively attached as Exhibit "A." In further reliance on Machine

14  Zone's representations, Peak Hosting used its proprietary and trade secret network topology,

15  command codes, and configurations to design, build, and maintain a complex network

16  infrastructure that optimizes the performance and operation of mobile apps, including Game of

17  War, delivering performance, stability, reliability, low latency, and no-jitter that Machine Zone's

18  previous network hosting provider was unable to deliver.

19      16.     Game of War is an inherently unstable application, prone to failure and

20  catastrophic collapse due to the architecture created by Game of War's developers, including over

21  ██████████████████████████████████████████████████████████

22  ████████. Peak Hosting's network system was designed and built using Peak Hosting's

23  intellectual property and technological know-how, which stabilize the operations of its clients'

24  applications, including Game of War, and provide improved speed and uptime without lag caused

25  by latency, late collisions, jitter, or other bandwidth issues, and a fully redundant architecture so

26  that every individual component within the network hosting environment has a back-up and can

27  be maintained without taking the service offline. This is critical to the success and profitability of

28  Peak Hosting's clients, including Machine Zone, since any lapse in connectivity that results in

4849-9592-3755.1                                - 5 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1  network downtime affects Machine Zone's ability to generate revenue from in-game purchases by

2  the hundreds of thousands of concurrent users simultaneously playing Game of War at any given

3  time. Additionally, short network "diameter," low latency, and no jitter are critical because of

4  Game of War's dependence on NO-SQL applications real-time updates.

5       17.     Peak Hosting used its trade secret network topology, command codes,

6  configurations and know-how to build a data center in Dallas which housed Peak Hosting's

7  physical and virtual network infrastructure. In communication networks, a topology is a

8  proprietary schematic description of the arrangement of a network, including its nodes and

9  connecting lines. There are numerous ways to design and configure network architectures. This

10  particular network system consists of over four thousand servers and other high-end networking

11  equipment selected by Peak Hosting that were custom configured to rapidly communicate with

12  each other and provide faster access to storage, transfer and processing of the large volumes of

13  data sent through the network system. Additionally, Peak Hosting's proprietary network system

14  uses complex layers of redundancy and failover options for lower latency requirements that are

15  critical to the stability and operation of its clients' applications, and is particularly critical to

16  Game of War due to its fragility. This proprietary network architecture is designed to provide

17  Peak Hosting's clients with the fastest and most reliable network system, giving Peak Hosting a

18  significant competitive advantage over other network hosting competitors.

19       18.     Pursuant to the parties' managed hosting Agreement, Machine Zone agreed to pay

20  Peak Hosting monthly reoccurring charges of approximately $▇▇▇▇▇▇ each month through

21  the term of the Agreement. The term of the Agreement was from April 1, 2015, to October 1,

22  2017, provided that: 1) neither party had materially breached the Agreement; or 2) Machine Zone

23  had not lost 40% or more of its revenue compared to the previous four quarters:

24          The term of this Agreement, including any open Service Orders as
           of the Commencement Date, shall be from the Commencement

25          Date [April 1, 2015] until April 1, 2016 (the "Term"). Thereafter,
           the Term shall renew automatically for one additional 12-month

26          term which will extend the Agreement until April 1, 2017, with the
           final six month auto-renewal term thereafter which will extend the

27          Agreement to October 1, 2017; provided that at the time of each
           auto-renewal, (1) neither Party is in breach of this Agreement

28          (other than for failure by Customer to pay any undisputed amounts

4849-9592-3755.1             - 6 -

1

2

3

4

5

> due under any Service Order which are covered under Section 4(F)
> below) or the Service Level Agreement, and (2) Customer has not
> or is not experiencing a "material downturn," which for purposes
> of this Agreement, shall be defined as a 40% decline in Customer's
> revenue as compared to the trailing four quarters on an annualized
> basis.
>
> *See* Section 5(B) of the MSA.

6    19.    Unbeknownst to Peak Hosting, Peak Hosting is informed and believes that

7  Machine Zone never intended to fulfill the terms of the Agreement. Rather, Peak Hosting is

8  informed and believes that Machine Zone induced Peak Hosting to enter into the Agreement so it

9  could learn, copy, and use Peak Hosting's confidential and proprietary network topology,

10  command codes, configurations, and other confidential and proprietary know-how needed to

11  design, build, and maintain its own in-house network system and data center, and once this was

12  accomplished, would wrongfully terminate the Agreement with Peak Hosting.

13    20.    Peak Hosting is informed and believes that, while Machine Zone was negotiating

14  the MSA with Peak Hosting and contrary to its representations, Machine Zone was already

15  engaging vendors and recruiting firms, and hiring personnel to build and maintain its own data

16  center and network architecture to support Game of War and Mobile Strike.

17    21.    Peak Hosting is informed and believes that prior to entering into the Agreement,

18  Machine Zone was attempting to hire JC Chau ("Chau") through a recruiting agency for the

19  purpose of building a new network system and data center to support Game of War and Mobile

20  Strike, which was still in development but was planned to be released in just a few months.

21    22.    On April 27, 2015, Machine Zone hired Chau as its Vice President of Technical

22  Operations, and on information and belief, Machine Zone tasked him with building a new data

23  center and network architecture for Machine Zone using Peak Hosting's proprietary and

24  confidential trade secrets. Chau had previously managed the network architecture for

25  SalesForce.com; and was able to scale, grow, and manage large data centers, including building

26  and managing network operations. Peak Hosting is informed and believes that Machine Zone

27  hired Chau specifically because of his industry expertise and to use Peak Hosting's intellectual

28  property to build an in-house network operation to replace Peak Hosting. Chau was critical of

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

4849-9592-3755.1                          - 7 -

1    Game of War's application architecture, specifically, that Machine Zone's game developers

2    created an inherently unstable application platform susceptible to catastrophic failures, and

3    therefore the network system needed multiple layers of redundancy to compensate for the fragile

4    nature of the game.

5    · 23.    In or about May 2015, Machine Zone's Chau, as well as others under Chau's

6    direction at Machine Zone, represented to Peak Hosting's Michelle Koert, the account

7    representative for Machine Zone, that it was planning to build a separate disaster recovery data

8    center in Las Vegas that would serve as a backup to Peak Hosting's primary data center located in

9    Dallas, and wanted Peak Hosting's help. Machine Zone assured Peak Hosting that Machine Zone

10   would not perform its own network operations and that Peak Hosting would continue to provide

11   managed network hosting and be the primary data center through at least October 1, 2017, the

12   term of the Agreement.

13        24.    Machine Zone represented that it wanted to continue to enhance its partnership

14   with Peak Hosting beyond the original term of the Agreement, and that the Las Vegas backup

15   data center would be an active backup system providing an additional layer of failsafe

16   redundancy capable of supporting Game of War in the event of a catastrophic network outage at

17   Peak Hosting's data center.

18        25.    Machine Zone represented that it intended to expand its products and launch into

19   new markets outside of gaming, and that Peak Hosting would provide the network hosting

20   services for these new markets. Machine Zone further represented that in order to design and

21   build the DR backup data center it needed copies of Peak Hosting's confidential and trade secret

22   network topology, configurations, and command codes so that the Las Vegas backup network

23   system would mirror Peak Hosting's network system.

24        26.    Peak Hosting relied on Machine Zone's representations, and on or about July 20

25   and 22, 2015, Peak Hosting provided Machine Zone with its proprietary and trade secret network

26   topology, command codes, configurations and other confidential know-how. In further reliance

27   on Machine Zone's representations, the parties entered into two SOs to establish the connection

28   between Machine Zone's Las Vegas backup data center and Peak Hosting's Dallas data center.

4849-9592-3755.1                                - 8 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1 The network topology, command codes, configurations and other confidential know-how to

2 create an identical back-up network infrastructure were identified as confidential and Peak

3 Hosting's intellectual property, which Machine Zone was only permitted to use until the

4 Agreement expired or was terminated. Additionally, between July and October 2015, Peak

5 Hosting's trade secrets were used to configure, troubleshoot, and optimize the Las Vegas disaster

6 recovery backup network system. Peak Hosting also disclosed to Machine Zone its international

7 network topology and trade secret know-how to build a private global network capable of

8 providing network services in countries where the Internet was unavailable or have high rates of

9 interruptions.

10  27. Peak Hosting permitted Machine Zone to use its proprietary and trade secret

11 technology so long as Machine Zone continued to pay the monthly reoccurring charges of

12 approximately $██████ per month through the full term of the Agreement, and once the

13 Agreement expired or terminated, Machine Zone was required to cease any further use of this

14 intellectual property. These monthly reoccurring charges reflect the value that Peak Hosting's

15 physical infrastructure (servers, storage, and network), and trade secret technology and know-how

16 have to Peak Hosting's clients, including Machine Zone. Once the Agreement expired or was

17 terminated, Machine Zone was required to cease use of Peak Hosting's intellectual property. If

18 Machine Zone wanted to engage a different hosting provider, or perform its own network

19 operations in-house, it could do so using the many different ways to design, build, and configure a

20 network architecture without using Peak Hosting's intellectual property.

21  28. Peak Hosting's trade secrets, including its network topology, configuration, and

22 command codes, were developed over more than 15 years, and with tens of thousands of

23 engineering and architectural hours invested in the research and development of a network

24 architecture capable of supporting its clients who are some of the largest online businesses,

25 including Sony Online Entertainment, Netflix, Facebook, MySpace, Yammer, Netflix, Square,

26 Hulu, YouTube, Evernote, Jdate, eHarmony, Turn, etc., and supporting the large volumes of data,

27 including real-time communications and revenue generating in-game purchases, that is critical to

28 the stability, success, and sustainability of large scale MMOGs. Peak Hosting's trade secret

4849-9592-3755.1  - 9 -

1  technology derives substantial economic value from not being generally known, is the product of

2  Peak Hosting's reasonable efforts to keep this information confidential, and provides Peak

3  Hosting with a significant competitive advantage over other network hosting competitors.

4      29.    Machine Zone leveraged Peak Hosting's confidential and proprietary expertise and

5  knowledge because they did not have anyone on-staff with this technical knowledge, and could

6  not contract this level of architecture/detail from ████████████████████████████████

7  ████████████████████████ that was hired by Machine Zone to install and configure the

8  equipment in the Las Vegas data center using Peak Hosting's topology, configurations, and

9  command codes.

10      30.    · Contrary to Machine Zone's representations, Peak Hosting is informed and

11  believes that Machine Zone never intended to use its Las Vegas data center as a backup to Peak

12  Hosting's data center, or to return Peak Hosting's confidential information and cease use of Peak

13  Hosting's intellectual property when the Agreement expired or was terminated. Rather, Machine

14  Zone induced Peak Hosting to disclose its confidential and proprietary intellectual property so

15  that it could design and build its own data center capable of supporting the network environment

16  for Game of War and Mobile Strike, and once the data center was built and operational, fabricate

17  a false excuse to wrongfully terminate the Agreement, refuse to pay the amounts owed for the

18  remaining term of the Agreement, while continuing to improperly use Peak Hosting's confidential

19  and proprietary information and intellectual property without Peak Hosting's authorization.

20      31.    In or about September or October 2015, the Las Vegas data center became

21  operational and, contrary to its prior representations, it was used to exclusively operate and

22  support the recently released Mobile Strike. Unbeknownst to Peak Hosting, Mobile Strike was

23  owned and released by Epic War, a company that Peak Hosting had not heard of and did not have

24  any business relationship with. Despite this lack of relationship, Peak Hosting is informed and

25  believes that Machine Zone caused, allowed, and permitted Epic War to access Peak Hosting's

26  network infrastructure and retrieve and use ████████████████████████████

27  ████████████████████████ that are stored, maintained, and processed on Peak Hosting's

28  servers. This ████████████████████████████ Game of War and Mobile Strike to make

4849-9592-3755.1                  - 10 -

**COMPLAINT; JURY DEMAND**

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1  ████████████████████████████████████████████████████████

2  ██████. This access and use by Epic War was not authorized by Peak Hosting.

3    32.    On October 27, 2015, an undocumented Cisco software bug caused a network

4  outage affecting Game of War. Cisco has repeatedly confirmed in writing that the outage was

5  caused by a previously unknown bug in their firmware. A true and correct copy of Cisco's written

6  confirmation is attached hereto as Exhibit B. Although this did not constitute a breach pursuant to

7  the terms of the Agreement as it was caused by a third party, by this time, Machine Zone's new

8  "backup" data center was fully operational, directly as a result of Machine Zone and Epic War's

9  use of Peak Hosting's intellectual property, including Peak Hosting's trade secret network

10  topology, configuration, and command codes. The Las Vegas data center was already supporting

11  Mobile Strike, and within 60 days would be ready to support Game of War.

12    33.    Machine Zone no longer needed Peak Hosting's network system and data center to

13  support Game of War once it had transferred the ████████████████████████, stored

14  in Peak Hosting's data center to Machine Zone's Las Vegas data center. This transfer would take

15  approximately 60 days. Therefore, on October 28, 2015, Machine Zone notified Peak Hosting that

16  it was terminating the Agreement, effective in 60 days.

17    34.    There had previously been multiple outages caused by Machine Zone and due to

18  the inherent instability of Game of War's application architecture. Peak Hosting never promised

19  Machine Zone there would be no outages, but rather, that the network system would have failsafe

20  redundancies to minimize the impact of any outages by getting the system back up quickly, and to

21  permit Peak Hosting to perform system maintenance without any downtime, which their prior

22  network hosting provider was unable to do. The industry standard is to specify maintenance

23  windows as times when the entire provider's network can be down, so all customers are down,

24  without recourse and customers must accept this scheduled (or even unscheduled) downtime.

25  Peak Hosting's architecture allows for fail-safe redundancies so that customers can maintain

26  connectivity with their customers even during scheduled maintenance windows. It does not

27  prevent human error or vendor software bugs from causing outages bypassing the built-in fail-

28  safe redundancies. As discussed more fully below, the parties agreed to a "strike" system,

4849-9592-3755.1                          - 11 -

COMPLAINT; JURY DEMAND

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1   whereby each outage caused by Peak Hosting (and not by Machine Zone or third parties such as

2   Cisco) would constitute a "strike," and three "strikes" within each calendar quarter would

3   constitute a material breach.

4       35.     On April 23, 2015, Machine Zone caused a claimed "outage" after Machine

5   Zone's Jing Zeng directed that the game be shut down after only six servers in a single rack were

6   impacted. Peak Hosting engaged in extensive post-mortem testing to re-create and verify for

7   Machine Zone that this was not a network wide failure, but only a specific rack. Machine Zone

8   did not show to a scheduled group troubleshooting session, and Machine Zone subsequently

9   dropped the issue after this was pointed out by Peak Hosting. Only one prior network outage that

10  occurred on August 21, 2015, was attributable to Peak Hosting, and that lasted only 34 minutes.

11  Therefore, Peak Hosting's quarterly uptime percentage since April 2015 has been nearly perfect,

12  with 100% uptime in Q2, 99.97% uptime in Q3, and 100% uptime in Q4. The remaining

13  downtimes during these periods were caused by Machine Zone or the confirmed Cisco bug,

14  neither of which were Peak Hosting's responsibility.

15      36.     Machine Zone never asserted the claimed April 23 or August 21 outages

16  constituted a material breach, or that Machine Zone contended that an outage lasting 13 minutes

17  or more constituted three strikes, because Machine Zone was still in the process of obtaining and

18  using Peak Hosting's proprietary technology to get the Las Vegas data center operational, and

19  once it was ready, Machine Zone terminated the Agreement within less than 24 hours of the event

20  based on the untenable excuse that the October 27th outage constituted a "material breach"

21  pursuant to the Agreement. Unbeknownst to Peak Hosting, on information and belief, Machine

22  Zone secretly intended to wrongfully terminate the Agreement as soon as it had obtained Peak

23  Hosting's trade secrets and the Las Vegas Machine Zone data center was fully operational and

24  running Mobile Strike.

25      37.     On October 29, 2015, Machine Zone issued a formal 60-day notice of termination

26  allegedly for cause wrongfully claiming that Peak Hosting had materially breached the

27  Agreement:

28          Pursuant to Section 8B of the Master Services Agreement dated

4849-9592-3755.1                        - 12 -

**COMPLAINT; JURY DEMAND**

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1

2

3

4

March 20, 2015 and effective April 1, 2015, between Machine
Zone, Inc. ("Machine Zone") and Peak Web LLC ("Peak"),
including the Service Level Agreement and Service Orders issued
thereunder (collectively, the "Agreement"), this letter shall serve as
Machine Zone's notice of termination of the Agreement for
Material Breach. Accordingly, the Agreement shall end effective
December 27, 2015.

5    38.    Machine Zone's early termination of the Agreement is itself a material breach of

6  the Agreement and in bad faith. The network outage that occurred on October 27, 2015, did not

7  constitute a "Material Breach" or otherwise permit Machine Zone to terminate the Agreement.

8  This outage was just an excuse to wrongfully claim material breach and terminate the Agreement

9  without paying Peak Hosting the over $███████ owed through December 2015, and the

10  liquidated damages of approximately $███████ owed for the balance of the contract term for

11  any termination for convenience, as expressly provided in the Agreement. Machine Zone and

12  Epic War had already obtained Peak Hosting's confidential and proprietary intellectual property

13  and their data center in Las Vegas was fully operational to host the primary game engine and all

14  user data for Game of War and Mobile Strike. So it was time to wrongfully terminate Peak

15  Hosting.

16    39.    Machine Zone specifically agreed that it could only terminate the Agreement for

17  cause under limited circumstances. Pursuant to Section 5 of the MSA, the parties agreed that if

18  Peak Hosting did not meet one of the service level requirements set forth in Schedule A to the

19  Service Level Agreement, it would constitute a single "Strike," and that three Strikes within a

20  specified period would constitute a "Material Breach":

21

22

23

24

25

26

[A] single strike will result in a 10% discount on the cost of
Services for the month in which the Strike takes place, a second
Strike within 90 days of the first Strike will result in an additional
25% discount (35% on a cumulative basis) on the cost of Services
for the month in which the second Strike takes place, and a third
Strike within a 90 day period of the first two Strikes will result in
an additional 50% discount (85% on a cumulative basis) on the
cost of Services for the month in which the third Strike takes place
and constitute a Material Breach of the Agreement (as further set
forth in Section 8(B) of this Agreement.

*See* Section 5(B) of the MSA.

27

28    40.    Section 8(B) of the MSA provides that three Strikes in any single calendar quarter

4849-9592-3755.1                                    - 13 -

**COMPLAINT; JURY DEMAND**

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1   constitutes a "Material Breach," allowing Machine Zone to terminate the Agreement for cause so

2   long as Machine Zone gives Peak Hosting 60 days' advanced written notice of the termination

3   within 180 days of the discovery of the Material Breach:

4               In addition, this Agreement may be terminated for cause by
               Customer in the event of a "Material Breach" of this Agreement.

5               For purposes of this Agreement, "Material Breach" shall exist in
               the event Peak fails to meet a service level requirement set forth in

6               the Service Level Agreement three times (i.e., three "Strikes") in
               any calendar quarter (as defined in the Service Level

7               Agreement....Customer shall have 180 days from the date of
               discovery of the Material Breach in which to exercise its right of

8               termination of the Agreement by giving 60 days advance written
               notice to Peak.

9

10      41.    However, the three Strikes needed to constitute a Material Breach only occur

11   where the failure to meet a service level requirement is *caused by* Peak Hosting. Due to the

12   complexity of network systems and use of third-party software and hardware, the parties agreed

13   that certain service level failures that were unknown to Peak Hosting and outside of its control do

14   not constitute a Strike.

15      42.    Schedule A to the SLA, specifically provides that Peak Hosting is not responsible

16   for network outages caused by software bugs in vendor code such as what occurred on October

17   27:

18               Peak Hosting will not be responsible for outages: 1) caused by
               software bugs in vendor code, 2) where the bug was not identified

19               in any bug scrub for that code version, and 3) the manufacture
               recommends that code version as the most stable and appropriate

20               version, 4) Peak tested the code version in a lab and bench before
               putting it into production and 5) Peak performs monthly bug-scrub

21               vendor check-ins to [sic].

22      43.    Peak Hosting provided Machine Zone with an incident root cause explanation

23   evidencing that pursuant to the five points listed in Schedule A of the SLA, the October 27 outage

24   did not constitute a Strike, let alone three Strikes necessary for a Material Breach. A true and

25   correct copy of the incident root cause explanation is attached hereto as Exhibit C. Since the

26   October 27 outage was the result of a Cisco (third party) bug and did not constitute a Material

27   Breach pursuant to the terms of the Agreement, on October 29, 2015, Peak Hosting requested that

28   Machine Zone clarify the basis for its termination notice or rescind it. On October 30, 2015,

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1    Machine Zone ignored the fact that the outage was caused by a vendor bug, and therefore did not

2    constitute a Material Breach, instead stating that the single outage constituted at least three

3    Strikes, and therefore a Material Breach. According to Machine Zone's October 29 written

4    termination notice, any outage that lasts more than 13 minutes or more constitutes three Strikes

5    and a Material Breach. Machine Zone never raised this specious claim for either the April or

6    August outages, even though both were over 13 minutes. Machine Zone also stopped paying the

7    majority of fees owed and, in fact, only paid 15% of the monthly fees owed in October, and has

8    not paid, and on information and belief, will not pay any of the fees owed for October, November

9    and December 2015, which total over $███████.

10       44.    Machine Zone's position is contradicted by the terms of the Agreement. In

11   addition to the fact that the outage was caused by a vendor software bug, which does not

12   constitute a Strike, a single outage only constitutes a single Strike unless it is caused by Peak

13   Hosting's failure to meet multiple service level requirements, or service is restored and the failure

14   occurs again:

> The parties agree that each failure of a service level beyond the
> time period designated for such service level shall each constitute a
> Strike, such that it is possible for one event, or series of events, in a
> single 24 hours to result in more than one Strike where more than
> one service level is failed or service is restored but then fails again
> after the designated time interval.

See Section 5(B) of the MSA.

20       45.    In violation of the parties' Agreement that single outage constitutes a single Strike,

21   Machine Zone continued to assert that Peak Hosting had materially breached the Agreement

22   based on the patently false assertion that a single outage that lasts 13 minutes or more constitutes

23   three Strikes. Machine Zone's interpretation would make almost any network failure a material

24   breach, rendering the Agreement's detailed requirements for multiple Strikes meaningless.

25   Moreover, Machine Zone continued to ignore the fact that Cisco provided confirmation that the

26   outage was caused by a vendor bug, and pursuant to Section A of the SLA, did not constitute a

27   strike. See Exhibits B and C.

28       46.    Cisco performed its own independent investigation and confirmed in writing that

4849-9592-3755.1                        - 15 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1  the October 27 outage was caused by a previously unknown software bug in Cisco's firmware

2  code, which thereafter caused four subsequent outages on November 1st, 3rd, 4th and 22nd 2015.

3  *See* Exhibit B. Peak Hosting provided Machine Zone with the written confirmation from Cisco,

4  and Peak Hosting's incident root cause explanation, which confirm the outages were caused by

5  the previously unknown Cisco software bug and pursuant to Section A of the SLA, the outages

6  did not constitute a Strike because: 1) the Cisco bug caused the outage; 2) the Cisco bug had not

7  been previously identified in any bug scrub for that code version; 3) the software version used

8  was recommended by Cisco; 4) the software had been tested in a lab and bench before it was put

9  in production; and 5) Peak Hosting had performed the required monthly bug scrubs. *See* Exhibit

10  C.

11      47.    Despite the fact that the outages caused by the Cisco software bug did not

12  constitute a single Strike, let alone the three Strikes necessary to constitute a Material Breach,

13  Machine Zone refused and continues to refuse to rescind its termination notice. Further, Machine

14  Zone and Epic intend to continue using Peak Hosting's confidential and proprietary trade secrets

15  and other intellectual property through its continuing use of Machine Zone's Las Vegas data

16  center.

17      48.    Peak Hosting is informed and believes that Machine Zone never intended to fulfill

18  the terms of the Agreement. Rather, once Machine Zone had induced Peak Hosting to disclose its

19  proprietary and trade secret technology that would enable it to design, build, and maintain its own

20  network infrastructure and data center, it wrongfully breached the Agreement under the guise of

21  terminating for cause.

22      49.    Peak Hosting is informed and believes that this was done to deprive Peak Hosting

23  of the approximately $      owed for the remaining term of the Agreement, among other

24  things. Pursuant to Section 5(D) of the MSA, Machine Zone could terminate the Agreement

25  before the term expires on October 1, 2017, but would be obligated to pay 100% of the monthly

26  recurring charges through the term of the Agreement:

27          Customer may terminate this Agreement or any Service Order(s)
upon sixty (60) calendar days' notice; provided, however, that in
28          the event Customer terminates this Agreement or any Service

4849-9592-3755.1          - 16 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1

2

3

> Order(s) pursuant to this Section 8(D) other than for cause or
> default, then Customer shall pay an early termination fee (as
> liquidated damages and not as a penalty) to Peak in an amount
> equal to 100% of all monthly recurring charges that would
> otherwise be due but for the termination.

4   50.    The only way Machine Zone could avoid payment of the amounts owed for the

5   term of the Agreement, was if Machine Zone terminated the Agreement because of a Material

6   Breach. Since Peak Hosting did not Materially Breach the Agreement, Peak Hosting is entitled to

7   immediate payment of the $▮▮▮▮ owed for the remaining term of the Agreement (January

8   2016 to October 1, 2017), in addition to the over $▮▮▮▮ owed from October through

9   December 2015, totaling over $▮▮▮▮.

10   51.    Further, Machine Zone and Epic War must cease any further use of Peak Hosting's

11   proprietary and trade secret network topology, command codes, and configurations that it is

12   currently using in its Las Vegas data center. Pursuant to Section 10 of the MSA, Machine Zone is

13   required to discontinue use and return all of Peak Hosting's intellectual property upon termination

14   of the Agreement:

15

16

17

18

19

20

> Neither Party shall use any copyrights, patents, trade secrets
> software, trademarks, trade names, service marks, license rights or
> other intellectual property rights (collectively "Intellectual
> Property") owned, licensed or used by the other Party....Upon
> expiration or termination of this Agreement, or any affected
> Service Order, all Permitted Uses shall be discontinued, and any
> Intellectual Property, including all copies thereof, shall be returned
> to the other Party. Each Party hereby disclaims any right, title and
> interest in any Intellectual Property, owned, used or licensed by the
> other Party.

21   52.    Machine Zone's conduct as described above, including its continued use Peak

22   Hosting's proprietary and trade secret technology without payment for the right to use such

23   intellectual property, has caused Peak Hosting to sustain damages in an amount to be proven at

24   trial, but not less than $97.3 million.

25   53.    Peak Hosting has also suffered irreparable harm as a result of the aforementioned

26   conduct, and will continue to suffer irreparable injury that cannot be adequately remedied at law

27   unless Machine Zone, Epic War, and Does 1-10 (including their officers, agents, and employees),

28   and all other persons acting in concert with them, are enjoined from using Peak Hosting's

4849-9592-3755.1                           - 17 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1  confidential and proprietary trade secrets.

2  **FIRST CAUSE OF ACTION**
**Misappropriation of Trade Secrets**
3  **(Against Machine Zone, Epic War and Does 1 through 10)**

4  54.  Peak Hosting re-alleges each and every allegation in paragraphs 1 through 53,

5  inclusive, and incorporate them by reference as though fully set forth herein.

6  55.  Through its efforts and investments in research, technology, equipment and

7  employees, Peak Hosting has developed valuable trade secret information about the technology,

8  products, and services related to the design, building, and maintenance of network hosting

9  systems. Specifically, Peak Hosting's trade secrets consist of, among other things, network

10  topology, command codes, configurations, processes, strategies and methods, designs, plans,

11  techniques and requirements needed to support the large volumes of data that is critical to the

12  stability, success, and sustainability of large online businesses, including large scale MMOGs.

13  56.  Each or all of the above described trade secrets give Peak Hosting a competitive

14  edge over its existing and would-be competitors in the design, build, and maintenance of complex

15  network architecture needed to support online mobile gaming systems, and was and is today

16  commercially valuable. In fact, Machine Zone switched to Peak Hosting after its former network

17  hosting provider was unable to support the inherent instability of Game of War's application

18  architecture, and therefore Peak Hosting's managed network hosting was a substantial

19  improvement to Game of War, allowing Game of War to increase the number of users and expand

20  its revenue growth potential.

21  57.  Peak Hosting's trade secret technology and information, including its detailed

22  network topology, configurations, and command codes, derives significant independent economic

23  value from not being generally known by its customers and competitors, who would obtain

24  substantial economic value from its disclosure to, and use by, them without payment for such

25  rights. Further, Peak Hosting's trade secrets are extremely valuable because they were and are

26  difficult, costly and time-consuming to develop, and/or because this information is difficult or

27  impossible to ascertain independently given the extremely low availability for network architects

28  and the competitive nature of hiring them, thus the reason why Machine Zone was to pay Peak

4849-9592-3755.1  - 18 -

1  Hosting over $ ▮▮▮▮▮ over the course of two and half years to use this technology, the

2  physical infrastructure (servers, storage, and network), and the expertise to manage the network

3  system.

4      58.     Peak Hosting has made and continues to make reasonable efforts to preserve the

5  confidentiality of its trade secrets, including, but not limited to, requiring Machine Zone to

6  execute an NDA and enter into the Agreement prior to disclosure of Peak Hosting's proprietary

7  trade secrets. Additionally, Peak Hosting employed and continues to employ commercially and

8  industry standard reasonable efforts to preserve the confidentiality of its trade secrets by, among

9  other things, restricting access to information and requiring its employees to sign confidentiality

10  agreements and other employee confidentiality/non-solicitation agreements and reiterating in

11  company documents and through oral communications the confidential nature of, and duty to

12  maintain the confidentiality of the information at issue. Peak Hosting applies security measures to

13  preserve the confidentiality of its proprietary and technical trade secret information including, but

14  not limited to, strict compartmentalization of customer artifacts, documentation, inventories, and

15  designs. These are strictly isolated from one another, as is the physical topology, so that no one

16  customer can impact one another, and all intellectual property is isolated to the individual

17  customer.

18      59.     Peak Hosting's trade secrets described above derive independent economic value

19  from not being generally known to the public or to other persons who can obtain economic value

20  from its disclosure or use. Said information is not only proprietary and confidential but constitutes

21  "trade secrets" under California's Uniform Trade Secrets Act, California Civil Code §§ 3426 *et*

22  *seq.*

23      60.     Machine Zone and Does 1 through 10 knew or should have known they had

24  acquired such information under circumstances giving rise to a duty to maintain its secrecy or

25  limit its use such that upon termination of the Agreement, all such use of Peak Hosting's

26  intellectual property, including trade secrets, must cease. Further, Epic War and Does 1 through

27  10 knew or should have known that its possession, use, and/or disclosure of this information were

28  without authority or rights granted by Peak Hosting. Nevertheless, Peak Hosting is informed and

4849-9592-3755.1                           - 19 -

COMPLAINT; JURY DEMAND

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1      believes that Machine Zone, Epic War, and Does 1 through 10 are continuing to use Peak

2      Hosting's above-described trade secrets without the express or implied consent of Peak Hosting

3      and in a manner adverse to Peak Hosting's interests.

4          61.     Machine Zone, Epic War, and Does 1 through 10 obtained Peak Hosting's trade

5      secrets described above wrongfully from Peak Hosting under false pretenses and not from

6      generally available information or from Machine Zone's own independent research and efforts. In

7      fact, in or about June or July 2015, Machine Zone's Chau stated to Peak Hosting's Jeffrey Papen

8      and Michelle Koert that is was extremely difficult to hire network engineers or managed network

9      providers because they lacked the technological experience and know-how that Peak Hosting had,

10     and that it was precisely because of Peak Hosting's reputation and network systems' technology

11     that Machine Zone was looking for a long-term business relationship with Peak Hosting to

12     provide managed network hosting services, among other services.

13         62.     The actions of Machine Zone and Does 1 through 10 constitute misappropriation

14     of trade secrets under California Civil Code §§ 3426 *et seq.*

15         63.     Each of the acts of misappropriation was done willfully and maliciously by the

16     herein described Defendants, thereby entitling Peak Hosting to exemplary damages to be proven

17     at trial pursuant to California Civil Code § 3426.3(c).

18         64.     As a direct and proximate result of Defendants' misappropriation of Peak

19     Hosting's trade secrets, the herein described Defendants have been unjustly enriched, and Peak

20     Hosting has sustained damages in an amount to be proven at trial, but not less than $97.3 million.

21     Peak Hosting is also entitled to a disgorgement of Machine Zone and Epic War's wrongful profits

22     obtained from the infringing use of Peak Hosting's trade secrets and other wrongful conduct.

23     Peak Hosting has also suffered irreparable harm as a result of the aforementioned conduct, and

24     will continue to suffer irreparable injury that cannot be adequately remedied at law unless

25     Machine Zone, Epic War and Does 1 through 10 (including their officers, agents, and

26     employees), and all other persons acting in concert with them, are enjoined from engaging in any

27     further acts of misappropriation and/or use of Peak Hosting's trade secrets.

28         WHEREFORE, Peak Hosting prays that this Court award it the full amount of its

4849-9592-3755.1          - 20 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1   damages, together with pre-judgment interest and costs, exemplary damages and a permanent and

2   temporary injunction.

### SECOND CAUSE OF ACTION
#### Breach of Contract
#### (Against Machine Zone and Does 1 through 10)

5       65.    Peak Hosting re-alleges and incorporates by reference the allegations contained in

6   paragraphs 1 through 64, inclusive, as though fully alleged and set forth herein.

7       66.    Pursuant to the written Agreement between the parties, Peak Hosting designed,

8   built, and managed the network hosting for Machine Zone's popular mobile app, Game of War.

9   In exchange, as an consideration therefor, including use of Peak Hosting' proprietary and

10  confidential trade secret technology, Machine Zone agreed to pay Peak Hosting monthly

11  reoccurring charges of approximately $█████████ each month through the term of the

12  Agreement.

13      67.    Pursuant to Section 5(B) of the MSA, the term of the Agreement was from April 1,

14  2015 to October 1, 2017 provided that: 1) neither party had materially breached the Agreement;

15  or 2) Machine Zone had not lost 40% or more of its revenue compared to the previous four

16  quarters.

17      68.    Peak Hosting fully performed all conditions, covenants and promises required of it

18  in accordance with the terms and conditions of the Agreement between the parties, or have been

19  excused from non-performance due to the conduct and non-performance of Machine Zone.

20      69.    Machine Zone and Does 1 through 10 breached the Agreement by terminating the

21  Agreement without cause and refusing to pay the $█████████ owed for the remaining term of

22  the Agreement (January 2016 to October 1, 2017), in addition to the over $█████████ owed

23  from October through December 2015, totaling over $█████████.

24      70.    Pursuant to Section 5(D) of the MSA, Machine Zone could terminate the

25  Agreement before the term expires on October 1, 2017, but would be obligated to pay 100% of

26  the monthly recurring charges through the term of the Agreement:

27          Customer may terminate this Agreement or any Service Order(s)
        upon sixty (60) calendar days' notice; provided, however, that in
28          the event Customer terminates this Agreement or any Service

4849-9592-3755.1

- 21 -

**COMPLAINT; JURY DEMAND**

*Ropers Majeski Kohn & Bentley*
*A Professional Corporation*
*San Jose*

> Order(s) pursuant to this Section 8(D) other than for cause or default, then Customer shall pay an early termination fee (as liquated damages and not as a penalty) to Peak in an amount equal to 100% of all monthly recurring charges that would otherwise be due but for the termination.

71.    The only way Machine Zone could avoid payment of the amounts owed for the term of the Agreement, was if Machine Zone terminated the Agreement for cause or because of a default due to a Material Breach. Since Peak Hosting did not Materially Breach the Agreement, Peak Hosting is entitled to immediate payment of the $▓▓▓▓▓ owed for the remaining term of the Agreement (January 2016 to October 1, 2017), in addition to the over $▓▓▓▓▓ owed from October through December 2015.

72.    Machine Zone further breached the Agreement by continuing to use Peak Hosting's proprietary and trade secret network topology, command codes, and configurations after Machine Zone wrongfully terminated the agreement and without authorization to do so. Pursuant to Section 10 of the MSA, Machine Zone is required to discontinue use and return Peak Hosting's intellectual property upon termination of the Agreement:

> Neither Party shall use any copyrights, patents, trade secrets software, trademarks, trade names, service marks, license rights or other intellectual property rights (collectively "Intellectual Property") owned, licensed or used by the other Party....Upon expiration or termination of this Agreement, or any affected Service Order, all Permitted Uses shall be discontinued, and any Intellectual Property, including all copies thereof, shall be returned to the other Party. Each Party hereby disclaims any right, title and interest in any Intellectual Property, owned, used or licensed by the other Party.

73.    Despite Machine Zone's failure to pay the $▓▓▓▓▓ owed pursuant to the terms of the Agreement, Machine Zone continues to derive benefit from the use of Peak Hosting's proprietary and confidential information, including its trade secrets, used to design and build an optimum network infrastructure for the Game of War and Mobile Strike online environment.

74.    As a direct and proximate result of the breaches of contract by Machine Zone and Does 1 through 10, inclusive, Peak Hosting has been damaged in an amount to be proven at trial, but not less than the approximately $▓▓▓▓▓ owed but unpaid invoices for October through December 2015, and the remaining $▓▓▓▓▓ in liquidated damages owed from January 2016

4849-9592-3755.1

- 22 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1   through October 1, 2017, the remaining term of the Agreement, totaling over $▮▮▮▮▮▮.

2   WHEREFORE, Peak Hosting prays that this Court award it the full amount of its

3   damages, together with pre-judgment interest and costs.

### THIRD CAUSE OF ACTION
4
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
5   **(Against Machine Zone and Does 1 through 10)**

6   75.     Peak Hosting re-alleges and incorporates by reference the allegations contained in

7   paragraphs 1 through 74, inclusive, as though fully alleged and set forth herein.

8   76.     In California, every contract contains an implied covenant of good faith and fair

9   dealing, including the Agreement between Peak Hosting and Machine Zone.

10  77.     The covenant of good faith and fair dealing prohibits a party from doing anything

11  to prevent the other party to the contract from receiving the benefits and entitlements of the

12  contract.

13  78.     Machine Zone breached the covenant of good faith and fair dealing by misleading

14  Peak Hosting both prior to and after the Agreement was entered into, that Peak Hosting would be

15  the primary provider of Machine Zone's network operations for Game of War and Mobile Strike

16  through at least October 1, 2017, that Peak Hosting would manage all of Machine Zone's primary

17  and back-up network operations for Game of War and Mobile Strike as part of a long-term

18  business relationship, and that Peak Hosting would provide the network hosting services to

19  Machine Zone as it expanded into markets beyond online gaming.

20  79.     Machine Zone breached the covenant of good faith and fair dealing by inducing

21  Peak Hosting to provide services outside the scope of the Agreement, and without compensation,

22  while wrongfully using and deriving the benefits of those services based on the false promise that

23  Peak Hosting would be a long-term partner for managed hosting services. Machine Zone

24  repeatedly represented that it wanted to continue to enhance its partnership with Peak Hosting

25  beyond the original term of the Agreement.

26  80.     Machine Zone breached the covenant of good faith and fair dealing by relying on

27  false excuses and interpretation of the parties' Agreement that is contrary to the parties' intent to

28  wrongfully claim Peak Hosting materially breached the Agreement, when Machine Zone knows

4849-9592-3755.1                        - 23 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1     that its excuse for terminating the Agreement is not true to deprive Peak Hosting of the current

2     and future benefits of the Agreement.

3          81.     Machine Zone breached the covenant of good faith and fair dealing by fabricating

4     alleged breaches of the Agreement and failing to pay monthly invoices owed to Peak Hosting in

5     order to divert said funds to its alternate hosting platform.

6          82.     Machine Zone breached the covenant of good faith and fair dealing by inducing

7     Peak Hosting to invest time, money and resources into what was to be a long-term, expanding

8     business relationship when, in fact, it intended to terminate the Agreement early and cut Peak

9     Hosting out of the equation.

10         83.     Peak Hosting has performed all conditions, promises and covenants required of it

11     under the written Agreement between the parties, or has been excused from non-performance due

12     to the conduct and non-performance of Peak Hosting.

13         84.     As a direct and proximate result of the breaches of the implied covenant good faith

14     and fair dealing by Machine Zone and Does 1 through 10, inclusive, Peak Hosting has been

15     damaged in an amount to be proven at trial, but not less than $97.3 million.

16         WHEREFORE, Peak Hosting prays that this Court award it the full amount of its

17     damages, together with pre-judgment interest and costs.

18

**FOURTH CAUSE OF ACTION**
**Negligent Misrepresentation**
**(Against Machine Zone and Does 1 through 10)**

19

20         85.     Peak Hosting re-alleges and incorporates by reference the allegations contained in

21     paragraphs 1 through 53 and 65 through 84, inclusive, as though fully alleged and set forth herein.

22         86.     In or about March 2015, and prior to entering into the Agreement, Machine Zone's

23     Shawn Foust, head of business development at Machine Zone, and Tory Valenzuela, general

24     counsel, represented to Peak Hosting's Jeffrey Papen (CEO), John Biggi (COO), and Don Lavoie

25     (Management Advisor and Consultant), that Peak Hosting would be the primary provider of

26     Machine Zone's network operations through September 2017. Machine Zone further represented

27     that it would not perform its own network operations because they did not have the expertise,

28     capacity, intellectual property or technical capabilities to design, build and manage a network

4849-9592-3755.1                - 24 -

COMPLAINT; JURY DEMAND

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1    system capable of supporting the Game of War network. Machine Zone represented that Peak

2    Hosting would manage all of Machine Zone's primary and back-up network operations as part of

3    a long-term business relationship, including to provide the managed network operations for

4    Mobile Strike, which was to be released in several months.

5         87.    In or about May 2015, Machine Zone's Chau, as well as others under Chau's

6    direction at Machine Zone, including Does 1 through 10, represented to Peak Hosting's Michelle

7    Koert, the account representative for Machine Zone, that it was planning to build a separate

8    disaster recovery data center in Las Vegas that would serve as a backup to Peak Hosting's data

9    center located in Dallas, and wanted Peak Hosting's help. Machine Zone assured Peak Hosting

10   that Machine Zone would not perform its own network operations and that Peak Hosting would

11   continue to provide managed network hosting and be the primary data center through at least

12   September 2017, the term of the Agreement.

13        88.    Machine Zone represented that it wanted to continue to enhance its partnership

14   with Peak Hosting beyond the original term of the Agreement, and that the Las Vegas backup

15   data center would be an active backup system providing an additional layer of failsafe

16   redundancy capable of supporting Game of War in the event of a catastrophic network outage at

17   Peak Hosting's data center for the benefit of both parties.

18        89.    Machine Zone represented it intended to expand its products and launch into new

19   markets outside of gaming, and that Peak Hosting would provide the network hosting services for

20   these new markets. Machine Zone further represented that in order to design and build the DR

21   backup data center it needed copies of Peak Hosting's network topology, configurations, and

22   command codes so that the Las Vegas backup network system would mirror Peak Hosting's

23   network system but only for use as a "back up" and only to further the parties' long-term business

24   relationship.

25        90.    The representations made by Machine Zone and Does 1 through 10 were in fact

26   false, and at the time the representations alleged herein were made, Defendants had no reasonable

27   ground for believing them to be true.

28        91.    Unbeknownst to Peak Hosting, Peak Hosting is informed and believes that while

4849-9592-3755.1                              - 25 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1   Machine Zone was negotiating the MSA with Peak Hosting and contrary to its representations,

2   Machine Zone was already engaging other vendors and working on hiring personnel to build and

3   maintain its own data center and network architecture to support Game of War and Mobile Strike.

4   At the time the representations were made by Defendants, Peak Hosting was ignorant of the

5   falsity of the representations and believed them to be true, and in fact Peak Hosting is informed

6   and believes that Machine Zone made the aforesaid representations with intent to induce and did

7   induce Peak Hosting to enter into the Agreement and so it could learn, copy, and use Peak

8   Hosting's confidential and proprietary business information.

9         92.    Peak Hosting is informed and believes that prior to entering into the Agreement,

10   Machine Zone had plans to perform its own network operations by building its own data center,

11   and once built, would be able to provide its own network hosting for Game of War, and

12   wrongfully terminate the Agreement with Peak Hosting based on a false excuse that Peak Hosting

13   materially breached the Agreement.

14         93.    Peak Hosting relied on Machine Zone's representations, and on or about July 20

15   and 22, 2015, without knowledge of their falsity, Peak Hosting provided Machine Zone with its

16   business information, including its proprietary and trade secret network topology, command

17   codes, configurations and other confidential know-how. Additionally, between July and October

18   2015, Peak Hosting's business information, including, but not limited to, its trade secrets, were

19   used to configure, troubleshoot, and optimize the Las Vegas backup network to support the Game

20   of War network environment.

21         94.    Had Peak Hosting known the true facts, it would not have taken such action or

22   entered into the Agreement.

23         95.    As a direct and proximate result of Machine Zone and Does 1 through 10's false

24   and misleading representations, Peak Hosting has been damaged in an amount to be proven at

25   trial, but not less than $97.3 million.

26         WHEREFORE, Peak Hosting prays that this Court award it the full amount of its

27   damages, together with pre-judgment interest and costs.

28

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

4849-9592-3755.1

- 26 -

1

2

## FIFTH CAUSE OF ACTION
### Fraudulent Inducement
### (Against Machine Zone)

3      96.    Peak Hosting re-alleges and incorporates by reference the allegations contained in

4  paragraphs 1 through 95, inclusive, as though fully alleged and set forth herein.

5      97.    In or about March 2015 and prior to entering into the Agreement, Machine Zone's

6  Shawn Foust, head of business development at Machine Zone, and Tory Valenzuela, general

7  counsel, represented to Peak Hosting's Jeffrey Papen (CEO), John Biggi (COO), and Don Lavoie

8  (Management Advisor and Consultant), that Peak Hosting would be the primary provider of

9  Machine Zone's network operations through September 2017. Machine Zone further represented

10  that it would not perform its own network operations because they did not have the expertise,

11  capacity, intellectual property or technical capabilities to design, build and manage a network

12  system capable of supporting the Game of War network. Machine Zone represented that Peak

13  Hosting would manage all of Machine Zone's primary and back-up network operations as part of

14  a long-term business relationship, including to provide the managed network operations for

15  Mobile Strike, which was to be released in several months.

16      98.    In or about May 2015, Machine Zone's Chau, as well as others under Chau's

17  direction at Machine Zone, including Does 1 through 10, represented to Peak Hosting's Michelle

18  Koert, the account representative for Machine Zone, that it was planning to build a separate

19  disaster recovery data center in Las Vegas that would serve only as an alleged backup to Peak

20  Hosting's data center located in Dallas, and wanted Peak Hosting's help. Machine Zone assured

21  Peak Hosting that Machine Zone would not perform its own network operations and that Peak

22  Hosting would continue to provide managed network hosting and be the primary data center until

23  at least October 1, 2017, the term of the Agreement.

24      99.    Machine Zone represented that it wanted to continue to enhance its partnership

25  with Peak Hosting beyond the original term of the Agreement, and that the Las Vegas backup

26  data center would be an active backup system providing an additional layer of failsafe

27  redundancy capable of supporting Game of War in the event of a catastrophic network outage at

28  Peak Hosting's data center.

4849-9592-3755.1

- 27 -

Case 16-03083-pcm   Doc 1   Filed 07/22/16

*Ropers Majeski Kohn & Bentley*
*A Professional Corporation*
*San Jose*

1    100.    Machine Zone represented it intended to expand its products and launch into new

2    markets outside of gaming, and that Peak Hosting would provide the network hosting services for

3    these new markets provided that Peak Hosting agree to assist Machine Zone with this Las Vegas

4    site. Machine Zone further represented that in order to design and build the DR backup data

5    center it needed copies of Peak Hosting's network topology, configurations, and command codes

6    so that the Las Vegas backup network system would mirror Peak Hosting's network system.

7    101.    The representations made by Machine Zone and Does 1 through 10 were in fact

8    false, and at the time the representations alleged herein were made, Defendants knew they were

9    not true, but made the representations with the intent that Peak Hosting rely on these

10   representations to Peak Hosting's detriment and provide its business information, as well as put

11   tremendous resources and efforts into the Machine Zone Agreement.

12   102.    Unbeknownst to Peak Hosting, Peak Hosting is informed and believes that while

13   Machine Zone was negotiating the MSA with Peak Hosting and contrary to its representations,

14   Machine Zone was already engaging vendors and working on hiring personnel to build and

15   maintain its own data center and network architecture to support Game of War and Mobile Strike.

16   At the time the representations were made by Defendants, Peak Hosting was ignorant of the

17   falsity of the representations and believed them to be true, and in fact Peak Hosting is informed

18   and believes that Machine Zone made the aforesaid representations with intent to induce and did

19   induce Peak Hosting to enter into the Agreement and so it could learn, copy, and use Peak

20   Hosting's business information, strategies and other materials to operate its own in-house network

21   operations saving ▬▬▬▬▬▬▬ of recurring overhead through wrongfully terminating Peak

22   Hosting.

23   103.    Peak Hosting is informed and believes that prior to entering into the Agreement,

24   Machine Zone had plans to perform its own network operations by building its own data center,

25   and once built, would be able to provide its own network hosting for Game of War, and

26   wrongfully terminate the Agreement with Peak Hosting based on a false excuse that Peak Hosting

27   materially breached the Agreement.

28   104.    Peak Hosting relied on Machine Zone's representations, and provided Machine

4849-9592-3755.1                          - 28 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1    Zone with critical services outside the scope of the Agreement, which Machine Zone did not

2    compensate Peak Hosting for, and were used to set up its own in-house network operations and

3    thereafter wrongfully terminate the Agreement.

4        105.    Had Peak Hosting known the true facts, it would not have entered into the

5    Agreement with Machine Zone.

6        106.    As a direct and proximate result of Machine Zone and Does 1 through 10's

7    fraudulent inducements and intentional misrepresentations, Peak Hosting has been damaged in an

8    amount to be proven at trial, but not less than $97.3 million.

9        107.    As alleged herein, Machine Zone is guilty of oppression, fraud, and/or malice as

10   defined in Civil Code section 3294, and Peak Hosting should recover, in addition to actual

11   damages, exemplary and punitive damages.

12       WHEREFORE, Peak Hosting prays that this Court award it the full amount of its

13   damages, together with pre-judgment interest, costs and punitive damages.

14                              **SIXTH CAUSE OF ACTION**
         **Unfair Competition, California Business & Professions Code §§ 17200 et seq.**
15                   **(Against Machine Zone, Epic War and Does 1 through 10)**

16       108.    Peak Hosting re-alleges and incorporates by reference the allegations contained in

17   paragraphs 1 through 53 and 65 through 107, inclusive, as though fully alleged and set forth

18   herein.

19       109.    Defendants have engaged in unfair, unlawful, and fraudulent business practices in

20   violation of California Business & Professions Code §§ 17200 et seq. by, among other things: 1)

21   fraudulently inducing Peak Hosting to enter into the Agreement and disclose its business,

22   confidential and proprietary technology to Machine Zone; 2) using knowingly false and

23   fabricated excuses to wrongfully terminate the Agreement and deprive Peak Hosting of the

24   amounts owed thereunder; 3) misrepresenting that the parties were engaged in a long-term

25   business partnership, and that Machine Zone wanted to the extend the terms of the Agreement so

26   long as Peak Hosting provided Machine Zone with critical services outside the scope of the

27   Agreement, which Machine Zone did not compensate Peak Hosting for, and were used to set up

28   its own in-house network operations; and 4) employing unfair and deceitful business tactics in

4849-9592-3755.1                        - 29 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1    order to gain an unfair competitive advantage in the marketplace and bypassing Peak Hosting to

2    avoid fees.

3        110.   Such conduct, and the conduct described in Paragraphs 1 through 53, unfairly

4    competes against Plaintiff and caused and will continue to cause third party competitors of Peak

5    Hosting to wrongfully divulge, use and transfer Peak Hosting's competitive information to

6    unfairly compete against Peak Hosting and/or erode the goodwill and business reputation built by

7    Peak Hosting.

8        111.   Defendants knew that the conduct described above was improper and that they

9    were unlawfully, unfairly, and fraudulently competing with Peak Hosting when they sought to

10   and did perform the acts described above.

11       112.   As a direct and proximate result of the unfair conduct by Defendants, Peak

12   Hosting is entitled to recover restitution from Defendants to restore to Peak Hosting money,

13   profits, and advantages obtained as a result of their wrongful acts as hereinabove alleged.

### SEVENTH CAUSE OF ACTION
#### Promissory Estoppel
#### (Against Machine Zone)

16       113.   Peak Hosting re-alleges and incorporates by reference the allegations contained in

17   paragraphs 1 through 52, inclusive, as though fully alleged and set forth herein.

18       114.   Machine Zone and Does 1 through 10 made clear and unambiguous

19   representations to Peak Hosting that Peak Hosting would be Machine Zone's primary provider of

20   Machine Zone's network operations for Game of War and Mobile Strike through at least

21   October 1, 2017, that Peak Hosting would manage all of Machine Zone's primary and back-up

22   network operations for Game of War and Mobile Strike as part of a long-term business

23   relationship beyond the initial term of the Agreement, and that Peak Hosting would provide the

24   network hosting services to Machine Zone as it expanded into markets beyond online gaming.

25       115.   These representations constitute clear and unambiguous promises between Peak

26   Hosting and Machine Zone.

27       116.   Peak Hosting detrimentally relied on these clear and unambiguous promises.

28       117.   Peak Hosting's reliance was reasonable and foreseeable particularly in light of the

4849-9592-3755.1                - 30 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1  expense, time and effort Peak Hosting put forth into the relationship and the assistance and

2  information provided to Machine Zone in contemplation of said future relationship.

3     118.  Peak Hosting suffered serious injury as result of his reasonable and foreseeable

4  reliance, including the fact that it did not pursue other business opportunities and expended time,

5  resources and funds to comply with the parties' agreement.

6     119.  As a direct and proximate result of Peak Hosting's reliance, Peak Hosting has been

7  damaged in an amount to be proven at trial, but not less than $97.3 million.

8     WHEREFORE, Peak Hosting prays that this Court award it the full amount of its

9  damages, together with pre-judgment interest and costs.

10  **EIGHTH CAUSE OF ACTION**
**Conversion**
**(Against Machine Zone, Epic War and Does 1 through 10)**

12     120.  Peak Hosting re-alleges and incorporates by reference the allegations contained in

13  paragraphs 1 through 52, inclusive, as though fully alleged and set forth herein.

14     121.  Peak Hosting has a right to possess its confidential and proprietary documents

15  including schematics and other business information that Machine Zone induced Peak Hosting to

16  provide to Machine Zone, who then shared them with third parties, including Does 1 through 10

17  and Epic War, for Machine Zone's benefit, and Peak Hosting has the right to the exclusive use of

18  said documents to secure an advantage over its existing and prospective competitors in the design,

19  development, production, service, marketing, and sale of its products and services.

20     122.  On information and belief, based on conduct wholly independent of the existence,

21  knowledge, misappropriation, and use of Peak Hosting's trade secrets, Machine Zone, Epic War,

22  and Does 1 through 10, willfully received and retained Peak Hosting's converted documents

23  without permission or authorization, and used such documents for the economic advantage of

24  Machine Zone, Epic War and Does 1 through 10, and to unfairly compete with Peak Hosting.

25  Machine Zone, Epic War and Does 1 through 10's attempt to exercise dominion over the Peak

26  Hosting's converted documents through the unauthorized receipt, retention, and use of the same is

27  incompatible with Peak Hosting's and has substantially interfered with and/or deprived Peak

28  Hosting of its ability to exercise exclusive control over the use of said Peak Hosting converted

4849-9592-3755.1   - 31 -

COMPLAINT; JURY DEMAND

1  documents.

2      123.   Machine Zone also converted the amounts due and owing under the Agreement.

3  Machine Zone stopped paying the majority of fees owed and, in fact, only paid 15% of the

4  monthly fees owed in October, and has not paid, and on information and belief will not pay, any

5  of the remaining $         owed for October through December, which it has converted for

6  its own use and intends to convert the remaining balance of the approximately $

7  owed to Peak Hosting up to October 1, 2017, as a result of terminating the Agreement early and

8  without cause.

9      124.   As a direct and proximate result of Defendants' receipt, retention, and use of Peak

10  Hosting's converted documents and amounts owed under the Agreement, Peak Hosting has been

11  damaged in an amount to be proven at trial, but not less than $97.3 million.

12      125.   On information and belief, each of the acts of receipt, retention, and use was done

13  willfully and maliciously by Defendants, thereby entitling Peak Hosting to exemplary damages to

14  be proven at trial in addition to the actual damages suffered by Peak Hosting.

15      WHEREFORE, Peak Hosting prays that this Court award it the full amount of its

16  damages, together with pre-judgment interest and costs.

17                    **NINTH CAUSE OF ACTION**
                         **Declaratory Relief**
18      **(Against Machine Zone, Epic War and Does 1 through 10)**

19      126.   Peak Hosting re-alleges and incorporates by reference the allegations contained in

20  paragraphs 1 through 125, inclusive, as though fully alleged and set forth herein.

21      127.   An actual controversy has arisen and now exists between Peak Hosting on the one

22  hand, and Machine Zone, Epic War and Does 1 through 10 on the other, concerning each party's

23  respective continuing rights, obligations and duties with regard to the respective written

24  Agreement between the parties. Specifically, an actually controversy exists as to:

25      •      Whether Machine Zone wrongfully terminated the Agreement by claiming the

26  October 27 outage constituted three Strikes and a Material Breach;

27      •      Whether Machine Zone terminated the agreement early for convenience, and not

28  for cause, entitling Peak Hosting to the approximately $         owed for the remainder of

4849-9592-3755.1                        - 32 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1    the term of the Agreement;

2         •    Whether Machine Zone, Epic War, and Does 1 through 10 must cease all use of

3    Peak Hosting's proprietary, confidential intellectual property and trade secrets upon expiration or

4    termination of the Agreement;

5         128.    Peak Hosting requests a declaration concerning each party's respective rights,

6    obligations, and duties with regard to the above-described controversies.

7         129.    Substantial detriment and irreparable damage has been and will continue to be

8    sustained by Plaintiff if it is not permitted to resolve these issues on an expedited basis to

9    determine the scope and extent of the conduct and activities of Defendants related to the use of

10   Plaintiff's proprietary and/or trade secret information and/or non-trade secret information, and

11   continued use of this information to support Machine Zone and Epic War's network system and

12   for the purpose and intent to thwart, stall, or otherwise competitively injure Peak Hosting using

13   unfair business practices as set forth above. Therefore, it is imperative that a judicial declaration

14   resolve the actual controversy between the parties before further irreparable harm occurs to

15   Plaintiff.

16                                    **PRAYER**

17        WHEREFORE, Plaintiff Peak Hosting prays for judgment against Defendants Machine

18   Zone, Epic War, and Does 1 through 10, and each of them, as follows:

19        1.    For general, special and consequential damages in amounts proved at trial, but not

20   less than $97.3 million.

21        2.    For disgorgement of Machine Zone and Epic War's wrongful profits obtained

22   from the infringing use of Peak Hosting's trade secrets and other wrongful conduct.

23        3.    For a temporary and permanent injunction enjoining Machine Zone, Epic War, and

24   Does 1 through 10, to cease use of Peak Hosting's confidential information and intellectual

25   property after December 27, 2015.

26        4.    For a declaration that Machine Zone wrongfully terminated the Agreement, the

27   termination is not for cause and therefore Peak Hosting is entitled to the amounts owed pursuant

28   to the terms of the Agreement and applicable law; and that Machine Zone, Epic War, and Does 1

4849-9592-3755.1                          - 33 -

**COMPLAINT; JURY DEMAND**

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1  through 10 must cease all use of Peak Hosting's proprietary, confidential intellectual property and

2  trade secrets upon expiration or termination of the Agreement;

3      5.    For punitive damages in an amount to be determined at trial;

4      6.    For attorneys' fees and costs of suit incurred herein;

5      7.    For prejudgment and post-judgment interest; and

6      8.    For such other and further relief as this Court may deem just and proper.

7  Dated: December 3, 2015          ROPERS, MAJESKI, KOHN & BENTLEY

8

9      By:

10      MICHAEL J. IOANNOU
11      DANIEL P. MCKINNON
    Attorneys for Plaintiff
    PEAK WEB LLC

12

13

### DEMAND FOR JURY TRIAL

14

15  Plaintiff is Peak Hosting hereby demands a trial by jury.

16  Dated: December 3, 2015          ROPERS, MAJESKI, KOHN & BENTLEY

17

18      By:

19      MICHAEL J. IOANNOU
    DANIEL P. MCKINNON
    Attorneys for Plaintiff
20      PEAK WEB LLC

21

22

23

24

25

26

27

28

4849-9592-3755.1        - 34 -

COMPLAINT; JURY DEMAND

# Exhibit  A



# MASTER SERVICES AGREEMENT

THIS MASTER SERVICES AGREEMENT, including all exhibits ("Agreement") is made this 20th day of March, 2015, to be effective as of April 1, 2015 (the "Commencement Date") between **Machine Zone, Inc.,** with offices located at 2225 E. Bayshore Road, Suite 200, Palo Alto, CA 94303 ("Customer") and **Peak Web LLC,** a California Limited Liability Company doing business as Peak Web Hosting (hereinafter known as "Peak") on behalf of itself and its affiliates, with offices located at 8400 N. Maple Place, Suite 108, Rancho Cucamonga, CA 91730. Customer and Peak are each individually a "Party" herein, and collectively, the "Parties" herein.

### RECITALS

WHEREAS, Customer and Peak wish to enter into this Agreement to set forth the general terms and conditions under which Peak will provide Customer with services and Customer will purchase services from Peak.

In consideration of the mutual covenants and agreements contained herein the Parties agree as follows:

## 1. DEFINITIONS

A. "Service(s)" shall mean the services and products particularly described in each Service Order.

B. "Service Order(s)" shall mean orders for specific Services on Peak's standard Service Order forms, including attachments thereto. Each Service Order shall be issued and accepted by the Parties in accordance with the provisions of this Agreement. Each Service Order will be subject to the standards set forth in the Service Level Agreement (defined below) and will contain specific provisions with respect to prices, features, locations, descriptions of service, duration and other terms as appropriate.

C. "Service Level Agreement" shall mean response and uptime requirements, escalation procedures and penalties which govern Products and Service-specific operating and performance requirements of each Party, issued and accepted by the Parties and set forth in greater detail in Exhibit A.

## 2. SCOPE AND STRUCTURE/ORDER OF PRECEDENCE

A. Unless otherwise agreed by the Parties, each Service Order issued and accepted, and all Services provided hereunder, shall be subject to all of the terms of this Agreement and the Service Level Agreement.

B. In the event of conflict or inconsistency between the general provisions of this Agreement and those of an individual Service Order, or the Service-specific portions of the Service Level Agreement, the conflict or inconsistency shall be resolved in the following order of precedence: first, in favor of the Service Order, next in favor of the Service Level Agreement, and last, in favor of the provisions in this Agreement. Any conflict or inconsistency between the provisions of any applicable Service Level Agreement and those of any Service Order shall be resolved in favor of the provisions of the Service Order.

C. As further inducement for Customer to issue future Service Orders and enter into this Agreement and the Service Level Agreement, and in recognition of Customer's current business, Peak agrees to fully address each of the issues set forth in the "Audit Remediation Plan" attached hereto as Exhibit B, by completing each of the action items set forth therein in the manner and on the timeline described therein.

3.    **TERM and RENEWAL**

A.    Subject to Section 8 of this Agreement, this Agreement shall begin on the Commencement Date and shall continue until the expiration of the last Service Order issued and accepted hereunder. Provided, however, that if Customer is not then in default, and if, at the time of expiration or termination of the existing Service Order Term, the Parties are in active discussions for additional Services under one or more Service Orders, the term of this Agreement shall extend for an additional period as may be reasonably necessary for the Parties to conclude their discussions and execute implementing Service Order(s).

B.    The term of this Agreement, including any open Service Orders as of the Commencement Date, shall be from the Commencement Date until April 1, 2016 (the "Term"). Thereafter, the Term shall renew automatically for one additional 12-month term which will extend the Agreement until April 1, 2017 with final six month auto-renewal term thereafter which will extend the Agreement to October 1, 2017; provided that at the time of each auto-renewal, (1) neither Party is in breach of this Agreement (other than for failure by Customer to pay any undisputed amounts due under any Service Order which are, covered under Section 4(F) below) or the Service Level Agreement, and (2) Customer has not or is not experiencing a "material downturn," which for purposes of this Agreement, shall be defined as a 40% decline in Customer's revenue as compared to the trailing four quarters on an annualized basis. In the event of a "material downturn" of Customer's business, the Parties agree to negotiate in good faith a decrease in price(s) that is consistent with the level of decline in Customer's business. All Service Orders issued pursuant to this Agreement after the Commencement Date shall be co-termed with the Agreement; provided, however, that Customer may terminate any Service Order 36 months after its date of issuance by providing 30 days written notice to Peak Hosting.

4.    **PAYMENT; PRICING**

A.    **Monthly Recurring Charges.** Installation and all other non-recurring charges, and monthly recurring charges for the Services will be at the rates set forth by Service type, as agreed by the Parties under the specific Service Order. Except for usage-based Services, which are billed in arrears, the Services are billed one (1) month in advance and the first billing cycle may include a partial month Service and a full month Service charge, if the Service is installed and activated during a partial month of Service. All fees and charges are payable for the duration of the Term, regardless of whether Customer actually uses the Services or occupies space in Peak facilities, unless the Service Order is earlier terminated (other than for Customer's breach, under Section 8(A)), as provided herein.

B.    **Taxes and Other Fees.** Unless otherwise noted, prices established in this Agreement and the applicable Service Order are exclusive of taxes and other fees (including FCC fees like universal service fees, TRS, etc.) which may be imposed on Peak or Customer for the provision or use of the Services. Customer will pay such taxes and other fees, except for Peak's U.S. federal and state income tax. Tax exempt status will be granted to Customer upon presentation of a certificate of exemption reasonably satisfactory to Peak.

C.    **Non-Recurring Charges.** One hundred percent (100%) of non-recurring charges will be due from Customer upon signing of the applicable Service Order. Any non-recurring charges incurred by Peak on behalf of Customer in excess of the amount defined in the applicable Service Order will be included in the first invoice to Customer for monthly services.

D.    **Invoicing and Payment.** Billing will commence for each Service on the date set forth as the Billing Commencement Date on the Service Order or, if there is no Billing Commencement Date, then when the Customer is notified of order completion. Customer will pay all amounts owed under each Service Order within thirty (30) calendar days after the invoice date (the "Due Date"). Peak reserves the right to charge interest on undisputed delinquent amounts at the lower of one and one-half percent (1.5%) per month or such maximum rate or rates of interest per month as may be permitted under applicable law.

E.    **Disputed Payments.** In the event Customer in good faith disputes any charges invoiced by Peak, Customer shall promptly pay all undisputed charges when due, and shall notify Peak in writing of any such disputed amounts on or before the Due Date, identifying in reasonable detail its reasons for the dispute and the nature and amount of the dispute. All amounts not timely and appropriately disputed, other than for non-recurring charges for Services that have not been performed by the Due Date, shall be deemed final and not subject to further dispute; provided Customer does not become aware of facts within ninety (90) days after the Due

Date, that, if known prior to the Due Date, would have reasonably given rise to a dispute of the amounts owed. Peak will review the amounts in dispute within ten (10) business days after its receipt of a notice of dispute. If Peak, acting reasonably and in good faith, determines that Customer was billed in error, a credit for the amount billed incorrectly will be made to the next invoice, if Peak determines that the amount was billed correctly, the Parties will submit the dispute to a mutually agreed-upon form of dispute resolution.

F.  **Suspension or Termination of the Services.**  If payment in full for Services performed under any Service Order (other than for payments validly disputed by Customer in good faith) is not received by Peak on or before the Due Date and provided Peak is not then presently in breach of this Agreement or any Service Order, Peak shall have the right, upon giving Customer twenty (20) calendar days advance written notice, to suspend Services until such time as Customer has paid such charges in full, including any interest charged on undisputed delinquent amounts as provided above. Immediately upon expiration of the notice period, Peak shall have the right to suspend the Services and both physical and network Customer management access to all datacenter facilities and equipment. Following such payment, Peak shall immediately reinstate the Services, and/or access to datacenter facilities and equipment. Failure by Customer to pay for such Services within ten (10) calendar days after any such suspension of the Services shall be deemed to constitute a termination of the Services. No cancellation or termination under this provision shall relieve Customer from its obligations to pay for Services under any Service Order not so canceled or terminated. Amounts owed may be recouped through a collections process.

G.  **Server Pricing.**  Peak agrees that Customer shall receive a 5% discount on the purchase price on the 2500th through the 4500th servers procured by Peak on behalf of Customer, a 7.5% discount on the purchase price of the next 2500 servers procured by Peak on behalf of Customer and a 10% discount on any and all servers procured by Peak for Customer thereafter.

## 5.  SERVICE LEVEL COMMITMENTS

A.  Peak warrants and represents to Customer that the Services shall comply with the service level requirements for each Service as more specifically described in the Service Level Agreement attached hereto as Exhibit A.

B.  Peak agrees that a single failure to meet any service level requirement set forth in the Service Level Agreement attached to this Agreement as Exhibit A shall constitute a "Strike." Peak further agrees that a single Strike will result in a 10% discount on the cost of Services for the month in which the Strike takes place, a second Strike within 90 days of the first Strike will result in an additional 25% discount (35% on a cumulative basis) on the cost of Services for the month in which the second Strike takes place, and a third Strike within a 90 day period of the first two Strikes will result in an additional 50% discount (85% on a cumulative basis) on the cost of Services for the month in which the third Strike takes place and constitute a Material Breach of the Agreement (as further set forth in Section 8(B) of this Agreement). In each case the discount shall be applied to the gross cost of Services (i.e., before applying any credits). The Parties agree that each failure of a service level beyond the time period designated for each service level shall each constitute a Strike, such that it is possible for one event, or series of events, in a single 24 hours to result in more than one Strike where more than one service level is failed or service is restored but then fails again after the designated time interval.

## 6.  INTERNET USAGE.  To the extent the Services are used in connection with Customer's use of the Internet, Customer warrants and represents to Peak (i) Customer shall not intentionally transmit, retransmit or store material in violation of any applicable federal or state laws or regulations and (ii) that Customer will at no time use any Service to distribute unsolicited commercial e-mail (commonly known as "spam") in violation of any applicable federal or state laws or regulations, including the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003.

## 7.  INDEMNIFICATION AND WAIVER

A.  Each Party shall indemnify, defend and hold the other Party harmless from and against any and all liability, damage and expense (including consequential damages and reasonable attorneys' fees) arising out of any demand, claim, suit or judgment for damages related to (i) a breach by the indemnifying party of its representations, warranties or obligations under this Agreement; (ii) any unlawful act or violation of any applicable local, state, national, or international law, rule, or regulation by the indemnifying party, or (iii) any bodily injury, death or

Page 3

Peak Hosting Confidential

damage to real or tangible personal property arising from the gross negligence or willful misconduct of the Party providing indemnification. Each Party's indemnification obligations are conditioned on the Party seeking indemnity (the *"Indemnified Party"*) providing the other Party (the *"Indemnifying Party"*) with (i) prompt written notice of any claim after the Indemnified Party's actual notice of said claim, (ii) sole control over defense and settlement of the claim unless: (a) the Indemnifying Party is also a person against whom the third-party claim is made and the Indemnified Party determines in good faith that joint representation would be inappropriate; or (b) the Indemnifying Party fails to provide reasonable assurance to the Indemnified Party of its financial capacity to defend such third-party claim and provide indemnification with respect to such third-party claim, and (iii) reasonable assistance with defense and settlement. Notwithstanding the foregoing, (y) failure to notify the Indemnifying Party will not relieve the Indemnifying Party of any liability that it may have to the Indemnified Party, except to the extent that the Indemnifying Party demonstrates that the defense of such third-party claim is prejudiced by the Indemnified Party's failure to give such notice, and (z) if the Indemnifying Party assumes the defense of a third- party claim, no compromise or settlement of such third-party claims may be effected by the Indemnifying Party without the Indemnified Party's written consent, which shall not be unreasonably withheld, unless: (1) there is no finding or admission of any violation of any law or regulations or any violation of the rights of any person, on the part of the Indemnified Party; (2) the sole relief provided is monetary damages that are paid in full by the Indemnifying Party; and (3) the Indemnified Party shall have no liability with respect to any compromise or settlement of such third-party claims effected without its written consent.

B. Except to the extent attributable to the gross negligence or willful misconduct of Peak, and provided Peak is not in breach of the on-site security obligations set forth in Section 1 and Section 17(b) of the Service Level Agreement, Customer agrees that Peak will not have any responsibility or liability for damage to Customer's equipment or interruption of Customer's operations that is caused by any other Peak customer, any other tenant or occupant of the datacenter, the building, the property or the employees, agents, contractors, technicians, representatives, customers, co-locators or invitees of any such tenant or occupant.

8. **TERMINATION.** Either Party in accordance with the following may terminate this Agreement, the Service Level Agreement and any Service Order (s):

A. Default. If either Party is in breach of this Agreement or any Service Order, (other than for failure by Customer to pay any undisputed amounts due under any Service Order which are covered under Section 4(F) above or a breach of the Service Level Agreement which is covered therein), the non-breaching Party shall give the breaching Party notice in writing of such breach. Within ten (10) business days after delivery of a notice pursuant to this Section 8(A), the breaching Party shall (a) cause a root cause summary to be prepared with regard to the alleged breach; (b) provide a copy of such summary to the non-breaching Party; and (c) subject to the non-breaching Party's availability, conduct a face-to-face meeting at the premises (or at the non-breaching Party's request, by conference call) to discuss the root cause and the measures that have been (and/or will be) taken to remedy the issue and/or otherwise protect against recurrences (the "Remediation Meeting"). If the breach has not been cured to the non-breaching Party's reasonable satisfaction within the time framed agreed to by the Parties after the Remediation Meeting, then the non-breaching Party may terminate such portion of this Agreement or the applicable Service Order, without penalty, upon written notice to the breaching Party. No termination for breach pursuant to this Section shall constitute or permit termination of any portions of this Agreement or any Service Order not breached or materially affected by such breach.

B. Cause. This Agreement (including the Service Level Agreement and any Service Orders issued hereunder) may be terminated for cause by either Party in the event that the other Party commits one of the following: (i) admits in writing its inability to pay its debts; (ii) ceases to function as a going concern or to conduct its operations in the normal course of business without a successor; (iii) breaches Section 6 (Internet Usage) hereof; (iv) breaches Section 9 (Confidentiality) hereof, or (v) a catastrophic failure on the part of Peak whereby Peak fails to deliver uptime performance for power and network for more than 20 hours in any 7 day period. In addition, this Agreement may be terminated for cause by Customer in the event of a "Material Breach" of this Agreement. For purposes of this Agreement, "Material Breach" shall exist in the event Peak fails to meet a service level requirement set forth in the Service Level Agreement three times (i.e., three "Strikes") in any calendar quarter (as defined in the Service Level Agreement). Subject to Section 8(A) above, in the event Peak fails to timely complete the Audit Remediation Plan agreed to by the Parties, then such failure shall be considered a Strike for purposes of Material Breach and such Strike shall apply in the calendar quarter in which the applicable notice provision expires. Customer shall have 180 days from the date of discovery of the Material Breach in which to

Peak Hosting Confidential

4830-1797-8146v4
MV\16889001

exercise its right of termination of the Agreement by giving 60 days advance written notice to Peak. In the event of a termination under this Section 8(B), Customer agrees to pay for all Services through the Termination Date and an amount equal to the recurring service costs that appear on Customer's statement the month prior to the Termination Date, as well as to engage in a good faith conversation with Customer about the services and products Peak might offer in the future.

C.    Remedies. In the event of termination for breach or cause, the non- breaching Party shall have the right to pursue any or all remedies available to it at law or in equity.

D.    Early Termination. Customer may terminate this Agreement or any Service Order(s) upon sixty (60) calendar days' notice; provided, however, that in the event Customer terminates this Agreement or any Service Order(s) pursuant to this Section 8(D) other than for cause or default, then Customer shall pay an early termination fee (as liquidated damages and not as a penalty) to Peak in an amount equal to 100% of all monthly recurring charges that would otherwise be due but for the termination.

E.    Customer agrees that, upon termination or expiration of this Agreement, it will engage in a good faith conversation with Peak regarding Customer taking over the payments for the hardware procured by Peak on Customer's behalf during the course of this Agreement, or otherwise the subject of a Service Order issued during the course of this Agreement. Customer further agrees that, upon termination or expiration of this Agreement, it will, at its expense, use commercially reasonably best efforts to immediately vacate and surrender the space and remove all of its equipment. Peak will allow Customer to access the space and remove its equipment upon twenty-four (24) hours' notice. If Customer has not removed its equipment from the space within thirty (30) calendar days following the effective date of any termination or expiration of this Agreement, Peak shall charge a reasonable storage fee for such equipment.

F.    No termination pursuant to this Section shall relieve either Party of any of its obligations under this Agreement or any Service Order, including, without limitation, the obligation to pay for Services prior to such termination and the obligation of Confidentiality to one another as described in Section 9 below.

9.    CONFIDENTIALITY. "Confidential Information" shall include: (i) all requests for quotations and proposals for Services, including resulting Service Orders, (ii) all prices, rates and other financial information related to the Services, Service Orders or Customer, (iii) all information relating to the customers of either Party, including customer lists, and (iv) all information one Party provides to the other which is clearly identified as confidential or proprietary. Confidential Information disclosed by either Party to the other shall be held by the recipient in confidence and not: (a) used by the recipient for personal advantage of any kind or for any reason other than the benefit of the disclosing Party, or (b) made available for third parties to use. Each Party will direct its employees, contractors, consultants and representatives who have access to any Confidential Information to comply with all of the terms of this Section. The foregoing information shall not be Confidential Information if: (i) it is or becomes available to the public through no wrongful act of the receiving Party; (ii) it is already in the possession of the receiving Party and not subject to any agreement of confidence, between the Parties; (iii) it is received from a third party without restriction for the benefit of the disclosing Party and without breach of this Agreement; (iv) it is independently developed by the receiving Party; (v) it is disclosed pursuant to a requirement of a duly empowered government agency or a court of competent jurisdiction after due notice and an adequate opportunity to intervene is given to the disclosing Party unless such notice is prohibited. Upon termination or expiration of this Agreement, the receiving Party shall at the disclosing Party's direction, either return or destroy all of the disclosing Party's Confidential Information and so certify to disclosing Party in writing. The obligations of this provision will survive for three (3) years after any termination or expiration of this Agreement. Either Party may disclose Confidential Information of the other Party if required by a court, administrative agency or other governmental body, provided that the disclosing Party (i) gives the other Party written notice of such requirement as soon as practicable after it has knowledge of it and in any event prior to disclosure of the Confidential Information, and (ii) discloses no more Confidential Information than required.

In the event of a breach with respect to either Party's Confidential Information, then both Parties agree that the following terms will apply:

A.    Any breach with respect to one Party's Confidential Information by the other Party would result in irreparable injury for which there is no adequate remedy at law. Therefore, in the event of a breach or threatened breach of a Party's obligations regarding the other Party's Confidential Information, the non-breaching Party will be

Peak Hosting Confidential

4830-1797-8146v4
MV\16899001

entitled to seek equitable relief, without the need of posting a bond, in addition to its other available legal remedies in the state or federal courts sitting in Santa Clara County, California; and

B. The choice of law with respect to the prosecution of a breach of this Section 9 shall be the laws of the State of California excluding conflicts of laws principles, and the Parties agree to submit to the jurisdiction of the courts of Santa Clara County.

10.    **INTELLECTUAL PROPERTY RIGHTS.** Neither Party shall use any copyrights, patents, trade secrets, software, trademarks, trade names, service marks, license rights or other intellectual property rights (collectively "Intellectual Property") owned, licensed or used by the other Party. Notwithstanding the foregoing, each Party may use the other Party's name and logo in any and all media, whether now known or hereafter developed (including Internet pages) for the sole purpose of listing one or more representative customers or vendors but only with such other Party's prior written consent or to issue mutually-approved press releases (each, a "Permitted Use"). Upon expiration or termination of this Agreement, or any affected Service Order, all Permitted Uses shall be discontinued, and any Intellectual Property, including all copies thereof, shall be returned to the other Party. Each Party hereby disclaims any right, title and interest in any Intellectual Property, owned, used or licensed by the other Party.

11.    **FORCE MAJEURE.** Neither Party shall have any claim or right against the other for any failure of or delay in performance by such other Party if the failure or delay is caused by or the result of causes beyond the reasonable control of such other Party, including, but not limited to, acts of God, fire, flood, hurricane, or other natural catastrophes, terrorist actions, laws, orders, policies, regulations, directions or actions of governmental authorities having jurisdiction over the subject matter hereof; or any civil or military authority, national emergency, insurrection, riot or war; inability to obtain circuits or equipment, material or other supplies, default of or failure to perform by subcontractors, or other similar occurrence beyond the control and without the fault or negligence of the affected Party. Any such delay or failure shall suspend the affected Service Order until the delay or failure ceases, and the Service Order shall be deemed extended accordingly. Notwithstanding the foregoing, either Party may terminate any affected Service Order immediately upon written notice if the datacenter co-location facility provides notification to Peak that the excusable delay or failure will exceed more than thirty (30) days. Such notification will be provided by the datacenter co-location facility within a time period as soon as practicable after the event.

12.    **LEGAL NOTICES**

Notices and communications concerning this Agreement shall be addressed to:

Machine Zone, Inc.
2225 E. Bayshore Road, Suite 200
Palo Alto, CA 94303
Attn: Ed Lu, Chief Financial Officer
Phone:
Fax: N/A
e-mail:

Peak Web LLC
P.O. Box 917
Rancho Cucamonga, CA 91729-0917
Attn: Legal Department
Phone: 909-945-4826
Fax: 866-563-9300
e-mail: legal@peakwebhosting.com

or at such other address as either Party may designate to the other in writing.

Notices shall be sent by registered or certified US Mail, postage prepaid, or by commercial overnight delivery service, by facsimile, or electronic transmission, and shall be deemed delivered either on the date of return receipt acknowledgment (in the case of US Mail), or on the next day after the sending of the notice (in the case of facsimile or overnight delivery service). Notwithstanding the foregoing, in the event of facsimile or electronic transmission notice, the confirming original must be sent by regular mail or overnight delivery service for notice to be deemed effective.

### 13.   DISCLAIMER OF WARRANTIES

CUSTOMER ASSUMES TOTAL RESPONSIBILITY AND RISK FOR CUSTOMER'S USE AND ITS END USERS' USE OF THE INTERNET SERVICES PROVIDED BY PEAK. CUSTOMER ACKNOWLEDGES THAT THE INTERNET (1) CONTAINS MATERIALS SOME OF WHICH ARE SEXUALLY EXPLICIT OR MAY BE OFFENSIVE TO SOME PEOPLE AND (2) IS ACCESSIBLE BY PERSONS WHO MAY ATTEMPT TO BREACH THE SECURITY OF PEAK'S AND/OR CUSTOMER'S NETWORK FACILITIES. PEAK HAS NO CONTROL OVER AND EXPRESSLY DISCLAIMS ANY LIABILITY OR RESPONSIBILITY WHATSOEVER FOR THE CONTENT OF MATERIALS TRANSMITTED OVER THE INTERNET, SERVICE INTERRUPTIONS ATTRIBUTABLE SOLELY TO CUSTOMER'S NETWORK, OR CUSTOMER AND CUSTOMER'S END USERS USE OF THE INTERNET OR CUSTOMER'S GAME.

EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT, INCLUDING THE EXHIBITS HERETO OR IN ANY SERVICE ORDER, THE SERVICES PROVIDED BY PEAK ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF TITLE, NONINFRINGEMENT OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. NO ADVICE OR INFORMATION GIVEN BY PEAK, ITS AFFILIATES OR ITS CONTRACTORS OR THEIR RESPECTIVE EMPLOYEES SHALL CREATE A WARRANTY OF ANY TYPE OR NATURE.

14.    **LIMITATION OF LIABILITY.** EXCEPT FOR ACTS OR OMISSIONS OF GROSS NEGLIGENCE, INTENTIONAL MISCONDUCT OR FRAUD, A PARTY'S INDEMNIFICATION OBLIGATIONS UNDER SECTION 7, ACTS OR OMISSIONS TRIGGERING THE LIQUIDATED DAMAGES IN THIS SECTION 14, BREACHES OF CONFIDENTIALITY UNDER SECTION 9, OR THE REMEDIATION AMOUNTS AGREED TO BY THE PARTIES IN THE SERVICE LEVEL AGREEMENT, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT SHALL SUCH PARTY, ITS AFFILIATES, SUBSIDIARIES, EMPLOYEES, OFFICERS, DIRECTORS, INVESTORS, MEMBERS, SHAREHOLDERS, CONTRACTORS, AGENTS AND OTHER REPRESENTATIVES BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OR LOST OR IMPUTED PROFITS OR ROYALTIES, LOST DATA OR COST OF PROCUREMENT OF SUBSTITUTE SERVICES ARISING FROM OR RELATED TO THE SERVICES OR PERFORMANCE OF ITS OBLIGATIONS WITH REGARD TO THIS AGREEMENT OR ANY SERVICE ORDER, WHETHER FOR, AMONG OTHER THINGS, BREACH OF WARRANTY OR ANY OBLIGATION ARISING THEREFROM, AND WHETHER LIABILITY IS ASSERTED IN CONTRACT OR TORT (INCLUDING NEGLIGENCE AND STRICT PRODUCT LIABILITY) IRRESPECTIVE OF WHETHER CUSTOMER HAS ADVISED OR HAS BEEN ADVISED OF THE POSSIBILITY OF ANY SUCH LOSS OR DAMAGE. FOR CLARITY, THE EXCEPTION ABOVE OF SECTION 14 LIQUIDATED DAMAGES AND THE REMEDIATION AMOUNTS SET FORTH IN THE SERVICE LEVEL AGREEMENT ARE NOT INTENDED TO GIVE RISE TO ADDITIONAL LIABILITY OR DAMAGES FOR SUCH EVENTS, BUT RATHER TO MAKE CLEAR THAT THE PARTIES HAVE AGREED THAT THEY ARE PERMITTED EXCLUSIONS TO THE FOREGOING SENTENCE WHICH IS OTHERWISE INTENDED TO LIMIT THE TYPE OF DAMAGES THAT MAY BE SOUGHT BY A PARTY. EXCEPT FOR ACTS OR OMISSIONS OF GROSS NEGLIGENCE, INTENTIONAL MISCONDUCT OR FRAUD, A PARTY'S INDEMNIFICATION OBLIGATIONS UNDER SECTION 7, ACTS OR OMISSIONS TRIGGERING THE LIQUIDATED DAMAGES IN THIS SECTION 14, BREACHES OF CONFIDENTIALITY UNDER SECTION 9, OR THE REMEDIATION AMOUNTS AGREED TO BY THE PARTIES IN THE SERVICE LEVEL AGREEMENT, EITHER PARTY'S LIABILITY HEREUNDER TO THE OTHER PARTY SHALL IN NO EVENT EXCEED AN AMOUNT EQUAL TO THE FEES PAID BY CUSTOMER IN THE 12-MONTH PERIOD PRIOR TO THE DATE THE CLAIM AROSE. THE PARTIES HEREBY WAIVE ANY CLAIM THAT THESE EXCLUSIONS DEPRIVE THEM OF AN ADEQUATE REMEDY OR CAUSE THIS AGREEMENT TO FAIL OF ITS ESSENTIAL PURPOSE. THE PARTIES FURTHER AGREE THAT THIS SECTION 14 REPRESENTS A REASONABLE ALLOCATION OF RISK. IN THE EVENT OF A CATASTROPHIC FAILURE AS DEFINED IN SECTION 8(B)(5), THE PARTIES AGREE THAT LIQUIDATED DAMAGES SHALL BE DUE AND PAYABLE TO CUSTOMER IN AN AMOUNT EQUAL TO THE TOTAL FEES PAID BY CUSTOMER IN THE THREE (3) MONTH PERIOD PRIOR TO THE DATE OF SUCH CATASTROPHIC FAILURE.

15.    **ASSIGNMENT** Neither Party may assign this Agreement, any Service Order or any obligations thereunder without the prior written consent of the other Party, which consent will not be unreasonably withheld or

Case 16-03083-pcm    Doc 1    Filed 07/22/16

denied, so long as in the case of Customer, the designated assignee can demonstrate the financial means to satisfy the obligations in the Agreement and, in the case of Peak, the designated assignee can demonstrate the financial and operational means to satisfy the obligations and commitments set forth in this Agreement. The term "assign" or any derivation thereof, shall not mean, for purposes of this Section 15, (i) the sale or other transfer of more than 50% of the voting securities of Customer; or (ii) the issuance of voting securities of Customer in one or more transactions so as to cause the Customer's shareholders or members, as of the date of this Agreement, to own, in the aggregate, less than a majority of the voting securities of Customer, including, without limitation, as the result of a merger, reorganization or consolidation.

16. **COMPLIANCE WITH LAWS.** Each Party agrees to conduct its business in a reputable manner and agrees to comply with all federal, state and municipal laws, rules, and regulations that are binding upon or applicable to the Parties or their business, equipment or personnel under or related by this Agreement.

17. **GOVERNING LAW.** This Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to its principles of conflict of laws.

18. **PASSWORD SECURITY.** It is Customer's sole responsibility to monitor use of its user ID and password ("access codes") for all purposes. Customer accepts all responsibility for the security of Customer's access codes and utilization of the secure areas of Peak's website therewith.

19. **INSURANCE.**

   A.    Customer is required under the terms of this Agreement to hold a Commercial General Liability Insurance policy in the amount of at least $1,000,000 single limit and $2,000,000 aggregate limit. All companies providing insurance required under this Agreement shall be authorized to do business in the state in which the co-location facility is located. Customers shall provide such certificate(s) of insurance to Peak prior to the earlier of (1) their move in or (2) ten (10) calendar days after execution of this Agreement. Customer will provide Peak with evidence of sufficient insurance bond held by any contractor engaged by Customer to provide services to Customer in the co-location facility. All insurance policies shall be issued by insurance companies with a Best's Rating of at least A- (A minus) VIII, and contain a waiver of subrogation clause whereby the insurer waives all rights of subrogation it may have under such policies as related to Peak. Customer will give Peak at least thirty (30) days' prior written notice of any alteration in the terms of such policy or the cancellation thereof. Customer will promptly provide Peak with written notice thereof and make available to Peak all relevant information and documentation relating thereto.

   B.    During the term of this Agreement, Peak will hold a Commercial General Liability Insurance policy in the amount of at least $1,000,000 single limit and $2,000,000 aggregate limit. All companies providing insurance required under this Agreement shall be authorized to do business in the state in which the co-location facility is located. All insurance policies shall be issued by companies be issued by insurance companies with a Best's Rating of at least A- (A minus) VIII, and contain a waiver of subrogation clause whereby the insurer waives all rights of subrogation it may have under such policies as related to Customer. Peak will give Customer at least thirty (30) days' prior written notice of any alteration in the terms of such policy or the cancellation thereof. Peak will promptly provide Customer with written notice thereof and make available to Customer all relevant information and documentation relating thereto.

20. **GENERAL PROVISIONS**

   A.    Each Party has full power and authority to enter into and perform this Agreement, and the person signing this Agreement on behalf of each Party has been properly authorized and empowered to enter into this Agreement and to execute it and any Service Orders or other attachments hereto on behalf of such Party and any of its Affiliates. The Parties agree that the United Nations Convention for Contracts for the International Sale of Goods shall not apply to this Agreement.

   B.    The relationship of the Parties hereunder shall always and only be that of independent contractors. No provision of this Agreement shall be construed to create a joint venture or partnership between the Parties.

   C.    In the event any provision in this Agreement shall be held invalid, illegal or unenforceable, the unaffected provisions shall remain in full force and effect.

D.    This Agreement, the Service Level Agreement, Service Order(s) and the attachments and Exhibits hereto and to each Service Order constitute the entire agreement between the Parties with respect to the subject matter hereof, and supersede any and all prior or contemporaneous agreements, written or oral. This Agreement, the Service Level Agreement, Service Order(s) and any attachments or exhibits hereto or thereto, may be modified at any time only by written agreement of the Parties.

E.    If any legal action or any arbitration or other proceeding is brought for the enforcement of this Agreement or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the prevailing Party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding from the other Party, in addition to any other relief to which it or they may be entitled.

F.    No waiver of any breach of this Agreement or any Service Order shall be deemed to be a waiver of any other or subsequent breach.

G.    Each Party agrees that the delivery by facsimile/pdf format of this Agreement, the Service Level Agreement, any Service Orders or attachments or exhibits hereto or thereto issued hereunder shall have the same force and effect as delivery of original signatures and that each Party may use such facsimile/pdf format signatures as evidence of the execution and delivery of the Agreement and Service Orders to the same extent that an original signature could be used.

H.    Customer acknowledges that if Customer authorizes datacenter technical support requested that is not described as a non-recurring charge or monthly recurring charge in any Service Order, Customer will be charged agreed-upon support rates for any work performed that is found not to be caused by Peak.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year first above written.

MACHINE ZONE, INC, a Delaware corporation

By:

Name:    _Ed Lu_

Date:    _March 20th, 2015_

PEAK WEB: Peak Web LLC, a California Limited Liability Company, on behalf of itself and its affiliates

By:

Name:    _Jeffrey Papen_

Date:    _March 20th, 2015_

**EXHIBIT A -- SERVICE LEVEL AGREEMENT**

[EXHIBIT A TO THE MASTER SERVICES AGREEMENT]

## Peak Hosting/Machine Zone Service Level Agreement

This Service Level Agreement, including all Schedule(s) attached hereto ("SLA"), effective April 1, 2015 ("Commencement Date") is provided pursuant to that certain Master Services Agreement of even date herewith (the "MSA"), between Machine Zone, Inc. ("Machine Zone") and Peak Web, LLC. (" "Peak Hosting"). The following SLA is applicable to the Peak Hosting OaaS. (Operations as a Service or "Services") to be provided by Peak Hosting, in connection with the MSA and pursuant to the terms and conditions set forth herein and in applicable Service Orders to be issued by Machine Zone. References to section numbers, schedules, and attachments are to sections and attachments of this SLA unless otherwise specified.

1. General Performance Standards. Peak Hosting commits to perform the Services contemplated by this SLA in accordance with Industry Standard Best Practices for Tier IV Data Center Operations (except for the requirement to provide dual-powered ventilating and HVAC systems). Further, Peak Hosting shall (i) perform the Services in an accurate, complete and timely manner with personnel qualified by training and experience to perform the functions assigned to them and (ii) meet or exceed the response time and uptime performance requirements set forth in Schedule A. Peak shall ensure that all Peak Facilities used for the Services, housing Machine Zone equipment or assets, or otherwise used for the benefit of Machine Zone shall at all times be Tier IV facilities (except for the requirement to provide dual-powered ventilating and HVAC systems) equipped with 24 hour a day, 7 day a week onsite security services, audited fire suppression system and onsite replacement servers for production servers commensurate with the schedule and obligations detailed in Schedule A (Service Level Requirements) and Schedule "X" (Server Priority List").

The fact that the Services as set forth in the Service Order shall be the subject of response time and uptime performance requirements shall not limit the obligation of Peak Hosting to fulfill all obligations under this Agreement (including Peak Hosting' obligations to comply with laws) and those obligations set forth in the applicable Service Orders.

If more than one performance expectation applies to any particular obligation of Peak Hosting, Peak Hosting shall perform in accordance with the more stringent of such performance expectations.

2. Service Level Compliance. Peak Hosting shall perform the Services in accordance with all terms and conditions of this SLA, as may be further detailed in an applicable Service Order and the Remediation Plan attached to the MSA as Exhibit B, and in such a manner as to meet or exceed the performance requirements for each of the "Service Level requirements" as set forth in Schedule A.

Upon request, Peak Hosting shall provide to Machine Zone the raw performance data that Peak Hosting used to calculate its compliance to the performance requirements set forth in Schedule A.

> (a) Additions to Service Levels. Machine Zone may add Service Level requirements for a New Service at any time, pursuant to the Change Approval Procedures. Machine Zone will request the addition of a Service Level requirement by providing written notice to Peak Hosting's Support email alias mz-support@peakhosting.com, which define will state the criteria for measuring such Service Level(s) (including any specific

1

measurement tools), any unique reporting requirements, and any other pertinent information regarding such request.

(b) Modifications to Service Levels. Machine Zone may at any time request to modify one or more Service Level requirements to reflect changes in measurement methodologies or tools, technology, or Machine Zone's business requirements, by providing written notice to Peak Hosting Support email alias mz-support@peakhosting.com on or before thirty (30) days prior to the proposed date of the effectiveness of the proposed Service Level modification. The notice will describe, in reasonable detail, the nature of the modification, including any changes in the measurement tools and method for measuring the Service Level requirement.

(c) Deletions of Service Levels. Machine Zone's may delete one or more Service Level requirement(s) at any time by providing written notice of the deletion to Peak Hosting Support email alias mz-support@peakhosting.com of the deletion.

(d) Procedures for adding to or modifying a Service Level requirement. The Parties agree that any changes in scope, schedule, or cost of the Services or Service Level requirements shall be set forth in a written amendment (executed by the Parties), which amends the Service Level requirements set forth on Schedule A to this SLA. Notwithstanding the foregoing, a mutually agreed upon Change which modifies the manner in which the Services are to be provided by Peak Hosting pursuant to the Service Level requirements, but which does not alter the ongoing resources required of Peak Hosting or its risks of non-performance, shall have no effect on the Charges for such Services.

3. Measurement and Monitoring Tools. Peak Hosting will implement and use such measurement and monitoring tools, which, unless otherwise agreed by the Parties, will not be less than industry standard tools, as are necessary to measure, monitor and report its performance of the Services against applicable Service Level requirements. Peak Hosting will reasonably demonstrate to Machine Zone that any measurement tools permit reporting at a reasonable level of detail sufficient for Machine Zones to verify compliance with the Service Level requirements on Schedule A.

Machine Zone's may audit the data collected to verify accuracy, and if errors are found that cannot be resolved to Machine Zone's reasonable satisfaction, may designate the tools to verify accuracy, and Peak Hosting will implement and use such tools in a timeframe agreed upon between the Parties.

If Machine Zone reasonably determines that a measurement tool used by Peak Hosting resulted in inaccurate measurements or reporting, Machine Zone may require Peak Hosting to use a different measurement tool and Peak Hosting will promptly corrected such inaccuracies and change its measurement tool within a timeframe agreed upon between the Parties.

If Peak Hosting desires to use a different measurement tool for any Service Level requirement, Peak Hosting will provide written notice to the Machine Zone's Representative describing the desired change and justification for it, and if agreed to by the Parties, the Parties will follow the change procedure in Section 2(d). Provided the change in measurement tools does not impact the quality of the data provided to Machine Zone or the ability of Peak Hosting to scale its operations to continue to support Machine Zone, Machine Zone's consent to change measurement tools will not unreasonably be withheld. If the Parties cannot agree upon the requested change, Peak Hosting will continue to use the measurement tool already in use by Peak Hosting.

2

If Machine Zone requires that Peak Hosting use a customized measurement tool in place of an industry standard measurement tool proposed by Peak Hosting that Peak Hosting has demonstrated to Machine Zone's reasonable satisfaction is capable of accurate and reasonably detailed measurement of the Service Level requirements, then Peak Hosting will use the customized tool requested by Machine Zone, and Machine Zone will reimburse Peak Hosting the amount of any demonstrable incremental predetermined costs incurred by Peak Hosting as a result of its implementation and use of the customized tool in place of the industry standard tool.

4. Quality Assurance. Peak Hosting shall develop and implement quality assurance and internal control processes and procedures, including implementing tools and methodologies, to ensure that the Services are performed in an accurate and timely manner, in accordance with (i) the Service Level requirements and other requirements of this SLA; and (ii) practices generally accepted in the managed hosting industry.

(a) Internal Audit. Peak Hosting shall maintain an internal audit function to monitor the processes and systems used to provide the Services (i.e., perform audits, track control measures, communicate status to Machine Zone management, drive corrective action, etc.) and notify Machine Zone of suspected internal fraudulent activities (e.g., theft or manipulation of data by a Peak Hosting employee or contractor) in connection with the Services within the Peak Hosting organization and, if necessary, conduct investigations of such suspected activity with Machine Zone's assistance (provided that Peak Hosting shall not have access to or penetrate Machine Zone's systems or network in connection with its internal audit function without Machine Zone's prior written consent).

(b) Reports. Peak Hosting provide to Machine Zone's monthly reports detailing Peak Hosting's performance of the Service in accordance with this SLA. At a minimum, Peak will collect, measure and report on the uptime and response time requirements set forth in Schedule A. Peak Hosting will provide such reports for all existing Service Level requirements by the fifteenth (15th) Business Day of each month, commencing on the dates provided in Exhibit B to the MSA (Remediation Document).

(c) No Waiver. No failure or inability of the quality assurance procedures to disclose any errors or problems with the Services shall excuse Peak Hosting's failure to comply with the Service Level requirements and other terms of this SLA.

5. Report Delivery. Within 24 hours following the failure of Peak Hosting to meet an Uptime Requirement, Peak Hosting will deliver to Machine Zone a Reason for Outage (RFO) report, which shall include an initial assessment (based on available data). In the event of a failure of Peak Hosting to meet a Response Requirement, Peak Hosting will promptly deliver to Machine Zone an RFO upon Machine Zone's reasonable request. Thereafter, Peak Hosting will use best efforts to promptly perform at its expense a Root Cause Analysis (RCA) to determine the reason for that failure and impact determination documentation to Machine Zone. Such RFO report will include, at a minimum, incident date, duration of failure, issues, available details of the problem and, if available, details of the resolution. Upon its final determination of the cause of any failure, Peak Hosting will provide to Machine Zone the RCA report that details the results of the root cause analysis, and details any measures that reasonably should be taken to minimize the possibility that such failures will recur. Such measures may include suggested changes in Peak Hosting's or Machine Zone's operating procedures. To the extent that the RCA report

3

indicates that Peak Hosting's failure to meet the Service Level requirement was caused by Peak Hosting or its subcontractors, Peak Hosting will correct the problem and use reasonable commercial efforts to minimize the recurrence of such failures, and to meet the applicable Service Level requirement going forward.

In the event of Peak Hosting's failure to meet a Service Level requirement related to user satisfaction or other similar subjective Service Level requirements, Peak Hosting and Machine Zone will jointly examine the causes of the failure and develop and undertake plans for corrective action to avoid repeated failures of such Service Level requirements. Peak Hosting will use commercially reasonable efforts in providing expertise and recommendations for solutions to hardware and software failures.

6. Service Level Credits. In the event of a failure by Peak Hosting to meet any of the Service Level requirement(s) set forth on Schedule A or any other obligation in this SLA (each a "Service Level Failure"), the Parties have agreed to the discounts ("Service Level Credits") and remedies (including a right of termination by Machine Zone) set forth in the MSA and the Service Level requirements exhibit attached hereto. The application of Service Level Credits shall not relieve Peak Hosting of its obligation to continue its efforts in correcting such Service Level requirement failures.

Peak Hosting's failure to meet the applicable Service Level requirements shall not be covered by Service Level Credits alone and Machine Zone's shall have all of its rights and remedies available to it under this SLA or at law or in equity with respect to any such non-performance.

The Parties agree and acknowledge that (i) Service Level Credits are not liquidated damages for any other related or unrelated breach of the SLA by Peak Hosting, e.g., a breach by Peak Hosting of the information security or confidentiality or other obligations hereunder (except to the extent that Machine Zone's only injury from any such breach flows directly from the failure to meet the relevant Service Level requirement), or any indemnification obligation of Peak Hosting hereunder and (ii) the application of Service Level Credits is without prejudice to other rights and non-monetary remedies that Machine Zone's may have (e.g., termination for cause) under any Service Order or the SLA or at law or in equity.

7. Maintenance. At certain times planned maintenance is required to be performed by Peak Hosting which can cause service disruption. Maintenance services can affect the Public Network, Private Network, Admin Tool, Servers, SAN Storage, Security and other services. Peak Hosting will ensure that all maintenance MOPs will be planned, scripted, approved by Machine Zone and locked down at least six (6) hours prior to the scheduled maintenance. Further, Peak Hosting will notify Machine Zone of planned maintenance service in advance and will work with the Machine Zone to resolve any issues that they may have with the planned maintenance. Peak Hosting will provide at least 72-hour notice to Machine Zone for maintenance activity via email at ▮▮▮▮▮▮▮▮▮▮ and at least 96 hours' notice via email to ▮▮▮▮▮▮▮▮▮ for disruptive maintenance activity that will cause a noticeable outage to Machine Zone. Peak Hosting shall further comply with the Service Level requirements related to maintenance set forth in Schedule A.

Emergency Maintenance refers to any corrective action intended to remedy conditions likely to cause a severe Service degradation, as designated by Peak Hosting. Emergency Maintenance may include, but is not limited to, actions intended to address hardware or software failures or viruses/worms. Peak Hosting must inform Machine Zone in advance of any interruptions and receive Machine Zone's approval to proceed with Emergency Maintenance. Emergency Maintenance will require the approval of Machine Zone except in the case of a Priority 1 or Priority 2 Calls (as defined in Schedule A Service Level requirements) (all effort will be made to notify and receive approval from

4

Machine Zone's in this case, but the change to restore service will not be compromised by delay to do that). Machine Zone will provide Peak Hosting with designated Points of Contact to authorize Emergency Maintenances by the Commencement Date.

8. Financial Responsibility. Peak Hosting shall be responsible for any third party fees or expenses incurred on or after the Commencement Date of any applicable Service Order associated with software, equipment and related third party contracts used by Peak Hosting to provide the Services. Except for payments for which Peak Hosting is responsible pursuant to the previous sentence, Machine Zone shall be responsible for third party fees or expenses incurred on or after the applicable commencement date associated with (x) software, equipment, and third party contracts used by Peak Hosting to provide the Services and for which Machine Zone is designated to be financially responsible under such Service Order and (y) third party contracts handled by Peak Hosting on a pass-through or cost-plus basis pursuant to an applicable Service Order.

9. Operational Responsibility. With respect to software, equipment, and related third party contracts used by Peak Hosting to provide the Services and for which Peak Hosting is operationally responsible or under an applicable Service Order, Peak Hosting shall be responsible for:

(i) its evaluation, administration of procurement, testing, installation, rollout, use, support, management, operation, and administration of maintenance;

(ii) the evaluation, administration of procurement, testing, installation, rollout, use, support, management, operation, and administration of maintenance of new, substitute or replacement software, equipment, and third party contracts (including upgrades, enhancements, new versions or new releases of such software);

(iii) the performance, availability, reliability, compatibility and interoperability of such software, equipment and third party contracts each in accordance with this SLA, including the Service Level requirements;

(iv) the compliance with and performance of all non-financial operational, administrative and contractual obligations specified in such licenses, leases and contracts;

(v) the administration and exercise as appropriate of all rights available under such licenses, leases and contracts not requiring the expenditure of money; and

(vi) the payment of any fees, penalties, charges, taxes and interest or other expenses due and owing under or with respect to such software licenses, equipment, and third party contracts that are incurred, caused by or result from Peak Hosting's failure to comply with or perform its obligations, all of (i)-(vi) as may be further described and set forth in an applicable Service Order.

10. Rights Upon Expiration/Termination. With respect to third party software, equipment, and related third party contracts used by Peak Hosting solely to provide the Services and for which Peak Hosting is operationally responsible under an applicable Service Order, Peak Hosting shall use commercially reasonably efforts to obtain full transferability of Peak Hosting' rights without charge to Machine Zone and/or any replacement service provider upon termination of this SLA. Upon termination, Peak Hosting shall identify those third party contracts used by Peak Hosting to deliver the Services to Machine Zone. Further, Peak Hosting shall promptly notify Machine Zone of those agreements in which it does not have such rights of transferability.

11. Benefits Pass-Through. With respect to any products and services procured by Peak Hosting for Machine Zone on a cost-plus, cost-reimbursement or pass-through expense basis during the course of performing the Services, Peak Hosting shall use commercially reasonable efforts to pass through to Machine Zone all benefits offered by the manufacturers and/or suppliers of such products and services (including all warranties, refunds, credits, rebates, indemnification, discounts, training, technical

5

support and other consideration offered by such manufacturers and suppliers) except to the extent otherwise agreed by Machine Zone. If Peak Hosting is unable to pass through any such benefit to Machine Zone, it shall notify Machine Zone in advance and shall not purchase such product or service without Machine Zone's prior written approval.

12. **Compliance with Software Licenses and Related Agreements.** With respect to all contracts between Machine Zone or Machine Zone Affiliates and third parties relating to the software to be used in connection with the Services, the right to access and use as granted to Machine Zone or the applicable Machine Zone Affiliates under such contracts and the performance obligations of Machine Zone or the Machine Zone Affiliate under such contracts shall be deemed to be subcontracted or delegated by Machine Zone or the applicable Machine Zone Affiliate to Peak Hosting and Peak Hosting shall act in compliance with all the terms and conditions of such contracts to the extent such terms and conditions have been disclosed to Peak Hosting by Machine Zone. Notwithstanding the foregoing, Peak Hosting shall promptly notify Machine Zone if there is any aspect of such terms and conditions that cannot be complied with despite Peak Hosting's commercially reasonable best efforts. Without limiting the generality of the foregoing, Peak Hosting agrees that it shall notify Machine Zone of any actual or threatened claims or legal actions by third parties (including by the applicable software licensor) in relation to the software covered by the third party contracts. Notwithstanding the obligations set forth in this Section 12, the Parties agree that Machine Zone shall be solely responsible for the licensing of VMWare and Microsoft products necessary for Peak Hosting to perform the Services.

13. **Peak Hosting Facilities.** Peak Hosting shall provide Machine Zone with the use of and escorted access to specific Peak Hosting facilities (or equivalent space) (such facilities identified as, the "Peak Facilities"). Machine Zone shall remove any Machine Zone Personnel from Peak Facilities at Peak Hosting's reasonable request, in Peak Hosting's sole discretion, provided that if the removal is to reallocate space from Machine Zone's use, Peak shall provide reasonable prior notice and the Machine Zone Personnel removal shall constitute a change that must be pre-approved by Machine Zone. Peak Hosting hereby agrees that all Machine Zone equipment and assets, and the Services to be provided to Machine Zone, will only take place in a Peak Facility compliant with this SLA.

Further, Machine Zone shall be entitled to 24 hour a day, 7 day a week escorted access to any Peak Facility used for the Services or housing Machine Zone equipment or assets. Any failure to comply with the obligations set forth in this Section 13, if left uncured for a period of [30] days, shall be considered a material breach of this SLA.

Machine Zone shall be responsible for designating the specific individuals who should be given access for each visit to a Peak Hosting Facility by submitting a support ticket in the Peak Hosting Ticket System.

14. **Compliance with Laws.** Without limiting any other provision of this SLA dealing with applicable laws, Peak Hosting will comply, with respect to the provision of the Services and the performance of its other legal and contractual obligations hereunder, with all applicable laws for the Term of the Master Services Agreement, this SLA and any active Service Order, including identifying and procuring applicable licenses, permits, certificates, approvals and inspections required under such laws. If Peak Hosting violates or, in Machine Zone's reasonable judgment, is likely to violate, any applicable laws in connection with the performance of any Services, or the performance of any Services or any other activities under this SLA, which would cause Machine Zone to be, in Machine Zone's reasonable judgment, in violation of any law, Machine Zone may immediately suspend any Services or any other portion of this SLA related to such real or potential violation. Machine Zone shall be required to give

6

Peak Hosting advance written notice of such real or suspected violation of law by Peak Hosting. Peak Hosting also agrees to give Machine Zone prompt written notice of any actual or expected violation of law that might impact Machine Zone or its operations or business.

15. Machine Zone's Data. All proprietary data and information provided by or on behalf of Machine Zone to Peak Hosting in connection with the Services will remain the property of Machine Zone ("Machine Zone Data"). Peak Hosting will use such data or information solely in connection with the Services and shall promptly destroy or return such Machine Zone Data upon request of Machine Zone. Further, Peak Hosting shall insure that any such Machine Zone Data is kept secure, is not disclosed to any third party and is kept secure while in the possession of Peak Hosting.

16. Audits.

(a) Operational Audits. Not more than once per contract year, Machine Zone or its authorized third party auditors (either, a "Machine Zone Auditor") may at any time upon reasonable notice, not to be less than 15 calendar days, audit Peak Hosting's systems, processes, and reasonably appropriate Peak Hosting operational records related to Machine Zone's assets or Services and inspect the Peak Facilities in connection with Peak Hosting's compliance with the terms and conditions of this SLA or any Service Order (including, but not limited to audits of data center operations and related internal controls); provided, that audits described in this Section 16(a) shall not include audits described in other paragraphs of this Section 16. Audits will be conducted during normal business hours except where such operations would require otherwise. Machine Zone may conduct audits in addition to the one ordinarily allowed if (i) the audit reveals discrepancies between the status of the operations and Peak Hosting's obligations under this SLA and Machine Zone reasonably determines that any such discrepancies could have a material adverse impact on its business; or (ii) Machine Zone reasonably determines that an audit is warranted to determine the cause for documented failures. Machine Zone acknowledges that a third party auditor must not be a Peak Hosting Competitor, and must first enter into a reasonable confidentiality agreement with Peak Hosting.

(b) Regulatory Audits. Upon written demand made by a third party having regulatory or statutory investigative authority over Machine Zone or Peak Hosting, Peak Hosting will (i) promptly make available to the requesting entity any requested information relating to Peak Hosting or Machine Zone's compliance with the regulatory requirements and, if so requested, (ii) allow the requesting governmental authority to visit a Peak Facility for purposes of observing such compliance; provided, however, that Peak Hosting will not disclose Machine Zone's information without providing advance notice to Machine Zone and allowing Machine Zone to review such information prior to disclosure to the third party regulatory agency.

(c) Financial Audits. Machine Zone's Auditors may at any time upon reasonable notice, but not more than once per contract year (unless an actual audit shows material discrepancies or Machine Zone has doubt concerning the material accuracy of the charges for the Services (the "Charges")), audit Peak Hosting' records to determine the accuracy of the Charges. Machine Zone's shall not, however, be entitled to audit records of Peak Hosting's cost of providing the Services unless such costs are the basis for the Charges (including any charges calculated on a pass- reasonable through basis). Such audits may be conducted during the Term of this SLA, the MSA and for twelve (12) months thereafter. If a financial

7

audit establishes that Peak Hosting has overcharged Machine Zone (on a net basis with respect to any applicable set-offs and reconciliations of over- and under-charges), Peak Hosting will promptly pay to Machine Zone the net amount of the overcharge, plus 5% interest from the date of receipt by Peak Hosting of the overcharged amount until the date of re- payment to Machine Zone. If Peak Hosting has overcharged Machine Zone on a net basis for pass-through services being audited by more than five percent (5%), then Peak Hosting shall also reimburse Machine Zone's for the costs of the financial audit.

(d) Cooperation and Remediation.    Peak Hosting will provide to the Machine Zone Auditors all documentation necessary and reasonably requested to determine Peak Hosting's compliance with this SLA. Peak Hosting, at its cost, will provide to the Machine Zone Auditors and to any third parties described in Section 16 (15)the necessary assistance to efficiently conduct any audits; provided that if Peak Hosting is required to assign additional personnel to support such an audit of Machine Zone (whether by Machine Zone or a third party), Peak Hosting shall be entitled to charge its standard hourly rates for such personnel, and provided further that if personnel assigned to perform Services are diverted from their usual assignments, Peak Hosting may request that Machine Zone relieve Peak Hosting from certain of its service obligations to the extent attributable to supporting the audit. The Parties shall discuss such relief in good faith and document any relief agreed upon and the timeframe for such relief. Machine Zone Auditors will conduct the audits in a manner that does not unreasonably disrupt or delay Peak Hosting's performance of services for Machine Zone or its other customers. To the extent that any audit uncovers that Peak Hosting has not complied with the Agreement, Peak Hosting will, as soon as commercially reasonable, remediate any such non-compliance.

(e) SAS 70 Reviews.  At Machine Zone's reasonable request and no less than once each calendar year, Peak Hosting shall arrange for an independent SAS 70 Type II audit, at Machine Zone's expense, to be performed for all data center Service Locations. As of the Commencement Date, the most recent report of a SAS 70 Type II audit for Peak Hosting's Dallas, Texas, Data Center was for a SAS 70 Review of Physical Access and Physical Environment Control Objectives (the "Baseline SAS 70 Review"). At Machine Zone's request, Peak Hosting will furnish a copy of the Baseline SAS 70 Review, and of future SAS 70 Type II reviews of its data center Service Locations ("SAS 70 Type II Reviews"). Prior to initiating any SAS 70 Type II Review, Peak Hosting will notify Machine Zone's if the scope of the upcoming review differs in any material respect from the scope of the Baseline SAS 70 Review. The reporting period covered by the SAS 70 Type II audit will be from January 1 to September 30 (in what year) and the SAS 70 Type II report will be issued to Machine Zone's no later than November 1 of that year. If Machine Zone's determines that a supplementary audit is necessary for it to meet its control requirements, then Peak Hosting, at the request of Machine Zone's, will request its external auditor performing the SAS Type II 70 Review to coordinate with Machine Zone's and its auditors to perform a supplementary audit in connection with Peak Hosting's SAS 70 Type II Review that includes Machine Zone's requested modifications. Any incremental costs related to the supplemental audit will be borne by Machine Zone.

If the results of any SAS 70 Type II audit show any material deficiency in Peak Hosting' internal controls, Peak Hosting will take commercially reasonable measures to remediate, at its cost, any such deficiency.

8

The SAS 70 Type II Reviews will be conducted at such time as to allow Machine Zone's to make its necessary certifications and attestations. Machine Zone will provide reasonable notice to Peak Hosting, no less than 30 days. Prior to initiating any SAS 70 Type II Review, Peak Hosting will consult with Machine Zone, and will tailor the timing and scope of the SAS 70 Type II Review to meet Machine Zone's needs, provided that a variance from the timing or scope of the Baseline SAS 70 Type II Review will be at Machine Zone's expense. Peak Hosting will provide to Machine Zone's results of the SAS 70 Type II Reviews completed by Peak Hosting and its auditors that were tailored to meet Machine Zone's needs, as well as the results of the Baseline SAS 70 Type II Review.

17. Representations and warranties

(a) Viruses and Denial of Service Attacks. Peak Hosting will use commercially reasonable efforts (including but not limited to, continued use of F5's defense.net DDOS server and 10G transit providers): (i) to prevent malicious code designed to disable or damage hardware or damage, erase or delay access to Software or data from being coded or introduced into the Software or systems used to provide the Services; (ii) to assist Machine Zone's in reducing the effects of and recovering from the introduction of any such malicious code; and (iii) to guard against denial of service attacks.

(b) Disabling Devices. Peak Hosting will provide 24 hour a day, 7 day a week physical security to ensure no device created for the purpose of disabling all or any portion of the Services in any Software or Equipment provided or made available to Machine Zone's hereunder is permitted in any Peak Facility. With respect to any disabling code that may be part of such Software or Equipment, Peak Hosting will not, and will not permit any of its Subcontractors to, invoke such code.

In connection with the execution of the MSA between the Parties, of even date herewith, the Parties have executed this SLA on March 20, 2015.

Peak Web, LLC

Jeffrey Papen
Chief Executive Officer

Signature:

Name: Jeffrey Papen

Title: CEO

Address: 7395 SW Seneca Street

Tualatin, OR 97062

MACHINE ZONE, INC.

Name: _Ed Lu_

Name:

Title: _CFO_

Address: 2225 N. Bayshore Road, Suite 200

Palo Alto, CA 94303

Phone:

9

Schedule A – Service Level Requirements

[INSERT SPREADSHEET HERE]

Schedule A to Service Level Agreement

## UPTIME REQUIREMENTS (EFFECTIVE APRIL 1, 2015)

| Service ID | Service Description | Uptime Definition | Algorithm | Uptime Requirement | Uptime Period | Miss = Strike |
|---|---|---|---|---|---|---|
| Power | Datacenter Power | Power from either A or B Bus is Unapproved | (100% Possible Uptime – Unapproved Outage) / Total Possible Uptime) * 100 | 99.995% = 2.16 minute/month | Monthly | Yes |
| Cooling | MZ maintains between 20% to 50% humidity and a midpoint dew point of 52.5 degrees F. Average temp of premises below the raised floor to be maintained between 64.4 and 80.6 degrees (F) | See Service Description | Not applicable | 99.5% | Monthly | Yes |
| Network Services | 1.2 Network Service – (switches) Connectivity between servers in a cabinet. 1.3 Network Service – (routers) (routing connectivity between subnets internal to Peak Hosting 1.4 Network Application – FW, SLB (load balancer is accessible, but any IP is accessible) internet is accessible (not using IP is accessible, but any IP is accessible) Interface is accessible from anywhere, not everywhere, on the internet) | Panels may interrupt users and servers are accessible from any internet users. Peak Hosting will not be responsible for outages: 1) caused by software bugs in vendor code; 2) where the bug was not identified in any bug scrub for that code version, and 3) the manufacture recommends that code version as the most stable and appropriate version. 4) Peak tested the code version in a lab and bench before it was put into production and 5) Peak performs monthly top-scrub vendor check-ins to | ((Total Possible Uptime – Unapproved Outage) / Total Possible Uptime) * 100 | 99.999% | Quarterly | Yes |
| Server Hardware | Services defined in Schedule X allocated herein, which Peak hosting and MZ will review and update, as needed, at least twice monthly | This server is operational and performing according to specifications. | ((Total Possible Aggregated Uptime (based on the Number of Servers – Unapproved Outage) / Total Possible Uptime) * 100 | 99.5% | Quarterly | No, as long as failure is not attributable to Peak Hosting act or omission; Uptime below 99.5% will result in penalty of $5,000 per server. |
| ISF Routing | Any ISF routing or connectivity interruption that is beyond Peak Hosting's border routers (i.e. not the internet) and beyond Peak Hosting's policy routines can control will be responded to with "best commercial efforts" by Peak Hosting Network Engineering Staff | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Yes if not responding with best commercial efforts. |
| Splunk Services | Splunk service is routing the Splunk subnets on the serverd in the datacenter managed by Peak. If Peak becomes aware, responds to client's service fluent. Also, the Splunk indexing and forwarding functions are fully operational. | Responds to clients services during reasonable time frame. Also, corporate network (subnet) is a reasonable time frame. | ((Total Possible Uptime – Unapproved Outage) / Total Possible Uptime) * 100 | 99.9% availability = 45.6 minutes / month | Monthly | $5000 per occurrence |

| Quarterly Strike Count | Discount on Cost of Services (before credits) | | Cumulative Discount |
|---|---|---|---|
| Strike #1 | 25% of monthly billing for month in which breach occurred | | 25% Discount |
| Strike #2 | additional 25% of monthly billing for month in which breach occurred | | 50% Discount |
| Strike #3 | additional 50% of monthly billing for month in which 3rd breach occurred (material breach triggered | | 100% Discount |

Quarterly shall mean each of the following three month periods: January-March, April-June, July-September & October-December

MZ APPROVED EL

PEAK APPROVED

**EXHIBIT B – REMEDIATION PLAN**

[EXHIBIT B TO MASTER SERVICES AGREEMENT]

## Audit Remediation Plan

### DAL2 FACILITY:

#### Issue 1 – Current Service Level Agreement (SLA) void of accountability

- Parties to adopt new Service Level Agreement (attached as Exhibit A to the Master Services Agreement)
- Peak Hosting to gather Network & Power Uptime Metrics within one week of Commencement Date
- Peak Hosting to gather ISP Routing Metrics within one month of Commencement Date
  - o Ongoing updates for proper monitoring of URL from Machine Zone to Peak Hosting is required for Peak Hosting to provide real-time ISP monitoring. If new URL is added or URL is changed, Peak Hosting must be notified before URL goes into effect or we cannot provide proper monitoring of new URL.
- Peak Hosting to start gathering Server Uptime Metrics within 90 days of Commencement Date. In order to satisfy the requirements under this SLA and monitor the SLA response time and uptime metrics, Peak Hosting will require access to Machine Zone's Nagios Remote Plug-in Executor (NRPE), be able to install Link Layer Discovery Protocol (LLDP) on servers, Ipwatchd and install HP OneView and Dell equivalent monitoring tools and capabilities. Machine Zone to provide timely access to the systems and resources designated herein *(for engineering and testing these solutions)* to ensure Peak can execute within the timeframes provided. To expedite this work, Peak Hosting will explore SSH (Secured Shell) based solutions for immediately configuring these items. This effort will need to be coordinated with the long-term puppet configuration changes made by Machine Zone.
- Until such time as 14zen provides for meta-tagging in the Peak Hosting AdminTool, Machine Zone will manually assign the server severity to any new servers within 24 hours of such server coming online. Machine Zone shall make such assignment by submitting a ticket via JIRA to Peak Hosting and Peak Hosting will add the appropriate monitoring, escalation, etc. that is due under this Remediation Plan and/or the SLA.
- Response time SLA Reporting within 60 days after Commencement Date.

#### Issue 2 – Peak understaffed to support 24/7 Operations

- Peak Hosting to hire enough data center technicians (DCT) in Richardson, TX location for 2 DCT 24x7x366 staffing. Each shift with minimum of one senior (2+ years experience) DCT.
- Peak Hosting to hire sufficient customer service site associate (CSSA) to be present for all on-site maintenance.

- Timeframe — Peak Hosting shall have 3 months to hire staff sufficient for 2x DCT 24x7x366 shift coverage outlined above and additional CSSA for every maintenance session, plus two additional months for training new personnel.

## Issue 3 - Structured cabling needed going forward

- Peak Hosting to pay for fiber trays in both pod A (for new fiber runs) and pod B (for all fiber runs).
- All other structured cabling (fiber or copper) will be passed through to Machine Zone at Peak's cost. Machine Zone agrees to pay the direct cost for any other custom materials installations.
- Peak Hosting confirms it already uses, and will continue to use, Cat6 or better for all Gig-E copper cables.

## Issue 4 - Server Density Clarification

- Peak Hosting confirms it is currently using and will continue to use Cat6 or better patch cables for all 1 Gig servers.
- Peak Hosting agrees to rack TORS at the top of rack going forward. Peak Hosting and Machine Zone agree to leave rack density at current number of servers.
- Peak agrees to implement the above features immediately and to comply with these standards going forward.

## Issue 5 - Network Infrastructure Improvements

- Peak Hosting agrees to purchase Cisco Nexus 9000 series network switch as the core switch for DAL2 datacenter.
- Peak Hosting agrees NOT to use FEX for aggregation purposes, and will use Cisco Nexus 3000 series as top of rack switch for new server installations in both SJC2 and DAL2, but NOT MLP1.
- Peak Hosting will implement these practices immediately, after sufficient FMEA (failure mode and effects analysis) testing to ensure new infrastructure will perform correctly, and maintain them going forward.
- The Parties agree that Machine Zone shall pay the following cost difference to move from FEX architecture to N3K: incremental $▮▮▮▮▮▮▮▮▮▮ (see diagram below).
- The Parties agree that Machine Zone's bench environment will be updated to Nexus 3K and the cost will be split between the Parties.
- The Parties agree that Machine Zone's servers shall be upgraded to Cisco 9K platforms going forward at no additional charge to Machine Zone.
- Peak Hosting agrees to price out cost structure for new Machine Zone servers with dual 10 Gig uplinks.

## Issue 6 - Maintenance process to be reviewed by Machine Zone

- Peak Hosting to have a minimum of two DCT and (once staffed) one CSSA (3 staff total) on-site for all hardware maintenance to ensure strict process adherence.
- Peak Hosting to have remote quarterback directing all MOP activity.
- Machine Zone agrees to attend all maintenance calls via phone call.

- Timeline – Peak Hosting agrees to implement immediately upon the Commencement Date at least a 2 staff MOP on-site team for all hardware maintenance, with the CSSA added as soon as hired & trained pursuant to Issue 2.

## Issue 7 - Security Improvement Needed

- Peak Hosting to install 5 Cameras in DAL2 at West End (see bottom of diagram below) of pod A and B to look down front and back of each row.
- Peak Hosting agrees that all recordings shall be preserved for at least 30 days.
- Machine Zone to have real-time and historical (up to 30 days) remote access to all camera recordings.
- Peak Hosting agrees to have camera up and running within 2 months of the Commencement Date.



Total UPS 2N capacity (1250KVA) x power factor (90%) = 1,125Kw x safety factor (95%) = 1,069Kw
PDU Load Rating (300Kva) x power factor (90%) x safety factor (95%) = 256.5Kw per set: 128Kw per side

Items in blue are AS-BUILT Production Machine Zone

Items in solid red shows Machine Zone Benchmark Lab by 3/18/2015

Items outlined in red are AS-BUILT Machine Zone Benchmark Lab

Items in solid green by 3/18/2015

Items without color are PROPOSED

**New Issue 8: Machine Zone to submit tickets directly via Peak Hosting Support Portal**

- Machine Zone to provide priority level in the Support Ticket submitted through the Peak Hosting Support Portal.
- Machine Zone needs to provide all critical information available to it at the time in the Support Ticket to enable Peak Hosting to successfully complete the requested or required work.
- There needs to be a designated Machine Zone contact/resource available by phone for clarifying questions and information needed to effectively address request or issue.
- For Machine Zone initiated issues that are otherwise unknowable or detectable by Peak Hosting, the SLA timer does not start until the available information necessary to successfully complete the work is provided to Peak Hosting via portal.
- The Parties agree that Skype is not an acceptable form for submitting Support Tickets.
- Peak will regularly update Support Tickets with timely updates and completion status. Machine Zone will confirm work is completed and close ticket requests in a timely manner.

**All OTHER PEAK FACILITIES USED BY MACHINE ZONE; OTHER COMMITMENTS:**

- The Parties agree that all Machine Zone servers and equipment will be located in data centers providing Tier-4 performance levels (except for MLP1), including 99.995% uptime, but in no case shall such datacenters be required to provide dual power HVAC systems.
- Peak Hosting agrees to allow Machine Zone to house Machine Zone owned servers and/or equipment in Peak COLOs at reasonable prices to be negotiated in good faith by the Parties. At a minimum, Peak Hosting to provide Machine Zone a 58U rack in DAL2 with 8.65 KW primary and 8.65KW back-up, plus four 10 Gig SAN network uplinks, both at no charge to Machine Zone.
- Peak Hosting agrees to provide unblocked network connectivity from any Peak Hosting location to any current or future Machine Zone datacenters; Machine Zone to pay the pass-through cost of such network connectivity.
- In the event a Peak facility does not satisfy the requirements in this Remediation Plan, or Peak Hosting fails to deliver on the obligations set forth herein, Peak Hosting will deliver a remediation plan (including implementation timelines) within 2 business days of any written notice to Peak Hosting of a deficiency.
- Machine Zone to decide whether or not its servers will be moved from MLP1 to SJC2 within 60 days of the Commencement Date.

## SCHEDULE X - SERVER SEVERITY LIST

| Id | Peakname | Customer Name | Severity |
|------|----------|---------------|----------|
| 6554 | PEAK4350 | acctdb-1-001.ody.live.dal2.mz-inc.com | 1 |
| 3805 | PEAK2005 | acctdb-1-001.wiso.live.dal2.mz-inc.com | 1 |
| 4408 | PEAK2604 | acctdb-1-001.wiso.live.dal2.mz-inc.com | 1 |
| 3695 | PEAK1907 | acctdb-1-001b.ody.live.dal2.mz-inc.com | 1 |
| 3602 | PEAK1814 | acctdb-1-002-suspect.ody.live.dal2.mz-inc.com | 1 |
| 6648 | PEAK4444 | acctdb-1-002.ody.live.dal2.mz-inc.com | 1 |
| 3822 | PEAK2022 | acctdb-1-002.wiso.live.dal2.mz-inc.com | 1 |
| 3973 | PEAK2171 | acctdb-1-002.wiso.live.dal2.mz-inc.com | 1 |
| 4857 | PEAK2945 | acctdb-1-003.ody.live.dal2.mz-inc.com | 1 |
| 3976 | PEAK2174 | acctdb-1-003.wiso.live.dal2.mz-inc.com | 1 |
| 4409 | PEAK2605 | acctdb-1-003.wiso.live.dal2.mz-inc.com | 1 |
| 4854 | PEAK2942 | acctdb-1-004.ody.live.dal2.mz-inc.com | 1 |
| 4831 | PEAK2919 | acctdb-1-004.wiso.live.dal2.mz-inc.com | 1 |
| 2998 | PEAK1568 | adm-db-atlass-c01-m01.mlp1.addsrv.com | 1 |
| 2999 | PEAK1569 | adm-db-atlass-c01-s01.mlp1.addsrv.com | 1 |
| 4606 | PEAK1769 | adm-util-dns-c01.dal2.mz-inc.com | 1 |
| 2674 | PEAK1288 | adm-util-dns-c01.mlp1.addsrv.com | 1 |
| 3708 | PEAK1920 | adm-util-dns-c02.dal2.mz-inc.com | 1 |
| 2677 | PEAK1291 | adm-util-dns-c02.mlp1.addsrv.com | 1 |
| 2752 | PEAK1366 | adm-util-mha-c01.dal1.addsrv.com | 1 |
| 3597 | PEAK1809 | adm-util-mha-c01.dal2.mz-inc.com | 1 |
| 2770 | PEAK1384 | adm-util-mha-c02.dal1.addsrv.com | 1 |
| 3713 | PEAK1925 | adm-util-mha-c02.dal2.mz-inc.com | 1 |
| 3628 | PEAK1840 | admdb-1-001.ody.live.dal2.mz-inc.com | 1 |
| 4354 | PEAK2550 | admdb-1-001.wiso.live.dal2.mz-inc.com | 1 |
| 3778 | PEAK1990 | admdb-1-002.ody.live.dal2.mz-inc.com | 1 |
| 4363 | PEAK2559 | admdb-1-002.wiso.live.dal2.mz-inc.com | 1 |
| 3781 | PEAK1993 | admdb-1-003.ody.live.dal2.mz-inc.com | 1 |
| 4365 | PEAK2561 | admdb-1-003.wiso.live.dal2.mz-inc.com | 1 |
| 4856 | PEAK2944 | admdb-1-004.ody.live.dal2.mz-inc.com | 1 |
| 4366 | PEAK2562 | admdb-1-004.wiso.live.dal2.mz-inc.com | 1 |
| 3673 | PEAK1885 | allndb-1-001.ody.live.dal2.mz-inc.com | 1 |
| 4888 | PEAK2976 | allndb-1-001.wiso.live.dal2.mz-inc.com | 1 |
| 4412 | PEAK2608 | allndb-1-002.ody.live.dal2.mz-inc.com | 1 |
| 4889 | PEAK2977 | allndb-1-002.wiso.live.dal2.mz-inc.com | 1 |
| 3682 | PEAK1894 | allndb-1-003.ody.live.dal2.mz-inc.com | 1 |
| 4890 | PEAK2978 | allndb-1-003.wiso.live.dal2.mz-inc.com | 1 |
| 4827 | PEAK2915 | allndb-1-004.ody.live.dal2.mz-inc.com | 1 |
| 4891 | PEAK2979 | allndb-1-004.wiso.live.dal2.mz-inc.com | 1 |
| 3675 | PEAK1887 | allndb-2-001.ody.live.dal2.mz-inc.com | 1 |
| 4872 | PEAK2960 | allndb-2-001.wiso.live.dal2.mz-inc.com | 1 |
| 3680 | PEAK1892 | allndb-2-002.ody.live.dal2.mz-inc.com | 1 |

1

MZ APPROVED _BL_ PEAK APPROVED

## SCHEDULE X - SERVER SEVERITY LIST

| Id | Peakname | Customer Name | Severity |
|------|----------|----------------------------|----------|
| 6207 | PEAK4112 | util-spare | 5 |
| 6208 | PEAK4113 | util-spare | 5 |
| 6304 | PEAK4209 | util-spare | 5 |
| 6750 | PEAK4527 | util-spare | 5 |
| 6771 | PEAK4548 | util-spare | 5 |
| 6775 | PEAK4552 | util-spare | 5 |
| 6788 | PEAK4565 | util-spare | 5 |
| 6789 | PEAK4566 | util-spare | 5 |
| 6816 | PEAK4593 | util-spare | 5 |
| 6849 | PEAK4620 | util-spare | 5 |
| 6859 | PEAK4630 | util-spare | 5 |
| 6861 | PEAK4632 | util-spare | 5 |
| 2729 | PEAK1343 | util-spare-mlp1.addsrv.com | 5 |
| 3957 | PEAK2157 | util.spare | 5 |
| 4254 | PEAK2450 | util.spare | 5 |
| 4385 | PEAK2581 | util.spare | 5 |
| 4414 | PEAK2610 | util.spare | 5 |
| 4420 | PEAK2614 | util.spare | 5 |
| 4649 | PEAK2794 | util.spare | 5 |
| 4656 | PEAK2799 | util.spare | 5 |

60

MZ APPROVED _EL_ PEAK APPROVED

# Exhibit B

From: Kimberly Whitaker (kwhittak)
To: Jeffrey Papen
Subject: RE: Bug CSCux02122
Date: Wednesday, November 25, 2015 3:30:15 PM
Attachments: image001.png
image002.jpeg

You got it! This is an official customer facing bug ID. It looks like this was done just yesterday and I have been pushing on our teams this week to get this moving. We don't have the fix yet, but this is the bug ID and this is public information.

Best,

Kimberly Whittaker, CCIE #13806
Manager, Systems Engineering
kwhittak@cisco.com
818-769-5467

d:d:5d9DCA67-9FB7-4C1E-BE2B-C47160E71D12

https://cisco.jiveon.com/groups/cmp-area-community/

_____

From: Jeffrey Papen [mailto:jeffrey@peakhosting.com]
Sent: Wednesday, November 25, 2015 5:26 PM
To: Kimberly Whittaker (kwhittak)
Subject: FW: Bug CSCux02122

This is what team was able to pull down.

- Jeffrey

_____
Jeffrey Papen
Founder & CEO - Peak Hosting
408-533-0291 - Follow me #
What does Peak Hosting Do?

From: Ken McIntyre <kmcintyre@peakhosting.com>
Date: Wednesday, November 25, 2015 at 3:24 PM
To: Jeffrey Papen <jeffrey@peakhosting.com>
Cc: Network Engineering <neteng@peakhosting.com>
Subject: Bug CSCux02122

https://tools.cisco.com/bugsearch/bug/CSCux02122

| | |
|---|---|
| **From:** | Kimberly Whittaker (kwhittak) |
| **To:** | Jeffrey Papen |
| **Cc:** | Jason Forrester; Jon Billow; John Biggi |
| **Subject:** | RE: Where does this say Bug ID? |
| **Date:** | Wednesday, December 02, 2015 1:30:16 PM |
| **Attachments:** | image001.png |

Defect Identifiers=bug ID begin with **CSC.** Service requests=ticket=case begin with **SR.** Below is an example from the bug search tool for the N3048.

https://tools.cisco.com/bugsearch/search?
kw=*&pf=prdNm&pfVal=283970187&sb=anfr&srtBy=byRel&bt=custV

https://tools.cisco.com/bugsearch/

Best,

Kimberly Whittaker, CCIE #13606
Manager, Systems Engineering
kwhittak@cisco.com
816-769-5467

cid:5B3BCA97-9FB7-4C1E-BE2B-C47160E71D12



https://cisco.jiveon.com/groups/cmc-area-community/

**From:** Jeffrey Papen [mailto:jeffrey@peakhosting.com]
**Sent:** Wednesday, December 02, 2015 2:20 PM
**To:** Kimberly Whittaker (kwhittak)
**Cc:** Jason Forrester; Jon Billow; John Biggi
**Subject:** Where does this say Bug ID?
**Importance:** High

Hey Kimberly, I apologize for bugging you again. Where does this call out and specifically say bug ID?

We need something that we can show MZ that makes it clear, this is a bug and not a ticket or case #.

Thanks,
- Jeffrey

---

Jeffrey Papen
Founder & CEO - Peak Hosting
408-533-0291 - Follow me #
**What does Peak Hosting Do?**

**From:** Jon Billow <jbillow@peakhosting.com>
**Date:** Wednesday, December 2, 2015 at 12:15 PM
**To:** Jeffrey Papen <jeffrey@peakhosting.com>
**Subject:** FW: <no subject>

This can only be accessed via:

https://sso.cisco.com/autho/forms/CDClogin.html

And was PDF'd just now so is current.

Jon Billow
**VP, Engineering**
Peak Hosting
www.peakhosting.com
(971) 223-2862 - Cell
(909) 742-8163 - Office

---

**From:** Jason Forrester <jforrester@peakhosting.com>
**Date:** Wednesday, December 2, 2015 at 12:13 PM
**To:** Jon Billow <jbillow@peakhosting.com>
**Subject:** <no subject>

# Exhibit C

| | |
|---|---|
| **From:** | John Biggi |
| **To:** | Tory Valenzuela |
| **Cc:** | Ed Lu; Don Lavoie |
| **Subject:** | Peak/Machine Zone incident root cause explanation |
| **Attachments:** | Peak-Machine Zone incident root cause explanation.docx |
| **Importance:** | High |

Tory,

I wanted to make sure that you had the incident root cause explanation (see attached document). As you can see from the contents of the document, Peak has fulfilled the terms of the MSA relative to unknown vendor bugs.

We appreciate putting this incident behind us and look forward to serving Machine Zone through the term of the contract.

Thanks.

**John Biggi | President**

Peak Hosting | peakhosting.com
C.503.961.5330
Skype: peak.jbiggi

Peak/Machine Zone incident root cause explanation

To best understand the events of the last several weeks it is important to understand the nature of Infrastructure vendors. As vendors issue Generally Available (GA) hardware & software, it is general best practice to test the configuration of the entire integrated system to ensure compatibility & performance. It is impossible for any given vendor to test their products against all customer environments and configurations. As defects are discovered, vendors will release newer version of their software. Once a 'known accepted configuration' is determined, it is industry best-practice to maintain that configuration unless known defects are discovered in that tested configuration, regardless of newer software available.

Even if newer versions of code is released, unless there is a *specific known bug* that is trying to be corrected, Cisco's best practice recommendation is to not upgrade from a known working and tested software version. The reasoning is there is an equal or likely greater chance of introducing new unknown bugs in a newer version of code, than the stable version already being run.

The Machine Zone/Peak contracts specifically addresses the situation where vendor defects are identified, and the steps Peak will take to reasonably mitigate the risk of this event. Peak is not liable for vendor defects as long as Peak can establish. Those five items are as follows:

**#1. Caused by software bugs in vendor code,**
Cisco Bug ID CSCux02122

**#2. Where the bug was not identified in any bug scrub for that code version**
Proved - Cisco Bug ID CSCux02122. See below screenshot to establish this, and that the bug was found on 11/3/15. This issue was found on the established, certified and deployed Cisco 3048 switch running firmware version 6.0(2)U5(2)

Tools & Resources
**Bug Search**

Bug Search   CSCux02122                                                  Help | H Feedback

Loss of control plane with high Memory utilization on 3k Switches
CSCux02122

Description

Symptoms:
Memory utilization increased from 67% to 78% over the last 3-months.
When memory got above 78% the switch became unresponsive.                          Customer Visible
Initially SNMP access was lost. Then, L2 forwarding stop was observed,
Nothing coming out of console serial port.                                          Save Bug
Upon reload the switch came back fine –
                                                                                    Open Support Case
Conditions:

Workaround:

Further Problem Description:

Was the description about this bug Helpful?        (0)

Details

Last Modified: Nov 4, 2015     Known Affected Releases:   (1)    Known Fixed Releases:   (0)
Status: Open                   6.0(2)U5(2)                       Download software for Cisco Nexus
Severity: 3 Moderate                                             3000 Series Switches
Product: Cisco Nexus 3000
Series Switches
Support Cases: 0

Community Discussion on CSCux02122 - Cisco Support Community                        0 Discussion(s)

Start Community Discussion

**#3. The manufacture recommends that code version as the most stable and appropriate version**

From Cisco's website:
http://www.cisco.com/c/en/us/td/docs/switches/datacenter/nexus3000/sw/release/602_U_5_2/n3k_rel_notes_6_0_2_u5_2.html?referring_site=RE&pos=2&page=http://www.cisco.com/c/en/us/td/docs/switches/datacenter/nexus3000/sw/release/602_U_5_1/n3k_rel_notes_6_0_2_u5_1.html

This documentation substantiates that Cisco released this as a certified firmware version for the 3048 switch as of March 18th 2015, and as of November 2rd 205 have been adding support notes and maintaining the documentation set as this being a stable and appropriate firmware version. The chart below clearly indicates this:

Table 2. Hardware Supported by Cisco NX-OS Related 6.x Software.

| Hardware | Part Number | Supported Cisco NX-OS Release | | | | |
|---|---|---|---|---|---|---|
| | | 6.0(2)U1(3) 6.0(2)U1(2) 6.0(2)U1(1a) 6.0(2)U1(1) | 6.0(2)U2(5) 6.0(2)U2(4) 6.0(2)U2(3) 6.0(2)U2(2) 6.0(2)U2(1) | 6.0(2)U3(2) 6.0(2)U3(1) | 6.0(2)U4(4) 6.0(2)U4(3) 6.0(2)U4(2) 6.0(2)U4(1) | 6.0(2)U5(2) 6.0(2)U5(1) |
| Cisco Nexus 3132Q-X switch | N3K-C3132Q-40GX | | | | X | X |
| Cisco Nexus 3172TQ switch | N3K-C3172TQ-10GT | | X | X | X | X |
| Cisco Nexus 3172PQ switch | N3K-C3172PQ-10GE | | X | X | X | X |
| Cisco Nexus 3132Q switch | N3K-C3132Q-40GE | | X | X | X | X |
| Cisco Nexus 3016 switch | N3K-C3016Q-40GE | X | X | X | X | X |
| Cisco Nexus 3048 switch | N3K-C3048TP-1GE | X | X | X | X | X |

#4. Peak tested the code version in our lab and WISO

The following is are three email threads to confirm the Failure Mode Effect Analysis (FMEA) test for the deployment of the Nexus 3048 switches running the 6.0(2)U5(2) firmware in WISO.

The testing would not be performed in ODY because it was already running live production traffic on FMEA tested Nexus 2048.

**Completion of Phase 1**

NOTE – all 3048 testing was completed in phase 1. Phase 2 and 3 were for testing 9508 migration and other elements of the network unrelated to 6.0(2)U5(2)

From: Ramachandra Shenoy
Sent: Wednesday, June 24, 2015 5:55 PM
To: Damon Reed
Cc: JC Chau; Adam Sully; Cameron Berkenpas;                    Machine Zone discussions;
Jeffrey Papen; Network Engineering; MZ-Dedicated;
Subject: Re: WISO Network Test #1 Successful

Damon - Thanks for your support, we will keep in touch for the next set of testing. In the meantime let me know if you have any questions.

Best Regards
Ram N Shenoy
Manager of Infrastructure | Machine Zone
Tel:                    eMail:

On Wed, Jun 24, 2015 at 5:15 PM, Damon Reed <dreed@peakhosting.com> wrote:
We have completed the first round of WISO network testing today over a 4 hour test run period. (~1P-5P PDT)

Testing overall went very well, with only a few switch failure modes triggering some redis log errors. This behavior was somewhat expected- the log errors will potentially crop up when we see the loss of a single packet.

No major loss of connectivity was noted for any of the test elements.

The server uplink failure tests were all successful with no observed impact.

The 3048 failure mode tests were all successful- we covered all of the possible single-element failures for server, RS-peer, and RS-DS/Core connections, as well as full switch reboot or failure. The few log errors we saw were mostly during the reboot/power-off tests, with only one uplink failure out of 8 tested causing a log error.

Overall I consider this a successful test- we still have a lot more testing to continue with after the core migration, but the server connectivity and RS level sampling completed today looked very solid.

I'd like to thank the following people for supporting this test and making it successful:

Adam Sully (Peak TAM)
Kim Perea (Peak DCT Manager)
Jed Needle (Peak CE)
Victoria Acosta (Peak DCT)

Chris Dorn(Peak DCT)
Rickey Trevino(Peak DCT)

Ram N Shenoy(MZ)
Josh Gibbs(MZ)
Cameron Berkenpas(MZ)

Following is a link the the test plan and noted results:
https://docs.google.com/spreadsheets/d/1aLrR72rEbkmzUnIC4w4c0FgcqZ1FwakpAkJHabLCOaQ/edit#gid
=1578940748

--
**Damon Reed**
*Sr. Network Engineer*
**PEAK HOSTING**
dreed@peakhosting.com
Office: (925) 526-5019
Mobile: (925) 699-3285

**From:** JC Chau
**Sent:** Wednesday, June 24, 2015 11:33 AM
**To:** Adam Sully; Cameron Berkenpas
**Cc:** ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊ Machine Zone discussions; Jeffrey Papen;
Network Engineering; MZ-Dedicated; ▊▊▊▊▊
**Subject:** Re: JC green light 9508 WISO installation Tuesday June 30 at 11 AM

+Cameron

Cool. Cameron from my team will be taking point from MZ side.

JC

On Wed, Jun 24, 2015 at 11:14 AM, Adam Sully <asully@peakhosting.com> wrote:
Hello JC and Ram,

As you know, we have FMEA testing scheduled today for the WISO environment. This FMEA testing originally planned to test both the server connections and the failover of the rack switches. With the upgrade of the core switches to 9503's, some of this FMEA testing at a rack switch level will need to be repeated next week. In order to avoid this redundant effort, we'd like to begin server testing and test against 2 TOR pairs (C102/C103) today. Next week Tuesday we will switch to the new core and complete core and TOR testing on Wednesday 7/1.

**Updated FMEA Testing Schedule**
6/24 (12:30 am pst) - Testing begins on all server ports and the TORS pairs in C102 / C103.
6/30 - Install and cutover to 9508 core.
7/1 - FMEA testing on cores and TORS (to include C102/C103)
7/2 - FMEA testing for any missed items or issues requiring further action.

Please let me know if there's any concerns around this timeline. We can discuss further at the start of today's FMEA testing on the conference bridge if necessary.

Thank you,

Adam Sully

Technical Account Manager
www.peakhosting.com
M: 503.833.2001
Here is the notification to Machine Zone after Phase 2 Successful Completion

From: Ramachandra Shenoy <                    >
Date: Wednesday, July 1, 2015 7:58 PM
To: Adam Sully <asully@peakhosting.com>
Cc: Nicholas Gozun                         , Kerry Brabble <kbrabble@peakhosting.com>, Jeff
Routledge                       JC Chau                      , Josh Gibbs
                        Machine Zone discussions <machinezone@peakhosting.com>, Jeffrey
Papen <jeffrey@peakhosting.com>, Network Engineering <neteng@peakhosting.com>, MZ-Dedicated
<MZDedicated@peakhosting.com>, Jing Zeng <                         >, Cameron Berkenpas
                      Jimmy Hom <                          >, Ryan Underwood
                    , Ops-PM
Subject: Re: JC green light 9508 WISO Installation Tuesday June 30 at 11 AM

Hi Adam - Thanks for the update, looking forward to completion of the remaining part. I will be available
for any questions. Thanks.

Best Regards
Ram N Shenoy
Manager of Infrastructure | Machine Zone

On Wed, Jul 1, 2015 at 5:31 PM, Adam Sully <asully@peakhosting.com> wrote:
Hello JC, Jeff, Nick, and Ram,

As discussed with Nick on the phone, our networking team has completed the migration of the logical
routing to the new cores and has validated everything is functioning correctly. This effort took longer than
expected, and we will need to schedule another 4 hour maintenance window for tomorrow. This
maintenance will be non-impacting and will cover moving the redundant TOR switches to the new 9508s.
This final maintenance is scheduled to begin tomorrow morning from 6 am to 10 am pst (9 am - 1 pm est).
The MOP will be the same as yesterday and is pasted below for your reference:

https://docs.google.com/spreadsheets/d/1luNNBX950BhUe9kvbObrhZ6NoP8ZzdsJ98GdR0Kve2Q/edit#gi
d=1328663077

Thank you,

Adam Sully
Technical Account Manager
www.peakhosting.com
M: 503.833.2001

From: Nicholas Gozun
Sent: Wednesday, July 01, 2015 11:15 AM
To: Adam Sully
Cc: Kerry Brabble; Jeff Routledge; Ramachandra Shenoy; JC Chau; Josh Gibbs; Machine Zone discussions;
Jeffrey Papen; Network Engineering; MZ-Dedicated; Jing Zeng; Cameron Berkenpas; Jimmy Hom; Ryan
Underwood; Ops-PM
Subject: Re: JC green light 9508 WISO Installation Tuesday June 30 at 11 AM

MOP has been approved by Ram.

FMEA Phase 3 testing invitations to Nick Gozun and Cameron Berkenpas.

## FMEA WISO testing

**Adam Sully**

Required: Kerry Brabble;        Kimberly Perea
Optional: Erin Stadick;

Sent: Thursday, July 02, 2015 11:52 AM

Thursday, July 02, 2015 12:00 PM-4:00 PM. ⓘ

Where: 909-547-3370,1,576199

· As the meeting organizer, you don't have to respond to this meeting request.

Description:

When: Thursday, July 02, 2015 12:00 PM-4:00 PM. (UTC-08:00) Pacific Time (US & Canada)
Where: 909-547-3370,1,576199

*_*_*_*_*_*_*_*_*_*_*_*

The testing was confirmed successful by the MZ staff at the conclusion of this maintenance window
(which ran 4.5 hours long).

Here is an internal post mortem RE: the MZ staff

> By 10am PST, on 7/2, the migration of the remaining 3048 connections to CR4 was
> completed. The team re-grouped and immediately began discussing the plans for FMEA
> testing. MZ began ramping up CCUs to WISO around 12pm PST and testing began around 30-45
> minutes later. While we hit a few bumps initially, we immediately corrected the issues and
> restarted the tests. Testing was slow going and did not wrap up until around 8:30pm PST.
>
> WISO was not tested with the same load/scale as ODY (less CCU, etc), but MZ seemed to be
> happy with the performance/results from the FMEA testing,
>
> This was a huge team effort that required a lot of man-hours to execute, but overall, the project
> was a success with no impact to ODY and we kept impact to the WISO environment to a
> minimum where possible.

**Here is the follow-up internal confirmation all FMEA testing was successfully completed.**

**From:** Adam Sully
**Sent:** Monday, July 06, 2015 12:26 PM
**To:** Anne-Marie Lentini; Kerry Brabble; Erin Stadick
**Cc:** Chip Pleasants; Brandon Gressett; Network Engineering; Jon Billow; Deb Hellmer-Steele
**Subject:** RE: WISO Core upgrade and go forward decision

Hello Everyone,

Update from last week's status. The 9508 core upgrade was a success, no issues there. Additionally, Kerry
and the rest of the NetEng/DCT team was able to complete the WISO FMEA testing. No further work is
planned for WISO.

Thank you,

Adam Sully

Technical Account Manager
www.peakhosting.com
M: 503.833.2001

**#5 Peak performs monthly bug-scrub vendor check-ins to confirm #1-3**
The following appendix begins with the bug scrub we completed on October 2nd 2015 that clearly shows that there were no known memory leak defects/bugs in the Cisco 3048 switch that were consistent with the bug we found. As such, there was no way to predict this outage on the certified platform. The monthly Bug Scrubs for September through April follow listing all of the known issues with the code and how they do not apply to our Nexus 3048, the features we are running, and in any event would not cause a memory leak or crash.

Bug Scrub – October 2015

Open Bugs for 6.0(2)U5(2)

Bug Scrub (related only to Cisco 3048 environment) 10/2/15

**N3kC3048TP1GE - 5.0(3)U3(2)**

http://www.cisco.com/c/en/us/td/docs/switches/datacenter/nexus3000/sw/release/503_u3_2/n3k_rel_notes_503_u3_2.html#wp374568

**N3kC3048TP1GE - 5.0(3)U5(1a)**

http://www.cisco.com/c/en/us/td/docs/switches/datacenter/nexus3000/sw/release/503_U5_1/n3k_rel_notes_503_u5_1a.html#wp443735

**N3kC3048TP1GE - 6.0(2)U2(2)**

http://www.cisco.com/c/en/us/td/docs/switches/datacenter/nexus3000/sw/release/602_U_2/n3k_rel_notes_6_0_2_u2_2.html#pgfId-496725

**N3kC3048TP1GE - 6.0(2)U3(2)**

http://www.cisco.com/c/en/us/td/docs/switches/datacenter/nexus3000/sw/release/602_U_3/n3k_rel_notes_6_0_2_u3_2.html#pgfId-496725

Bug Scrub – September 2015

**N3kC3048TP1GE - 6.0(2)U5(2)**

Open Bugs for 6.0(2)U5(2)
Report Date: October 2, 2015

Bug Search
----------------
CSCuv63087 (NOTE: Not relevant to Nexus 3048)
Not Applicable, Only applies to Nexus 3100, not Nexus 3048

MAC address is not programmed in BCM HW resulting in unicast flooding

Description
Symptom:
Unknown unicast flooding is noticed on Nexus 3100 switches.

Conditions:
Destination MAC address is programmed in software, but not in hardware.
To check the software entries:
"show mac address-table address X.Y.Z vlan ABCD"
To check the BCM hardware entries: "
"test hardware internal bcm-usd bcm-diag-shell"
followed by
"l2 show"

Workaround:
Reload the Nexus 3100 switch to temporary recover from the issue.

Known Affected Releases:
6.0(2)U5(2)
6.0(2)U2(2.72)
6.0(2)U5(3.56)

Known Fixed Releases: None.

---

CSCuv66055

Clock Timezone command seems to be "ignored" after opening a new session

Description
Symptom:
Command "clock timezone" seems to be ignored by Nexus 3000 after opening a new session towards it.

Conditions:
- Nexus 3000
- Version: 6.0(2)U5(2)
- Log out from Nexus or open a new session right after applying the clock timezone command

Workaround:
- Use NTP instead of Clock Timezone

Further Problem Description: None

Known Affected Releases:
6.0(2)U5(2)

Known Fixed Releases:
No release planned to fix this bug-

---

CSCuv33416 (listed previously but still open)
IPv6 HSRP fails to establish Active/Standby states
Not Applicable, not running IPV6 or HSRP routing on 3048

Description:
Symptom:
IPv6 HSRP fails to establish 'Active/Standby' states between switches on SVIs.

Conditions:
HSRPv2 is configured for IPv6.

Workaround:
Adding a group address that is in the same subnet as the SVI, removing the statically-configured group, adding it back, and then removing the subnet group address on both sides should allow both switches to communicate and establish an 'Active/Standby' state. However, if the SVI is bounced or the switch reloaded, the problem will return and the same workaround must be followed.

Further Problem Description: None.

Known Affected Releases:
6.0(2)U5(2)

Known Fixed Releases: None.
---------

CSCuv33361 (listed previously but still open)
Not Applicable, not running IPV6 CoPP ACLs on 3048

IPv6 CoPP ACLs not present on N3000 switches

Description
Symptom:
IPv6 CoPP is not configured by default and must be manually configured when IPv6-based features are enabled.

Conditions:
This is present only on the N3000 series switches, not N3100 or N3500.

Workaround:
These must be manually configured whenever IPv6-based features are turned on and this is confusing for customers.

Further Problem Description: None.

Known Affected Releases:
6.0(2)U5(2)

Known Fixed Releases: None.


=============================
Release notes last updated: Mar 18, 2015

http://www.cisco.com/c/en/us/td/docs/switches/datacenter/nexus3000/sw/release/602_U_5_2/n3k_rel _notes_6_0_2_u5_2.html

---------

CSCuq01107
Not Applicable – Not running VPC Po on 3048

Traffic flooded when VPC Po is down with a static MAC entry configured for it.

Description
Symptom:
Static mac addresses pointing to VPC Po are flushed and traffic flooding is seen, when VPC PO is made shut.

Conditions:
1. This happens when traffic inteded to egress on Vpc PO is made shut.
2. Once VPC PO comes up, static mac entries are added again by switch and flooding stops.

Workaround:
None

Known Affected Releases:
6.0(2)U3(3)
(But still listed as open in 6.0(2)U5(2))

Known Fixed Releases: None

---

CSCuq89687
Not Applicable – Not running 40 Gig on 3048

40G Spirent test center connected port sometimes goes to linkFlapErrDisabled.

Description

BUG INFORMATION NOT PUBLICLY AVAILABLE

---

CSCur12654
Not Applicable – Not running MLPS on 3048

Removing feature mpls ldp also removes the label range config.

Description
Symptom:
show run diff also does not show the label removal config

Conditions:
ramoving feature mpls ldp also removes the label range config

Workaround:
Before doing "copy startup runn" enable feature mpls ldp and Please configure the label range before re-applying the configuration

Further Problem Description: None

Known Affected Releases:
6.0(2)U4(1M)
6.0(2)U5(0.27)
(But still listed as open in 6.0(2)U5(2))

---------

CSCur14762
Not Applicable – Not running VPC Peer-link DC36-101

Upon no shut of the vpc peer-link DC36-101, there is some packet duplication for all the sourced multicast groups.

Description
Symptom:
Upon no shut of the vpc peer-link DC36-101, there is some packet duplication for all the sourced multicast groups.

Conditions:
yer 2 orphan port connected to VPC

Workaround:
None. This is not a supported topology for Nexus 30XX and 31XX.

Further Problem Description: None

Known Affected Releases:
6.0(2)U3(1)
6.0(2)U4(1)
(But still listed as open in 6.0(2)U5(2))

---------

CSCur60142
Not Applicable – Cosmetic bug not applicable to our version of code

[no] shutdown is always displayed under show running interface.

Description
Symptom:
"[no] shutdown" is always displayed under "show running interface" even if it is default configuration

Conditions:
Breakout member ports

Workaround:
None required

Further Problem Description:
Breakout member ports from software release 6.0(3)U4(1) onwards. "shutdown" or "no shutdown" will always get displayed under "show running interface" of breakout member ports.

Known Affected Releases: (3)
6.0(2)U4(1)
6.0(2)U4(2)
6.0(2)U5(0.963)
No release planned to fix this bug

CSCur76020

GLDN: VRRPv3 tracking support to be added.
Not Applicable – Not running VRRP V3 on Nexus 3048

Description
Basic Description: object tracking feature is not supported in vrrpv3

Symptom:
when vrrpv3 groups are configured, you won't be able to associate it with tracking.

Conditions:
"tracking" submode is not available in case of vrrpv3 config.

Work-around: None

Workaround: None

Further Problem Description: None

Known Affected Releases: (1)
6.0(2)U5(0.988)
(But still listed as open in 6.0(2)U5(2))

CSCur96529
Not Applicable – Not running 16-way ECMP

Error message failed to allocate shared memory for per-protocol nexthop (nh) type.

Description
Symptom:
Error message Failed to allocate shared memory for per-protocol nexthop (nh) type

Conditions:
The number of ECMP x number of routes in ALPM mode exceeds 40K ipv4+40Kipv6 with 16-way ECMP.
The problem could manifest in multiple ways - 82K ipv4 routes + 16-Way ECMP.

Workaround:
None. The current software release do not support scale beyond the documented matrix.

Further Problem Description:
Refer to CCO documentation of ALPM scale matrix for nexus-31XX in 6.0(2)U5(1)

Known Affected Releases: (1)
6.0(2)U5(1)
(But still listed as open in 6.0(2)U5(2))

Also see:

http://www.cisco.com/c/en/us/td/docs/general/xmart/testing/Astoria/cases/61265/b_Nexus3k_Verified
_Scalability_6x/b_Nexus3k_Verified_Scalability_6x_chapter_010.html#reference_3E62A359358D4179AC1
10C2D4C2AC0C1

---------

CSCur78515
Not Applicable – Didn't downgrade code

Port channel members go down after downgrading.

Description

BUG INFORMATION NOT PUBLICLY AVAILABLE

---------

CSCus31911
Not Applicable – Not running CoPP profiles

Entering the copy ABC running command when the switch has a default/l2 CoPP profile and a file ABC has
an L3 CoPP profile config, the PPS credit limit exceeded error is thrown for the copp-s-routingProto1 class-
map.

Description
Symptom:
Switch comes up with default/l2 CoPP profile and a file ABC has L3 CoPP profile config. Now if we do
"copy ABC running", PPS credit limit exceed error is thrown for copp-s-routingProto1 class-map.

Conditions:
This problem happens only when there is a change in CoPP profile between running-config and the file

Workaround:
There are two workarounds for this issue,
- Run "setup" script and change COPP profile to L3.
- Do "copy running" twice

Further Problem Description: None

Known Affected Releases: (1)
6.0(2)U5(1)
No release planned to fix this bug

---------

CSCus32402
Not Applicable – Not running MPLS

Multihop Recursive routes may not be properly installed with MPLS static.

Description
Symptom:Incorrect ECMP next hops programmed in hardware for RNH routes
Conditions:All the below conditions must exist.
1. MPLS static feature enabled
2. The route is a RNH route learn't through an IBGP Next hop.

3. Shut/no shut of new CNH next hops (ECMP paths)
4. Combination of IBGP and EBGP in topology.

Workaround:1. Configure next-hop-self in the IBGP next hop for the route.

Known Affected Releases: (1)
6.0(2)U5(1).
(But still listed as open in 6.0(2)U5(2))

Bug Scrub – August 2015

**N3kC3048TP1GE - 6.0(2)U5(2)**

Open Bugs for 6.0(2)U5(2)
Report Date: September 1, 2015

Bug Search (none *new* since last report)
-----------

CSCuv33416
Not Applicable, not running IPV6 or HSRP routing on 3048
IPv6 HSRP fails to establish Active/Standby states

Description:
Symptom:
IPv6 HSRP fails to establish 'Active/Standby' states between switches on SVIs.

Conditions:
HSRPV2 is configured for IPv6.

Workaround:
Adding a group address that is in the same subnet as the SVI, removing the statically-configured group, adding it back, and then removing the subnet group address on both sides should allow both switches to communicate and establish an 'Active/Standby' state. However, if the SVI is bounced or the switch reloaded, the problem will return and the same workaround must be followed.

Further Problem Description: None.

Known Affected Releases:
6.0(2)U5(2)

Known Fixed Releases: None.
-----------

CSCuv33361
Not Applicable, not running IPV6 CoPP ACLs on 3048

IPv6 CoPP ACLs not present on N3000 switches

Description
Symptom:
IPv6 CoPP is not configured by default and must be manually configured when IPv6-based features are enabled.

Conditions:
This is present only on the N3000 series switches, not N3100 or N3500.

Workaround:
These must be manually configured whenever IPv6-based features are turned on and this is confusing for customers.

Further Problem Description: None.

Known Affected Releases:
6.0(2)U5(2)

Known Fixed Releases: None.

========================

Release notes last updated: Mar 18, 2015

http://www.cisco.com/c/en/us/td/docs/switches/datacenter/nexus3000/sw/release/602_U_5_2/n3k_rel_notes_6_0_2_u5_2.html

--------

CSCuq01107
Not Applicable – Not running VPC Po on 3048

Traffic flooded when VPC Po is down with a static MAC entry configured for it.

Description
Symptom:
Static mac addresses pointing to VPC Po are flushed and traffic flooding is seen, when VPC PO is made shut.

Conditions:
1. This happens when traffic inteded to egress on VPC PO is made shut.
2. Once VPC PO comes up, static mac entries are added again by switch and flooding stops.

Workaround:
None

Known Affected Releases:
6.0(2)U3(3)
(But still listed as open in 6.0(2)U5(2))

Known Fixed Releases: None

--------

CSCuq89687
Not Applicable – Not running 40 Gig on 3048

40G Spirent test center connected port sometimes goes to linkFlapErrDisabled.

Description

BUG INFORMATION NOT PUBLICLY AVAILABLE

CSCur12654
Not Applicable – Not running MLPS on 3048

Removing feature mpls ldp also removes the label range config.

Description
Symptom:
show run diff also does not show the label removal config

Conditions:
removing feature mpls ldp also removes the label range config

Workaround:
Before doing "copy startup runn" enable feature mpls ldp and Please configure the label range before re-applying the configuration

Further Problem Description: None

Known Affected Releases:
6.0(2)U4(1M)
6.0(2)U5(0.27)
(But still listed as open in 6.0(2)U5(2))

---

CSCur14762
Not Applicable – Not running VPC Peer-link DC36-101

Upon no shut of the vpc peer-link DC36-101, there is some packet duplication for all the sourced multicast groups.

Description
Symptom:
Upon no shut of the vpc peer-link DC36-101, there is some packet duplication for all the sourced multicast groups.

Conditions:
yer 2 orphan port connected to VPC

Workaround:
None. This is not a supported topology for Nexus 30XX and 31XX.

Further Problem Description: None

Known Affected Releases:
6.0(2)U3(1)
6.0(2)U4(1)
(But still listed as open in 6.0(2)U5(2))

---

CSCur60142

Not Applicable – Cosmetic bug not applicable to our version of code

[no] shutdown is always displayed under show running interface.

Description
Symptom:
"[no] shutdown" is always displayed under "show running interface" even if it is default configuration

Conditions:
Breakout member ports

Workaround:
None required

Further Problem Description:
Breakout member ports from software release 6.0(3)U4(1) onwards. "shutdown" or "no shutdown" will always get displayed under "show running interface" of breakout member ports.

Known Affected Releases: (3)
6.0(2)U4(1)
6.0(2)U4(2)
6.0(2)U5(0.963)
No release planned to fix this bug

CSCur76020
Not Applicable – Not running VRRP V3 on Nexus 3048

GLDN: VRRPv3 tracking support to be added.

Description
Basic Description: object tracking feature is not supported in vrrpv3

Symptom:
when vrrpv3 groups are configured, you won't be able to associate it with tracking.

Conditions:
"tracking" submode is not available in case of vrrpv3 config.

Work-around: None

Workaround: None

Further Problem Description: None

Known Affected Releases: (1)
6.0(2)U5(0.988)
(But still listed as open in 6.0(2)U5(2))

CSCur96529
Not Applicable – Not running 16-way ECMP

Error message failed to allocate shared memory for per-protocol nexthop (nh) type.

Description
Symptom:
Error message Failed to allocate shared memory for per-protocol nexthop (nh) type

Conditions:
The number of ECMP x number of routes in ALPM mode exceeds 40K ipv4+40Kipv6 with 16-way ECMP.
The problem could manifest in multiple ways - 82K ipv4 routes + 16-Way ECMP.

Workaround:
None. The current software release do not support scale beyond the documented matrix.

Further Problem Description:
Refer to CCO documentation of ALPM scale matrix for nexus-31XX in 6.0(2)U5(1)

Known Affected Releases: (1)
6.0(2)U5(1)
(But still listed as open in 6.0(2)U5(2))

Also see:
http://www.cisco.com/c/en/us/td/docs/general/xmart/testing/Astoria/cases/61265/b_Nexus3k_Verified
_Scalability_6x/b_Nexus3k_Verified_Scalability_6x_chapter_010.html#reference_3E62A359358D4179AC1
10C2D4C2AC0C1

--------
CSCur78515
Not Applicable -- Didn't downgrade code

Port channel members go down after downgrading.

Description

BUG INFORMATION NOT PUBLICLY AVAILABLE

--------
CSCus31911
Not Applicable -- Not running CoPP profiles

Entering the copy ABC running command when the switch has a default/l2 CoPP profile and a file ABC has
an L3 CoPP profile config, the PPS credit limit exceeded error is thrown for the copp-s-routingProto1 class-
map.

Description
Symptom:
Switch comes up with default/l2 CoPP profile and a file ABC has L3 CoPP profile config. Now if we do
"copy ABC running", PPS credit limit exceed error is thrown for copp-s-routingProto1 class-map.

Conditions:
This problem happens only when there is a change in CoPP profile between running-config and the file

Workaround:

There are two workarounds for this issue,
- Run "setup" script and change COPP profile to L3.
- Do "copy running" twice

Further Problem Description: None

Known Affected Releases: (1)
6.0(2)U5(1)
No release planned to fix this bug

_____

CSCus32402
Not Applicable – Not running MPLS

Multihop Recursive routes may not be properly installed with MPLS static.

Description
Symptom:Incorrect ECMP next hops programmed in hardware for RNH routes
Conditions:All the below conditions must exist.
1. MPLS static feature enabled
2. The route is a RNH route learn't through an IBGP Next hop.
3. Shut/no shut of new CNH next hops (ECMP paths)
4. Combination of IBGP and EBGP in topology.

Workaround:1. Configure next-hop-self in the IBGP next hop for the route.

Known Affected Releases: (1)
6.0(2)U5(1)
(But still listed as open in 6.0(2)U5(2))

Bug Scrub – July 2015

**N3kC3048TP1GE - 6.0(2)U5(2)**

Open Bugs for 6.0(2)U5(2)
Report Date: August 4, 2015

Bug Search
_____
CSCuv33416
IPv6 HSRP fails to establish Active/Standby states
Not Applicable, not running IPV6 or HSRP routing on 3048

Description:
Symptom:
IPv6 HSRP fails to establish 'Active/Standby' states between switches on SVIs.

Conditions:
HSRPv2 is configured for IPv6.

Workaround:
Adding a group address that is in the same subnet as the SVI, removing the statically-configured group, adding it back, and then removing the subnet group address on both sides should allow both switches to communicate and establish an 'Active/Standby' state. However, if the SVI is bounced or the switch reloaded, the problem will return and the same workaround must be followed.

Further Problem Description: None.

Known Affected Releases:
6.0(2)U5(2)

Known Fixed Releases: None.
-----------

CSCuv33361

IPv6 CoPP ACLs not present on N3000 switches
Not Applicable, not running IPV6 CoPP ACLs on 3048

Description
Symptom:
IPv6 CoPP is not configured by default and must be manually configured when IPv6-based features are enabled.

Conditions:
This is present only on the N3000 series switches, not N3100 or N3500.

Workaround:
These must be manually configured whenever IPv6-based features are turned on and this is confusing for customers.

Further Problem Description: None.

Known Affected Releases:
6.0(2)U5(2)

Known Fixed Releases: None.

====================================

Release notes last updated: Mar 18, 2015

http://www.cisco.com/c/en/us/td/docs/switches/datacenter/nexus3000/sw/release/602_U_5_2/n3k_rel_notes_6_0_2_u5_2.html

-----------
CSCuq01107
Not Applicable – Not running VPC Po on 3048

Traffic flooded when VPC Po is down with a static MAC entry configured for it.

Description
Symptom:

Static mac addresses pointing to VPC Po are flushed and traffic flooding is seen, when VPC PO is made shut.

Conditions:
1. This happens when traffic inteded to egress on Vpc PO is made shut.
2. Once VPC PO comes up, static mac entries are added again by switch and flooding stops.

Workaround:
None

Known Affected Releases:
6.0(2)U3(3)
(But still listed as open in 6.0(2)U5(2))

Known Fixed Releases: None

--------

CSCuq89687
Not Applicable – Not running 40 Gig on 3048
40G Spirent test center connected port sometimes goes to linkFlapErrDisabled.

Description

BUG INFORMATION NOT PUBLICLY AVAILABLE

--------

CSCur12654
Not Applicable – Not running MLPS on 3048
Removing feature mpls ldp also removes the label range config.

Description
Symptom:
show run diff also does not show the label removal config

Conditions:
removing feature mpls ldp also removes the label range config

Workaround:
Before doing "copy startup runn" enable feature mpls ldp and Please configure the label range before re-applying the configuration

Further Problem Description: None

Known Affected Releases:
6.0(2)U4(1M)
6.0(2)U5(0.27)
(But still listed as open in 6.0(2)U5(2))

--------

CSCur14762
Not Applicable – Not running VPC Peer-link DC36-101

Upon no shut of the vpc peer-link DC36-101, there is some packet duplication for all the sourced multicast groups.

Description
Symptom:
Upon no shut of the vpc peer-link DC36-101, there is some packet duplication for all the sourced multicast groups.

Conditions:
yer 2 orphan port connected to VPC

Workaround:
None. This is not a supported topology for Nexus 30XX and 31XX.

Further Problem Description: None

Known Affected Releases:
6.0(2)U3(1)
6.0(2)U4(1)
(But still listed as open in 6.0(2)U5(2))

---------

CSCur60142
Not Applicable – Cosmetic bug not applicable to our version of code

[no] shutdown is always displayed under show running interface.

Description
Symptom:
"[no] shutdown" is always displayed under "show running interface" even if it is default configuration

Conditions:
Breakout member ports

Workaround:
None required

Further Problem Description:
Breakout member ports from software release 6.0(3)U4(1) onwards. "shutdown" or "no shutdown" will always get displayed under "show running interface" of breakout member ports.

Known Affected Releases: (3)
6.0(2)U4(1)
6.0(2)U4(2)
6.0(2)U5(0.963)
No release planned to fix this bug

---------

CSCur76020
Not Applicable – Not running VRRP V3 on Nexus 3048

GLDN: VRRPv3 tracking support to be added.

Description
Basic Description: object tracking feature is not supported in vrrpv3

Symptom:
when vrrpv3 groups are configured, you won't be able to associate it with tracking.

Conditions:
"tracking" submode is not available in case of vrrpv3 config.

Work-around: None

Workaround: None

Further Problem Description: None

Known Affected Releases: (1)
6.0(2)U5(0.988)
(But still listed as open in 6.0(2)U5(2))

_____

CSCur96529
Not Applicable – Not running 16-way ECMP

Error message failed to allocate shared memory for per-protocol nexthop (nh) type.

Description
Symptom:
Error message Failed to allocate shared memory for per-protocol nexthop (nh) type

Conditions:
The number of ECMP x number of routes in ALPM mode exceeds 40K ipv4+40Kipv6 with 16-way ECMP.
The problem could manifest in multiple ways - 82K ipv4 routes + 16-Way ECMP.

Workaround:
None. The current software release do not support scale beyond the documented matrix.

Further Problem Description:
Refer to CCO documentation of ALPM scale matrix for nexus-31XX in 6.0(2)U5(1)

Known Affected Releases: (1)
6.0(2)U5(1)
(But still listed as open in 6.0(2)U5(2))

Also see:
http://www.cisco.com/c/en/us/td/docs/general/xmart/testing/Astoria/cases/61265/b_Nexus3k_Verified
_Scalability_6x/b_Nexus3k_Verified_Scalability_6x_chapter_010.html#reference_3E62A359358D4179AC1
10C2D4C2AC0C1

_____

CSCur78515
Not Applicable – Didn't downgrade code

Port channel members go down after downgrading.

Description

BUG INFORMATION NOT PUBLICLY AVAILABLE

--------
CSCus31911
Not Applicable — Not running CoPP profiles

Entering the copy ABC running command when the switch has a default/l2 CoPP profile and a file ABC has an L3 CoPP profile config, the PPS credit limit exceeded error is thrown for the copp-s-routingProto1 class-map.

Description
Symptom:
Switch comes up with default/l2 CoPP profile and a file ABC has L3 CoPP profile config. Now if we do "copy ABC running", PPS credit limit exceed error is thrown for copp-s-routingProto1 class-map.

Conditions:
This problem happens only when there is a change in CoPP profile between running-config and the file

Workaround:
There are two workarounds for this issue,
- Run "setup" script and change COPP profile to L3.
- Do "copy running" twice

Further Problem Description: None

Known Affected Releases: (1)
6.0(2)U5(1)
No release planned to fix this bug

--------

CSCus32402
Not Applicable — Not running MPLS

Multihop Recursive routes may not be properly installed with MPLS static.

Description
Symptom:Incorrect ECMP next hops programmed in hardware for RNH routes
Conditions:All the below conditions must exist.
1. MPLS static feature enabled
2. The route is a RNH route learn't through an IBGP Next hop.
3. Shut/no shut of new CNH next hops (ECMP paths)
4. Combination of IBGP and EBGP in topology.

Workaround:1. Configure next-hop-self in the IBGP next hop for the route.

Known Affected Releases: (1)
6.0(2)U5(1)
(But still listed as open in 6.0(2)U5(2))

Bug Scrub – June 2015

**N3kC3048TP1GE - 6.0(2)U5(2)**

Open Bugs for 6.0(2)U5(2)
Report Date: July 1, 2015

Bug Search
-----------
None found affecting 6.0(2)U5(2).

========================

Release notes last updated: Mar 18, 2015

http://www.cisco.com/c/en/us/td/docs/switches/datacenter/nexus3000/sw/release/602_U_5_2/n3k_rel_notes_6_0_2_u5_2.html

---------
CSCuq01107
Not Applicable – Not running VPC Po on 3048

Traffic flooded when VPC Po is down with a static MAC entry configured for it.

Description
Symptom:
Static mac addresses pointing to VPC Po are flushed and traffic flooding is seen, when VPC PO is made shut.

Conditions:
1. This happens when traffic inteded to egress on Vpc PO is made shut.
2. Once VPC PO comes up, static mac entries are added again by switch and flooding stops.

Workaround:
None

Known Affected Releases:
6.0(2)U3(3)
(But still listed as open in 6.0(2)U5(2))

Known Fixed Releases: None

---------

CSCuq89687
Not Applicable – Not running 40 Gig on 3048

40G Spirent test center connected port sometimes goes to linkFlapErrDisabled.

Description

BUG INFORMATION NOT PUBLICLY AVAILABLE

CSCur12654
Not Applicable – Not running MPLS

Removing feature mpls ldp also removes the label range config.

Description
Symptom:
show run diff also does not show the label removal config

Conditions:
removing feature mpls ldp also removes the label range config

Workaround:
Before doing "copy startup runn" enable feature mpls ldp and Please configure the label range before re-applying the configuration

Further Problem Description: None

Known Affected Releases:
6.0(2)U4(1M)
6.0(2)U5(0.27)
(But still listed as open in 6.0(2)U5(2))

CSCur14762
Not Applicable – Not running VPC Peer-link DC36-101

Upon no shut of the vpc peer-link DC36-101, there is some packet duplication for all the sourced multicast groups.

Description
Symptom:
Upon no shut of the vpc peer-link DC36-101, there is some packet duplication for all the sourced multicast groups.

Conditions:
yer 2 orphan port connected to VPC

Workaround:
None. This is not a supported topology for Nexus 30XX and 31XX.

Further Problem Description: None

Known Affected Releases:
6.0(2)U3(1)
6.0(2)U4(1)
(But still listed as open in 6.0(2)U5(2))

CSCur60142
Not Applicable — Cosmetic bug not applicable to our version of code

[no] shutdown is always displayed under show running interface.

Description
Symptom:
"[no] shutdown" is always displayed under "show running interface" even if it is default configuration

Conditions:
Breakout member ports

Workaround:
None required

Further Problem Description:
Breakout member ports from software release 6.0(3)U4(1) onwards. "shutdown" or "no shutdown" will always get displayed under "show running interface" of breakout member ports.

Known Affected Releases: (3)
6.0(2)U4(1)
6.0(2)U4(2)
6.0(2)U5(0.963)
No release planned to fix this bug

---------

CSCur76020
Not Applicable — Not running VRRP V3 on Nexus 3048

GLDN: VRRPv3 tracking support to be added.

Description
Basic Description: object tracking feature is not supported in vrrpv3

Symptom:
when vrrpv3 groups are configured, you won't be able to associate it with tracking.

Conditions:
"tracking" submode is not available in case of vrrpv3 config.

Work-around: None

Workaround: None

Further Problem Description: None

Known Affected Releases: (1)
6.0(2)U5(0.988)
(But still listed as open in 6.0(2)U5(2))

---------

CSCur96529

Not Applicable – Not running 16-way ECMP

Error message failed to allocate shared memory for per-protocol nexthop (nh) type.

Description
Symptom:
Error message Failed to allocate shared memory for per-protocol nexthop (nh) type

Conditions:
The number of ECMP x number of routes in ALPM mode exceeds 40K ipv4+40Kipv6 with 16-way ECMP.
The problem could manifest in multiple ways - 82K ipv4 routes + 16-Way ECMP.

Workaround:
None. The current software release do not support scale beyond the documented matrix.

Further Problem Description:
Refer to CCO documentation of ALPM scale matrix for nexus-31XX in 6.0(2)U5(1)

Known Affected Releases: (1)
6.0(2)U5(1)
(But still listed as open in 6.0(2)U5(2))

Also see:
http://www.cisco.com/c/en/us/td/docs/general/xmart/testing/Astoria/cases/61265/b_Nexus3k_Verified
_Scalability_6x/b_Nexus3k_Verified_Scalability_6x_chapter_010.html#reference_3E62A359358D4179AC1
10C2D4C2AC0C1

---------

CSCur78515
Not Applicable – Didn't downgrade code

Port channel members go down after downgrading.

Description

BUG INFORMATION NOT PUBLICLY AVAILABLE

---------

CSCus31911
Not Applicable -- Not running CoPP profiles

Entering the copy ABC running command when the switch has a default/l2 CoPP profile and a file ABC has
an L3 CoPP profile config, the PPS credit limit exceeded error is thrown for the copp-s-routingProto1 class-
map.

Description
Symptom:
Switch comes up with default/l2 CoPP profile and a file ABC has L3 CoPP profile config. Now if we do
"copy ABC running", PPS credit limit exceed error is thrown for copp-s-routingProto1 class-map.

Conditions:
This problem happens only when there is a change in CoPP profile between running-config and the file

Workaround:
There are two workarounds for this issue,
- Run "setup" script and change COPP profile to L3.
- Do "copy running" twice

Further Problem Description: None

Known Affected Releases: (1)
6.0(2)U5(1)
No release planned to fix this bug

--------

CSCus32402
Not Applicable -- Not running MPLS

Multihop Recursive routes may not be properly installed with MPLS static.

Description
Symptom:Incorrect ECMP next hops programmed in hardware for RNH routes
Conditions:All the below conditions must exist.
1. MPLS static feature enabled
2. The route is a RNH route learn't through an IBGP Next hop.
3. Shut/no shut of new CNH next hops (ECMP paths)
4. Combination of IBGP and EBGP in topology.

Workaround:1. Configure next-hop-self in the IBGP next hop for the route.

Known Affected Releases: (1)
6.0(2)U5(1)
(But still listed as open in 6.0(2)U5(2))

Bug Scrub -- May 2015

N3kC3048TP1GE - 6.0(2)U5(2)

Open Bugs for 6.0(2)U5(2)
Report Date: June 4, 2015

Bug Search
--------------

None found affecting 6.0(2)U5(2).

==========================================

Release notes last updated: Mar 18, 2015

http://www.cisco.com/c/en/us/td/docs/switches/datacenter/nexus3000/sw/release/602_U_5_2/n3k_rel_notes_6_0_2_u5_2.html

--------
CSCuq01107
Not Applicable -- Not running VPC Po on 3048

Traffic flooded when VPC Po is down with a static MAC entry configured for it.

Description
Symptom:
Static mac addresses pointing to VPC Po are flushed and traffic flooding is seen, when VPC PO is made shut.

Conditions:
1. This happens when traffic inteded to egress on Vpc PO is made shut.
2. Once VPC PO comes up, static mac entries are added again by switch and flooding stops.

Workaround:
None

Known Affected Releases:
6.0(2)U3(3)
(But still listed as open in 6.0(2)U5(2))

Known Fixed Releases: None

--------
CSCuq89687
Not Applicable -- Not running 40 Gig on 3048

40G Spirent test center connected port sometimes goes to linkFlapErrDisabled.

Description

BUG INFORMATION NOT PUBLICLY AVAILABLE

--------
CSCur12654
Not Applicable -- Not running MPLS

Removing feature mpls ldp also removes the label range config.

Description
Symptom:
show run diff also does not show the label removal config

Conditions:
removing feature mpls ldp also removes the label range config

Workaround:

Before doing "copy startup runn" enable feature mpls ldp and Please configure the label range before re-applying the configuration

Further Problem Description: None

Known Affected Releases:
6.0(2)U4(1M)
6.0(2)U5(0.27)
(But still listed as open in 6.0(2)U5(2))

---------

CSCur14762
Not Applicable – Not running VPC Peer-link DC36-101

Upon no shut of the vpc peer-link DC36-101, there is some packet duplication for all the sourced multicast groups.

Description
Symptom:
Upon no shut of the vpc peer-link DC36-101, there is some packet duplication for all the sourced multicast groups.

Conditions:
yer 2 orphan port connected to VPC

Workaround:
None. This is not a supported topology for Nexus 30XX and 31XX.

Further Problem Description: None

Known Affected Releases:
6.0(2)U3(1)
6.0(2)U4(1)
(But still listed as open in 6.0(2)U5(2))

---------

CSCur60142
Not Applicable – Cosmetic bug not applicable to our version of code

[no] shutdown is always displayed under show running interface.

Description
Symptom:
"[no] shutdown" is always displayed under "show running interface" even if it is default configuration

Conditions:
Breakout member ports

Workaround:
None required

Further Problem Description:

Breakout member ports from software release 6.0(3)U4(1) onwards. "shutdown" or "no shutdown" will always get displayed under "show running interface" of breakout member ports.

Known Affected Releases: (3)
6.0(2)U4(1)
6.0(2)U4(2)
6.0(2)U5(0.963)
No release planned to fix this bug

--------

CSCur76020
Not Applicable – Not running VRRP V3 on Nexus 3048

GLDN: VRRPv3 tracking support to be added.

Description
Basic Description: object tracking feature is not supported in vrrpv3

Symptom:
when vrrpv3 groups are configured, you won't be able to associate it with tracking.

Conditions:
"tracking" submode is not available in case of vrrpv3 config.

Work-around: None

Workaround: None

Further Problem Description: None

Known Affected Releases: (1)
6.0(2)U5(0.988)
(But still listed as open in 6.0(2)U5(2))

--------

CSCur96529
Not Applicable – Not running 16-way ECMP

Error message failed to allocate shared memory for per-protocol nexthop (nh) type.

Description
Symptom:
Error message Failed to allocate shared memory for per-protocol nexthop (nh) type

Conditions:
The number of ECMP x number of routes in ALPM mode exceeds 40K ipv4+40Kipv6 with 16-way ECMP.
The problem could manifest in multiple ways - 82K ipv4 routes + 16-Way ECMP.

Workaround:
None. The current software release do not support scale beyond the documented matrix.

Further Problem Description:

Refer to CCO documentation of ALPM scale matrix for nexus-31XX in 6.0(2)U5(1)

Known Affected Releases: (1)
6.0(2)U5(1)
(But still listed as open in 6.0(2)U5(2))

Also see:
http://www.cisco.com/c/en/us/td/docs/general/xmart/testing/Astoria/cases/61265/b_Nexus3k_Verified
_Scalability_6x/b_Nexus3k_Verified_Scalability_6x_chapter_010.html#reference_3E62A359358D4179AC1
10C2D4C2AC0C1

---------

CSCur78515
Not Applicable – Didn't downgrade code

Port channel members go down after downgrading.

Description

BUG INFORMATION NOT PUBLICLY AVAILABLE

---------

CSCus31911
Not Applicable – Not running CoPP profiles

Entering the copy ABC running command when the switch has a default/l2 CoPP profile and a file ABC has
an L3 CoPP profile config, the PPS credit limit exceeded error is thrown for the copp-s-routingProto1 class-
map.

Description
Symptom:
Switch comes up with default/l2 CoPP profile and a file ABC has L3 CoPP profile config. Now if we do
"copy ABC running", PPS credit limit exceed error is thrown for copp-s-routingProto1 class-map.

Conditions:
This problem happens only when there is a change in CoPP profile between running-config and the file

Workaround:
There are two workarounds for this issue,
- Run "setup" script and change COPP profile to L3.
- Do "copy running" twice

Further Problem Description: None

Known Affected Releases: (1)
6.0(2)U5(1)
No release planned to fix this bug

---------

CSCus32402
Not Applicable – Not running MPLS

Multihop Recursive routes may not be properly installed with MPLS static.

Description
Symptom:Incorrect ECMP next hops programmed in hardware for RNH routes
Conditions:All the below conditions must exist.
1. MPLS static feature enabled
2. The route is a RNH route learn't through an IBGP Next hop.
3. Shut/no shut of new CNH next hops (ECMP paths)
4. Combination of iBGP and EBGP in topology.

Workaround:1. Configure next-hop-self in the IBGP next hop for the route.

Known Affected Releases: (1)
6.0(2)U5(1)
(But still listed as open in 6.0(2)U5(2))

                              Bug Scrub – April 2015

N3kC3048TP1GE - 6.0(2)U5(2)

Open Bugs for 6.0(2)U5(2)
Report Date: May 2, 2015

Bug Search
-------------
None found affecting 6.0(2)U5(2).

====================================

Release notes last updated: Mar 18, 2015

http://www.cisco.com/c/en/us/td/docs/switches/datacenter/nexus3000/sw/release/602_U_5_2/n3k_rel
  notes_6_0_2_u5_2.html

--------
CSCuq01107
Not Applicable – Not running VPC Po on 3048

Traffic flooded when VPC Po is down with a static MAC entry configured for it.

Description
Symptom:
Static mac addresses pointing to VPC Po are flushed and traffic flooding is seen, when VPC PO is made
shut.

Conditions:
1. This happens when traffic inteded to egress on Vpc PO is made shut.
2. Once VPC PO comes up, static mac entries are added again by switch and flooding stops.

Workaround:
None

Known Affected Releases:
6.0(2)U3(3)
(But still listed as open in 6.0(2)U5(2))

Known Fixed Releases: None

--------

CSCuq89687
Not Applicable – Not running 40 Gig on 3048

40G Spirent test center connected port sometimes goes to linkFlapErrDisabled.

Description

BUG INFORMATION NOT PUBLICLY AVAILABLE

--------

CSCur12654
Not Applicable – Not running MPLS

Removing feature mpls ldp also removes the label range config.

Description
Symptom:
show run diff also does not show the label removal config

Conditions:
removing feature mpls ldp also removes the label range config

Workaround:
Before doing "copy startup runn" enable feature mpls ldp and Please configure the label range before re-applying the configuration

Further Problem Description: None

Known Affected Releases:
6.0(2)U4(1M)
6.0(2)U5(0.27)
(But still listed as open in 6.0(2)U5(2))

--------

CSCur14762
Not Applicable -- Not running VPC Peer-link DC36-101

Upon no shut of the vpc peer-link DC36-101, there is some packet duplication for all the sourced multicast groups.

Description
Symptom:
Upon no shut of the vpc peer-link DC36-101, there is some packet duplication for all the sourced multicast groups.

Conditions:
yer 2 orphan port connected to VPC

Workaround:
None. This is not a supported topology for Nexus 30XX and 31XX.

Further Problem Description: None

Known Affected Releases:
6.0(2)U3(1)
6.0(2)U4(1)
(But still listed as open in 6.0(2)U5(2))

---------

CSCur60142
Not Applicable – Cosmetic bug not applicable to our version of code

[no] shutdown is always displayed under show running Interface.

Description
Symptom:
"[no] shutdown" is always displayed under "show running interface" even if it is default configuration

Conditions:
Breakout member ports

Workaround:
None required

Further Problem Description:
Breakout member ports from software release 6.0(3)U4(1) onwards. "shutdown" or "no shutdown" will always get displayed under "show running interface" of breakout member ports.

Known Affected Releases: (3)
6.0(2)U4(1)
6.0(2)U4(2)
6.0(2)U5(0.963)
No release planned to fix this bug

---------

CSCur76020
Not Applicable – Not running VRRP V3 on Nexus 3048

GLDN: VRRPv3 tracking support to be added.

Description
Basic Description: object tracking feature is not supported in vrrpv3

Symptom:
when vrrpv3 groups are configured, you won't be able to associate it with tracking.

Conditions:
"tracking" submode is not available in case of vrrpv3 config.

Work-around: None

Workaround: None

Further Problem Description: None

Known Affected Releases: (1)
6.0(2)U5(0.988)
(But still listed as open in 6.0(2)U5(2))

---------

CSCur96529
Not Applicable – Not running 16-way ECMP

Error message failed to allocate shared memory for per-protocol nexthop (nh) type.

Description
Symptom:
Error message Failed to allocate shared memory for per-protocol nexthop (nh) type

Conditions:
The number of ECMP x number of routes in ALPM mode exceeds 40K ipv4+40Kipv6 with 16-way ECMP.
The problem could manifest in multiple ways - 82K ipv4 routes + 16-Way ECMP.

Workaround:
None. The current software release do not support scale beyond the documented matrix.

Further Problem Description:
Refer to CCO documentation of ALPM scale matrix for nexus-31XX in 6.0(2)U5(1)

Known Affected Releases: (1)
6.0(2)U5(1)
(But still listed as open in 6.0(2)U5(2))

Also see:
http://www.cisco.com/c/en/us/td/docs/general/xmart/testing/Astoria/cases/61265/b_Nexus3k_Verified
_Scalability_6x/b_Nexus3k_Verified_Scalability_6x_chapter_010.html#reference_3E62A359358D4179AC1
10C2D4C2AC0C1

---------

CSCur78515
Not Applicable – Didn't downgrade code

Port channel members go down after downgrading.

Description

BUG INFORMATION NOT PUBLICLY AVAILABLE

---------

CSCus31911
Not Applicable – Not running CoPP profiles

Entering the copy ABC running command when the switch has a default/l2 CoPP profile and a file ABC has an L3 CoPP profile config, the PPS credit limit exceeded error is thrown for the copp-s-routingProto1 class-map.

Description
Symptom:
Switch comes up with default/l2 CoPP profile and a file ABC has L3 CoPP profile config. Now if we do "copy ABC running", PPS credit limit exceed error is thrown for copp-s-routingProto1 class-map.

Conditions:
This problem happens only when there is a change in CoPP profile between running-config and the file

Workaround:
There are two workarounds for this issue,
- Run "setup" script and change COPP profile to L3.
- Do "copy running" twice

Further Problem Description: None

Known Affected Releases: (1)
6.0(2)U5(1)
No release planned to fix this bug

----------


CSCus32402
Not Applicable – Not running MPLS

Multihop Recursive routes may not be properly installed with MPLS static.

Description
Symptom:Incorrect ECMP next hops programmed in hardware for RNH routes
Conditions:All the below conditions must exist.
1. MPLS static feature enabled
2. The route is a RNH route learn't through an IBGP Next hop.
3. Shut/no shut of new CNH next hops (ECMP paths)
4. Combination of IBGP and EBGP in topology.

Workaround:1. Configure next-hop-self in the IBGP next hop for the route.

Known Affected Releases: (1)
6.0(2)U5(1)
(But still listed as open in 6.0(2)U5(2))

# EXHIBIT C

*to*

# *NOTICE OF REMOVAL*

Fill in this information to identify your case:

United States Bankruptcy Court for the:

DISTRICT OF OREGON

Case number (if known) _____ Chapter **11**

☐ Check if this an
amended filing

## Official Form 201
# Voluntary Petition for Non-Individuals Filing for Bankruptcy

**4/16**

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and case number (if known).
For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

| | | | |
|---|---|---|---|
| 1. | **Debtor's name** | **Peak Web LLC** | |
| 2. | **All other names debtor used in the last 8 years**<br>Include any assumed names, trade names and *doing business as* names | **DBA  Peak Hosting** | |
| 3. | **Debtor's federal Employer Identification Number** (EIN) | **26-3583745** | |

| | | | |
|---|---|---|---|
| 4. | **Debtor's address** | **Principal place of business** | **Mailing address, if different from principal place of business** |
| | | **35200 SW Deer Park Rd.**<br>**Wilsonville, OR 97070**<br>Number, Street, City, State & ZIP Code | **19363 Willamette Dr.**<br>**Mailbox 498**<br>**West Linn, OR 97068**<br>P.O. Box, Number, Street, City, State & ZIP Code |
| | | **Clackamas**<br>County | **Location of principal assets, if different from principal place of business**<br>**1725 Comstock St., Suite 103 Santa Clara, CA 95054**<br>Number, Street, City, State & ZIP Code |

| | | |
|---|---|---|
| 5. | **Debtor's website** (URL) | |

| | | |
|---|---|---|
| 6. | **Type of debtor** | ■ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))<br>☐ Partnership (excluding LLP)<br>☐ Other. Specify: _____ |

**7.** **Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

■ None of the above

B. *Check all that apply*

☐ Tax-exempt entity (as described in 26 U.S.C. §501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. §80a-3)

☐ Investment advisor (as defined in 15 U.S.C. §80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor.
See http://www.uscourts.gov/four-digit-national-association-naics-codes.

<u>5191</u>

**8.** **Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check one:*

☐ Chapter 7

☐ Chapter 9

■ Chapter 11. *Check all that apply*:

    ☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,566,050 (amount subject to adjustment on 4/01/19 and every 3 years after that).

    ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

    ☐ A plan is being filed with this petition.

    ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

    ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

    ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9.** **Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

■ No.

☐ Yes.

| District | | When | | Case number | |
|---|---|---|---|---|---|
| District | | When | | Case number | |

**10.** **Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list

■ No

☐ Yes.

| Debtor | | | Relationship | |
|---|---|---|---|---|
| District | | When | Case number, if known | |

| | | |
|---|---|---|
| **11.** | **Why is the case filed in this district?** | *Check all that apply:*<br><br>■ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.<br><br>☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district. |
| **12.** | **Does the debtor own or have possession of any real property or personal property that needs immediate attention?** | ■ No<br>☐ Yes.   Answer below for each property that needs immediate attention. Attach additional sheets if needed.<br><br>**Why does the property need immediate attention?** (*Check all that apply.*)<br><br>☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.<br>    What is the hazard? _____<br><br>☐ It needs to be physically secured or protected from the weather.<br><br>☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).<br><br>☐ Other _____<br><br>**Where is the property?** _____<br>    Number, Street, City, State & ZIP Code<br><br>**Is the property insured?**<br>☐ No<br>☐ Yes.   Insurance agency _____<br>         Contact name _____<br>         Phone _____ |

| | **Statistical and administrative information** |
|---|---|

| | | |
|---|---|---|
| **13.** | **Debtor's estimation of available funds** | *Check one:*<br><br>■ Funds will be available for distribution to unsecured creditors.<br><br>☐ After any administrative expenses are paid, no funds will be available to unsecured creditors. |

| | | | | |
|---|---|---|---|---|
| **14.** | **Estimated number of creditors** | ☐ 1-49<br>☐ 50-99<br>☐ 100-199<br>■ 200-999 | ☐ 1,000-5,000<br>☐ 5001-10,000<br>☐ 10,001-25,000 | ☐ 25,001-50,000<br>☐ 50,001-100,000<br>☐ More than 100,000 |
| **15.** | **Estimated Assets** | ☐ $0 - $50,000<br>☐ $50,001 - $100,000<br>☐ $100,001 - $500,000<br>☐ $500,001 - $1 million | ☐ $1,000,001 - $10 million<br>☐ $10,000,001 - $50 million<br>☐ $50,000,001 - $100 million<br>■ $100,000,001 - $500 million | ☐ $500,000,001 - $1 billion<br>☐ $1,000,000,001 - $10 billion<br>☐ $10,000,000,001 - $50 billion<br>☐ More than $50 billion |
| **16.** | **Estimated liabilities** | ☐ $0 - $50,000<br>☐ $50,001 - $100,000<br>☐ $100,001 - $500,000<br>☐ $500,001 - $1 million | ☐ $1,000,001 - $10 million<br>☐ $10,000,001 - $50 million<br>■ $50,000,001 - $100 million<br>☐ $100,000,001 - $500 million | ☐ $500,000,001 - $1 billion<br>☐ $1,000,000,001 - $10 billion<br>☐ $10,000,000,001 - $50 billion<br>☐ More than $50 billion |

| | **Request for Relief, Declaration, and Signatures** |
|---|---|

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is trued and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    **June 13, 2016**
       MM / DD / YYYY

**X** **/s/ Jeffrey E. Papen**            **Jeffrey E. Papen**
   Signature of authorized representative of debtor           Printed name

Title    **CEO**

**18. Signature of attorney**

**X** **/s/ Timothy J. Conway**       Date **June 13, 2016**
   Signature of attorney for debtor              MM / DD / YYYY

**Timothy J. Conway**
Printed name

**Tonkon Torp LLP**
Firm name

**1600 Pioneer Tower**
**888 SW Fifth Ave**
**Portland, OR 97204-2099**
Number, Street, City, State & ZIP Code

Contact phone    **503-221-1440**       Email address    **timothy.conway@tonkon.com**

   **Oregon Bar No. 851752**
Bar number and State

1 | **Timothy J. Conway**, OSB No. 851752 (Lead Attorney)
    Direct Dial: (503) 802-2027
2 |   Facsimile:  (503) 972-3727
    E-Mail:      tim.conway@tonkon.com
3 | **Ava L. Schoen**, OSB No. 044072
    Direct Dial: (503) 802-2143
4 |   Facsimile:  (503) 972-3843
    E-Mail:      ava.schoen@tonkon.com
5 | **TONKON TORP** LLP
   1600 Pioneer Tower
6 | 888 S.W. Fifth Avenue
   Portland, OR  97204
7 |
         Attorneys for Peak Web LLC
8 |
9 |              UNITED STATES BANKRUPTCY COURT
10 |                   DISTRICT OF OREGON
11 | In re                              | Case No.
12 | Peak Web LLC,                      | **DISCLOSURE OF
13 |              Debtor.               | COMPENSATION OF ATTORNEY
     |                                  | FOR DEBTOR PURSUANT TO
14 |                                    | RULE 2016(b)**
15 |        Tonkon Torp LLP ("Tonkon"), pursuant to Bankruptcy Rule 2016(b), states
16 | that:
17 |        1.      Tonkon has been engaged by Debtor herein to act as its general
18 | bankruptcy counsel in this case.
19 |        2.      In the twelve months preceding the filing of this Chapter 11 case,
20 | Tonkon received the following payments: a $100,000.00 retainer on June 1, 2016; a
21 | $17,450.60 retainer on June 2, 2016; and a $57,550.00 retainer on June 10, 2016.
22 | Immediately prior to filing the Petition, $72,373.50 was applied to current fees and costs,
23 | incurred prior to the Petition, which includes the bankruptcy filing fee of $1,717.00.  The
24 | remaining retainer balance of $102,627.10 is held in Tonkon's trust account.  All payments
25 | were made to Tonkon from the Debtor, except for the $17,450.60 retainer on June 2, 2016,
26 | which was received from Debtor's prior bankruptcy counsel.

**Page 1 of 2 -** DISCLOSURE OF COMPENSATION OF ATTORNEY FOR DEBTOR PURSUANT
        TO RULE 2016(b)

1    3.    The filing fee for commencing this Chapter 11 case will be paid in full.

2    4.    The source of payments to be made by Debtor to Tonkon for legal

3  services, filing fees, and costs incurred in or in connection with this case will be from the

4  Debtor and from property of the bankruptcy estate.

5  Tonkon has not shared or agreed to share with any person, other than its members, any

6  compensation paid or to be paid.

7           DATED this 13th day of June, 2016.

8           TONKON TORP LLP

9

10          By /s/ Timothy J. Conway
               Timothy J. Conway, OSB No. 851752
11             Ava L. Schoen, OSB No. 044072
               Attorneys for Peak Web LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Page 2 of 2 -** DISCLOSURE OF COMPENSATION OF ATTORNEY FOR DEBTOR PURSUANT
        TO RULE 2016(b)

ill in this information to identify the case:

| | |
|---|---|
| Debtor name | **Peak Web LLC** |
| United States Bankruptcy Court for the: | **DISTRICT OF OREGON** |
| Case number (if known): | |

☐ Check if this is an

amended filing

# Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders
**12/15**

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31).  Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| CoreSite, L.P. 1001 17th Street Suite 500 Denver, CO  80202 | Debbie Hice Ph:  303-405-1008 debbie.hice@Core Site.com | Lease termination | | | | $1,225,000.00 |
| Zynga Inc 315 Montgomery Street San Francisco, CA 94104 | Meredith Lobel-Angel 415-445-4201 mobelangel@zyng a.com | Promissory Note. | | | | $598,122.36 |
| InterXion Datacenters B.V. Cessnalaan 50 1119 NL Schiphol-Rijk PO Box 75812 Netherlands | Sebastian Holtslag 31-20-880-7600 sebastianh@interxi on.com | Lease termination | | | | $469,617.00 |
| Themesoft, Inc 13601 Preston Rd, Ste W860 Dallas, TX 75240 | Natalia Martinez 972-474-8787 natalia@themesoft. com | Information technology staffing services. | | | | $457,932.04 |
| Gregory M. Rodriguez 2 Kinghurst San Antonio, TX 78248 | Gregory M. Rodriguez 210-286-0832 senorgreg3658@g mail.com | Separation agreement | | | | $375,995.98 |
| Zayo Group, LLC P.O. Box 952136 Dallas, TX 75395-2136 | Kristen Stimler 800-390-6094 billing@zayo.com | Internet service provider. | | | | $190,815.11 |
| Data Sales Co., Inc. 3450 W. Burnsville Parkway Burnsville, MN 55337 | Ann Seurer (952) 890.8838 aseurer@datasales .com | Equipment lease. | | | | $100,000.00 |

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com                                                                Best Case Bankruptcy

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| Lightower POB 28730 New York, NY 10087 | Scott Callahan 978-268-93-09 scallahan@lightower.com | Internet service provider. | | | | $66,540.00 |
| Mainz Brady Group P.O Box 620375 Woodside, CA 94062 | Maria Mendoza 650-522-3955 maria@mbg.com | Information technology staffing services. | | | | $64,560.00 |
| Hewlett-Packard Financial Services Co. P.O. Box 402582 Atlanta, GA 30384-2582 | Arthur Gass 888-254-0006 arthur.gass@hp.com | Equipment lease. | | | | $58,000.00 |
| CISCO Systems Capital Crp P.O. Box 742927 Los Angeles, CA 90074-2927 | Lisa Kimble 866-654-0247 lkimble@cisco.com | Equipment lease. | | | | $47,000.00 |
| 8X8 INC Dept. 848080 Los Angeles, CA 90084-8080 | Stefan Falcon 888-898-8733 Stefan.falcon@8x8.com | Business telephone and call center services. | | | | $44,915.48 |
| American Express PO Box 660448 Dallas, TX 75265-0448 | 800-424-0448 | Credit card. | | | | $43,715.94 |
| Dell Marketing, L.P. c/o Dell USA L.P. PO Box 910916 Pasadena, CA 91110-0916 | Ghulam Hussain 877-671-1355 ghulam_hussain@dell.com | Data center supplies. | | | | $42,602.00 |
| Citi Credit Cards PO Box 78045 Phoenix, AZ 85062-8045 | 800-732-6000 alerts@citibank.com | Credit card | | | | $36,104.06 |
| Giglinx Inc. 6895 East Camelback Road Suite 115 Scottsdale, AZ 85251 | Laura Talbot 254-642-0001 accounting@giglinx.com | Internet service provider. | | | | $35,923.16 |
| Dasher Technologies, Inc. 655 Campbell Technology Pkwy suite 150 Campbell, CA 95008 | Michael Cook 408-409-2849 michael.cook@dasher.com | Data center supplies | | | | $34,306.39 |
| Axis Capital, Inc PO BOX 911685 Denver, CO 80291-1685 | Cindy Early 800-994-0016 cindye@quailcap.com | Equipment lease. | | | | $33,904.57 |

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com     Best Case Bankruptcy

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| **Dell Financial Services Payment Processing Center PO Box 6410 Carol Stream, IL 60197-6410** | **Susan Burleson 877-663-3355 susan_burleson@dell.com** | **Equipment lease.** | | | | **$30,000.00** |
| **St. Paul Fire & Marine Insurance c/o Joel A. Parker Schwabe Williamson & Wyatt PC 1211 SW 5th Avenue, #1900 Portland, OR 97204** | **Joel A. Parker 503-222-9981 jparker@schwabe.com** | **Litigation.** | **Disputed** | | | **Unknown** |

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy

**Fill in this information to identify the case:**

Debtor name    **Peak Web LLC**

United States Bankruptcy Court for the:    DISTRICT OF OREGON

Case number (if known) _____

☐ Check if this is an
   amended filing

## Official Form 202
# Declaration Under Penalty of Perjury for Non-Individual Debtors    12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

**WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

   ☐   *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)
   ☐   *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
   ☐   *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)
   ☐   *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)
   ☐   *Schedule H: Codebtors* (Official Form 206H)
   ☐   *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)
   ☐   Amended *Schedule*
   ■   *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)
   ☐   Other document that requires a declaration   _____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    **June 13, 2016**      X **/s/ Jeffrey E. Papen**
                                          Signature of individual signing on behalf of debtor

                                          **Jeffrey E. Papen**
                                          Printed name

                                          **CEO**
                                          Position or relationship to debtor

1 **Timothy J. Conway**, OSB No. 851752 (Lead Attorney)
   Direct Dial: (503) 802-2027
2  Facsimile:  (503) 972-3727
   E-Mail:    tim.conway@tonkon.com
3 **Ava L. Schoen**, OSB No. 044072
   Direct Dial: (503) 802-2143
4  Facsimile:  (503) 972-3843
   E-Mail:    ava.schoen@tonkon.com
5 **TONKON TORP** LLP
  1600 Pioneer Tower
6 888 S.W. Fifth Avenue
  Portland, OR  97204
7
       Attorneys for Peak Web LLC
8

9              UNITED STATES BANKRUPTCY COURT

10                  DISTRICT OF OREGON

11  In re                              Case No.

12  Peak Web LLC,                      **CERTIFICATE OF SERVICE OF LIST
                                       OF CREDITORS HOLDING
13              Debtor.                20 LARGEST UNSECURED CLAIMS
                                       ON THE U.S. TRUSTEE**

14

15        I hereby certify that I served (1) a copy of the List of Creditors Holding 20

16  Largest Unsecured Claims**;** (2) address mailing labels for Debtor, Debtor's attorney, and a

17  contact person for each creditor on the list; and (3) this Certificate of Service, on the

18  U.S. Trustee at 620 SW Main Street, Room 213, Portland, Oregon 97205, by causing a copy

19  thereof to be e-mailed on June 13, 2016.  I hereby further certify that each of the above items

20  was hand delivered to the U.S. Trustee at the address set forth above on June 13, 2016.

21        DATED this 13th day of June, 2016.

22                  TONKON TORP LLP

23

24                  By /s/ Timothy J. Conway
                       Timothy J. Conway, OSB No. 851752
25                     Ava L. Schoen, OSB No. 044072
                       Attorneys for Peak Web LLC
26

**Page 1 of 1 -** CERTIFICATE OF SERVICE OF LIST OF CREDITORS HOLDING 20 LARGEST
UNSECURED CLAIMS ON THE U.S. TRUSTEE

# United States Bankruptcy Court
### District of Oregon

In re    __Peak Web LLC__            Case No.    __16-32311-pcm11__

                     Debtor(s)         Chapter    __11__

## CORPORATE OWNERSHIP STATEMENT (RULE 7007.1)

Pursuant to Federal Rule of Bankruptcy Procedure 7007.1 and to enable the Judges to evaluate possible disqualification or recusal, the undersigned counsel for __Peak Web LLC__ in the above captioned action, certifies that the following is a (are) corporation(s), other than the debtor or a governmental unit, that directly or indirectly own(s) 10% or more of any class of the corporation's(s') equity interests, or states that there are no entities to report under FRBP 7007.1:

**FWH Holdings LLC**
**1916 Pike Place, #12-510**
**Seattle, WA 98101**

☐ None [*Check if applicable*]

__June 13, 2016__              /s/ Timothy J. Conway

Date                            **Timothy J. Conway**

                              Signature of Attorney or Litigant

                              Counsel for    **Peak Web LLC**

                              **Tonkon Torp LLP**
                              **1600 Pioneer Tower**
                              **888 SW Fifth Ave**
                              **Portland, OR 97204-2099**
                              **503-221-1440 Fax:503-274-8779**

# EXHIBIT D

*to*

# *NOTICE OF REMOVAL*

```
1                   UNITED STATES BANKRUPTCY COURT
                     FOR THE DISTRICT OF OREGON
2

3    IN RE:                    :     Case No. 16-32311-pcm-ll

4    PEAK WEB LLC,             :
                                     Portland, Oregon
5         Debtor.             :     Wednesday, June 15, 2016
                                     10:30 a.m.
6    : : : : : : : : : : : : : : : : : : : : : : : : : : : :

7

8              TRANSCRIPT OF PRELIMINARY HEARINGS
            BEFORE THE HONORABLE PETER C. McKITTRICK,
9                 UNITED STATE BANKRUPTCY JUDGE

10
     APPEARANCES:
11
     For the Debtor:          TIMOTHY J CONWAY, ESQ.
12                            AVA L SCHOEN, ESQ.
                              888 SW 5th Avenue, Suite 1600
13                            Portland, OR  97204

14   For Bank of the West:    AARON J BELL, ESQ.
                              Post Office Box 1547
15                            Wilsonville, OR  97070

16   For the United States    Office of the U. S. Trustee
     Trustee, Portland:       BY:  CARLA G. McCLURG, ESQ.
17                            620 SW Main Street, Suite 213
                              Portland, OR  97205
18

19   TRANSCRIPT PREPARED BY:  JANICE RUSSELL TRANSCRIPTS
                              1418 Red Fox Circle
20                            Severance, CO  80550
                              757/422-9089
21                            trussell31@tdsmail.com

22
     Proceedings recorded by electronic sound recording; transcript
23   produced by transcription service.

24

25
```

```
 1  APPEARANCES (continued):

 2  For Financial Pacific        JAMES P. LAURICK, ESQ.
    Leasing:                     732 NW 19th Avenue
 3                               Portland, OR  97209-1302

 4
    ALSO PRESENT:                LISA BUNDAY
 5                               JEFFREY PAPEN
                                 JON BILLOW
 6                               Peak Hosting

 7                               MARK CALVERT
                                 Cascade Capital Group
 8

 9
    APPEARANCES (via telephone):
10
    For the United States        Office of the U. S. Trustee
11  Trustee, Portland:           BY:  KATHYRN E. PERKINS, ESQ.
                                 700 Stewart Street, Suite 5103
12                               Seattle, WA  98101

13  For PSA 9, LLC:              Beacon Law Advisors, PLLC
                                 BY:  SHANE ANDERSON, ESQ.
14                               801 2nd Avenue, Suite 350
                                 Seattle, WA  98104
15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2         (Call to Order of the Court)

3              THE COURT:  Please be seated.  Good morning.

4              This is time set for preliminary hearings in the case

5    of Peak Web LLC, Case No. 16-32311.

6              So before we get started, we have a couple folks on

7    the phone.  I wanted to be sure that I had a full roll call on

8    that.  We have Kathleen [sic] Perkins from the U. S. Trustee's

9    Office in Seattle.

10             Ms. Perkins, are you there?

11             MS. PERKINS:  I am, yes, Your Honor.

12             THE COURT:  Thank you.

13             And we have Shane Anderson from Beacon Law Advisors?

14             MR. ANDERSON:  Yes, Your Honor.  I'm, I'm here.

15             THE COURT:  And, Mr. Anderson, who, who do you

16   represent?

17             MR. ANDERSON:  PSA 9, LLC --

18             THE COURT:  Okay, great.

19             MR. ANDERSON:  -- which is the lender.

20             THE COURT:  Right.

21             All right, Mr. Conway.  Why don't, unless you want to

22   do it in different order, perhaps we could start with the

23   motion for authority to use cash collateral and the motion for

24   authority to obtain credit.

25             MR. CONWAY:  Yes, Your Honor, if I could, just -- I'd

 1   like to take a little bit different order.  I think the --

 2              THE COURT:  Okay.

 3              MR. CONWAY:  -- cash collateral, operating loan,

 4   payroll, and utilities are all going to be non-controversial.

 5   The --

 6              THE COURT:  Okay.

 7              MR. CONWAY:  The secured litigation loan, we may need

 8   to discuss more about.

 9              So first of all, thank you, Your Honor, for having us

10   here today on such an expedited basis.  We do appreciate that.

11              I'd like to introduce you to the people on behalf of

12   the company.  So first would be Mr. Mark Calvert with the

13   Cascade Capital Group.  He's --

14              THE COURT:  Good morning.

15              MR. CONWAY:  He's the --

16              MR. CALVERT:  Good morning.

17              MR. CONWAY:  -- chief restructuring officer.

18              Jeffrey Papen is the founder and the owner.

19              THE COURT:  Good morning.

20              MR. CONWAY:  And then we have Lisa Bunday, who is the

21   chief financial officer.

22              THE COURT:  Okay.

23              MR. CONWAY:  And then Mr. Jon Billow is the chief

24   technology officer.

25              THE COURT:  Great.

1       THE COURT:  And I should say I've, I've read the

2  declaration and the accompanying, and all the motions.  So I'm

3  -- I have a, some familiarity with kind of the business and

4  what we're doing here, so.

5       MR. CONWAY:  Okay, perfect.

6       So, so yeah, just a little recap.  The company was

7  founded in 2001 by Mr. Papen.  It's, it's grown.  It's

8  developed.  It was doing very well.  It was very successful in

9  obtaining a very large client, Machine Zone, which was

10 excellent in the beginning.  As you've read through the

11 paperwork, there was a dispute and there is a dispute with

12 Machine Zone.  The company operations went from a million a

13 month to five million with Machine Zone.  Now that the Machine

14 Zone contract has been terminated and there's litigation

15 ongoing about that, the company has shrunk back down.  The

16 company did the best job it could prepetition to try to

17 restructure its operation.

18      So since January, maybe late December, the company's

19 been working with a number of its vendors.  There's probably 26

20 different vendors with secured and leases.  It's worked out a

21 lot of different arrangements through that time.  It couldn't

22 get all 26 onboard at the same time.  They are also working

23 with the Bank, who is very helpful through the process, even

24 gave them an additional loan in March.  Unfortunately, we

25 weren't able to get everybody onboard.

1    So what we're doing now with the Chapter 11 is simply

2 just finishing up that process.

3    The company has a significant amount of equipment

4 that's being returned that's no longer necessary.  Most of

5 that, if not all of it, has already been identified, put on

6 pallets by lender, checked for serial numbers, and shrink

7 wrapped.  A number of lenders have already picked up their

8 equipment.  We were hoping all of that would have been done

9 prepetition, but it's not.  So that, some of that is still

10 ongoing today.

11    That leaves us to where we are today, which is

12 allowing the company to continue to operate.  I see this case

13 following two different facets that are parallel, but somewhat

14 distinct.  One is the operations, the operations of the

15 company, which we want to restructure, and have it the right

16 size for its debt and its current operations.  That'll be the

17 operating side of things.

18    We also need to make sure that the litigation goes

19 forward.  The litigation claims that the company has against

20 Machine Zone are about a hundred million dollars.  If the

21 company is successful in that, the creditors would get paid in

22 full.  So that's a very valuable asset and we want to protect

23 that asset.  Right prior to the filing of the bankruptcy

24 petition, new counsel was retained, Susman Godfrey.  They're a

25 very prestigious plaintiffs' litigation law firm out of

1  Seattle, but they're nationwide.  They are now onboard.  They

2  will be helping prosecute the claims.  They'll also help on the

3  defense side as well.

4          There are a number of experts that need to be

5  retained.  They -- the trial -- it has a fixed trial date of

6  March 2017.  So that's nine months away.  Summary judgment

7  motions are all due four months prior to that.  So that's only

8  five months away.  And they need to retain a multiple of

9  experts, intellectual property experts, trade secret experts,

10 damages experts.  We need to be able to get the law firm money

11 to retain those experts as quickly as possible.  Fifty thousand

12 was put in by the lender prepetition just to do the initial

13 start of that.  We need $150,000 to do the next phase of that

14 as soon as possible and then the total cost of that litigation

15 expense side would be 1.5 million.  The law firm itself is

16 working on a contingency fee, but, of course, they need the

17 expenses and in this type of litigation you've got an enormous

18 amount of discovery and experts and even the electronic

19 discovery is very expensive, as, as you know.

20         So it is very expensive.  That's why we estimate it'll

21 be up to a million five for that.

22         So our, our plan through the bankruptcy is stabilize

23 the litigation by getting it lined up with that counsel

24 employed with the funding necessary to pay those expenses, then

25 that can be on that track.  And then in the Chapter 11 we'll

1  spend our time concentrating on the actual reorganization of

2  the company like you would in a typical bankruptcy.

3          So that's the big picture, Your Honor.

4          THE COURT:  Okay.

5          MR. CONWAY:  So in that regard, we have filed a motion

6  for authority to use cash collateral.

7          THE COURT:  Uh-huh.  (Indicating an affirmative

8  response)

9          MR. CONWAY:  Bank of the West is the only creditor

10  with a security interest in the cash collateral.  They're here

11  today represented by Mr. Bell.  We have had discussions with

12  them.  We have presented the budget.

13          The -- all of the expenses for the month of June are

14  necessary to keep the operations done.  The company, with

15  Mr. Calvert's assistance, has done an excellent job of

16  downsizing and making sure that we've cut this thing to the

17  bone as best we can.  We'll continue to look at that throughout

18  the case, but they've already done the hard work of trying to

19  right size the company for now.

20          So unless there's any questions about the cash

21  collateral, I would ask that the Court accept the declaration

22  of Mr. Calvert in lieu of testimony and that we would ask that

23  the Court approve the cash collateral order.

24          THE COURT:  So I will accept the declaration in lieu

25  of the testimony.

1        Mr. Bell, do you have any comments or wish to be heard

2    on this?

3        MR. BELL:  Just very quickly, Your Honor.

4        THE COURT:  Sure.

5        MR. BELL:  Aaron Bell.  I represent Bank of the West.

6        We, we don't consent, Your Honor, but at the same time

7    we haven't filed an objection, obviously, and that's because we

8    have a good grasp on the big picture, but we don't have a grasp

9    on the parts that make up the big picture.  For example, the

10   payment that's proposed by the debtor in the motion for use of

11   cash collateral is based upon a rejection of equipment that we

12   haven't received back yet.  We haven't received documentation

13   or information regarding that equipment, but we anticipate

14   receiving it very quickly and the debtor's been very

15   cooperative and Mr. Conway and his office.

16       So I merely need to state for the record, Your Honor,

17   that, that our -- the absence of an objection by Bank of the

18   West at this point is not tantamount to consent or a waiver of

19   our right to object at, for final approval.

20       THE COURT:  All right.

21       MR. BELL:  Thank you.

22       THE COURT:  So the debtor can use cash collateral

23   either with the consent of the secured creditor or a court

24   order authorizing it.

25       So I understand that you're not going to sign off on

1 | an order as consenting but at the same time you're not filing

2 | an objection to the interim use of cash collateral.  Do I have

3 | that right?

4 | MR. BELL:  Correct, Your Honor.

5 | THE COURT:  All right.  Do you have any objections to

6 | the form of order that has been submitted?

7 | MR. BELL:  I don't.

8 | THE COURT:  Have you seen it?  Okay.

9 | MR. BELL:  I don't, Your Honor.

10 | THE COURT:  All right.  Thank you.

11 | MR. BELL:  Thank you.

12 | THE COURT:  Ms. McClurg, do you wish to be heard on

13 | the cash collateral motion?

14 | MS. McCLURG:  Your Honor, the U. S. Trustee does not

15 | object with Mr. Conway's clarification that the debtor on an

16 | interim basis does not seek any more than the $250,000 that

17 | they need to get them through.

18 | MR. CONWAY:  That's the operating loan?

19 | MS. McCLURG:  That's the operating loan.  Oh, sorry.

20 | Yes.

21 | MR. CONWAY:  I'll put that next.

22 | MS. McCLURG:  So we're good with the cash collateral.

23 | Sorry.

24 | THE COURT:  All right.

25 | MS. McCLURG:  It's been --

1    THE COURT:  And you're okay with the form of order?

2    MS. McCLURG:  -- interesting for me.

3    Yes.

4    THE COURT:  All right.

5    All right.  So the cash collateral motion will be

6  approved and the Court will sign the order.  If we have any

7  questions about the order, we'll let you know, but I don't

8  anticipate that, given the fact no party's objected to the

9  form.

10    MR. CONWAY:  Okay.  Thank you, Your Honor.

11    THE COURT:  All right.  Go ahead.

12    MR. CONWAY:  So next would be the operating loan, Your

13  Honor.  We have spoken with the Bank about this and we have

14  spoken with the U. S. Trustees.  We -- the request is for a

15  $500,000 operating loan.  It would be unsecured, post-petition

16  administrative expense, priority only.  It's being lent to the

17  company by a company that's related to the 20 percent owner,

18  basically the money person of the company.  And again, it's,

19  it's needed because the cash flow is up and down through the

20  company and we have to pay the bills when we need.

21    So it's really needed for operating capital.  We have

22  talked with the U. S. Trustees and, and revised the order to

23  make it clear that we're only borrowing $250,000 on an interim

24  basis and, quite frankly, we suspect that'll be good for a few

25  months and certainly pending a final hearing on this matter.

1    So I don't think -- if there are any other questions

2  or comments about that.  We would like to have the Court,

3  again, consider the declaration of Mr. Calvert and approve the

4  entry of that order, as revised.  I can provide you with a

5  revised copy, if you'd like.

6    Do you have one with you?

7    THE COURT:  Sure.  If you have one --

8    MR. CONWAY:  If I can approach?

9    THE COURT:  -- that'd be great.

10    MR. CONWAY:  Thanks.

11   (Document handed to the Court)

12    THE COURT:  All right.

13    Mr. Anderson, anything you want to say on this matter?

14    MR. ANDERSON:  No, Your Honor, not on the, not on the

15  operating loan.

16    THE COURT:  Okay.

17    Ms. McClurg, anything you'd like to address to the

18  Court on this?

19    MS. McCLURG:  No, Your Honor.  Thank you.

20    THE COURT:  All right.

21    Anybody else wish to be heard on this matter?

22   (No response)

23    THE COURT:  Doesn't sound like it.

24    MR. CONWAY:  So, Your Honor, the changes that we made,

25  just to be clear, is Page 3 of 4 in Paragraph 3.

1      THE COURT:  Uh-huh.  (Indicating an affirmative
2  response)
3      MR. CONWAY:  We've added the words "up to $250,000"
4  and then we've added the words "pending final hearing."
5      THE COURT:  All right, great.
6      All right.  So the order will be signed.
7      MR. CONWAY:  Thank you, Your Honor.
8      THE COURT:  And also, I'm going to take the
9  declaration of Mr. Calvert in support of all of these motions.
10     MR. CONWAY:  Great, thank you.
11     THE COURT:  All right.
12     Yeah.  You'll need to upload the revised order for us.
13     MR. CONWAY:  We will.
14     THE COURT:  Okay.
15     MR. CONWAY:  Do we need to upload the cash collateral
16  as well, or will you take it off the exhibit?  It's easier for
17  us to upload?
18     THE COURT:  If you could upload it, please, yeah.
19     MR. CONWAY:  We will.
20     THE COURT:  All right.  Which would you like to handle
21  next?
22     MR. CONWAY:  Utilities.
23     THE COURT:  All right.
24     MR. CONWAY:  I, I think that's pretty standard, Your
25  Honor.  We all know what that is.  I don't think there are any

1  objections.

2          THE COURT:  All right.

3          Anybody wish to be heard on that motion?

4      (No response)

5          THE COURT:  All right.  For the record, it does

6  indicate -- the form of order does indicate that it's subject

7  to reconsideration in the event any specific party wants to be

8  heard with respect to a different deposit or --

9          So with that condition I'll go ahead and sign the

10  order.

11          MR. CONWAY:  Thank you.

12          THE COURT:  All right.

13          MR. CONWAY:  Next, payroll, Your Honor.  I think the

14  same thing there.  The U. S. Trustee did have some questions

15  about the dollar amounts.  There is going to be two pay periods

16  this month, even though the next payroll -- one is Friday.

17  One's July 1st.  But we actually have to fund today and we'll

18  have to fund on the Wednesday before July 1st.  That's why

19  there's two pay periods in there.  And the second payroll

20  includes additional obligations that aren't in this one, which

21  is why the total number is so high.

22          So I think, I think we're good on that unless the

23  U. S. Trustee has some more questions for us.

24          THE COURT:  Ms. McClurg?

25          MS. McCLURG:  Mr. Conway addressed our concerns, Your

1    Honor.  The U. S. Trustee does not object.

2              THE COURT:  All right.

3              So will there be a different form of order than the

4    one that was originally tendered?

5              MR. CONWAY:  No.  The original one is still the right

6    one, Your Honor.

7              THE COURT:  All right.  So if you want to go ahead and

8    tender that, upload that, I'll sign that.

9              All right.

10             MR. CONWAY:  Okay.

11             Next, Your Honor, would be the litigation loan.  So

12   this is the loan that would be provided by PSA 9, LLC, the same

13   entity that's making the operating loan.  This is more of a

14   traditional loan.  It's a litigation loan.  It has a higher

15   interest rate because it is riskier.  The only collateral for

16   this loan is the litigation.  If the litigation's not

17   successful or -- Machine Zone has claims against the debtor --

18   if they balance each other out and no funds are available, then

19   this is, essentially, an unsecured loan.

20             So I think the interest rate is commensurate with the

21   risk in this litigation.  The need for the money probably

22   wasn't as clear in our memorandum -- and it should have been --

23   but the need for the money is absolutely urgent, as I explained

24   earlier.  We have to get experts lined up ASAP.  The problem is

25   -- the experts will be hired by the law firm.  They won't be

1  hired by the debtor.  So we can maintain the confidentiality of

2  that.  The law firm is on a contingency fee, but they will

3  provide an accounting of their hours.  They can give us an

4  accounting of expenses, but we need to come up with a way to

5  protect that as far as confidentiality goes.

6        But the need for the money right now is to retain

7  these experts.  If you put yourself in the law firm's position

8  where they're trying to get a number of different experts lined

9  up and they've got to say, "Our client is a debtor in

10  bankruptcy and our client doesn't have the money to pay you,

11  but don't worry.  We'll get it to you," that's not going to

12  work very well.  And then when they further say, "Oh, but we've

13  got this person who's going to loan it to them," that's not

14  going to work very well.

15        So it's really important for our lawyers to be able to

16  go out right away and say, "We've got a client in bankruptcy,

17  but the company believes in it.  The court's already approved

18  the funding.  We've got the money sitting in our client trust

19  account.  We can retain you today."  And the urgency is the

20  fact of the timing.  We simply have nine months before trial,

21  five months before summary judgment, and that's very little

22  time.  I think they've already waited too long to be getting

23  these experts in line.

24        We're very pleased that PSA 9 is stepping up to the

25  plate not only helping fund the operations, but they also

1 believe so much in the company and the litigation that they're

2 willing to fund the litigation. Same with the law firm.

3 They're taking it on a contingency. This is going to cost them

4 lots and lots of money and they're willing to do it. They

5 believe so strongly in the litigation.

6 So we think those are all good things and we'd like to

7 get the hundred thousand dollars, 150,000 approved today.

8 With respect to the control that the lender has over

9 the litigation, it's nothing, I don't think, that you wouldn't

10 find in a normal litigation loan. The covenants themselves are

11 set forth in Paragraph 3 of the loan agreement and they are

12 negative covenants, for the most part, negative covenants about

13 changing lawyers. Well, that's because the lender doesn't want

14 to change lawyers without knowing about it. Same thing with

15 settlements. You don't want them to settle and give up the

16 ship by just having a walkaway if the lender's not going to get

17 paid without at least talking to the lender.

18 So it's not a matter of the lender directing the

19 litigation. It's a matter of the lender just being informed

20 and having these negative covenants. The affirmative covenants

21 are simply keeping the secured creditor appraised of what

22 happens and, and the secured creditor's willing to forego that

23 to the extent it would jeopardize the attorney-client

24 privilege.

25 And so there's nothing in here that we think is

1   unusual for this type of loan or is inappropriate for this type

2   of loan and we would ask the Court that it approve the loan and

3   allow us to advance the $150,000 now so we can address, so they

4   can go forward with the litigation.

5         Just to be clear, there are two pieces of litigation,

6   our lawsuit against Machine Zone; Machine Zone's against ours.

7   Our lawsuit against them is not stopped by the automatic stay.

8   Theirs against ours is.  We have drafted a stipulated relief

9   from stay because the court's not going to let us get too far

10  in our case without letting them also come back at us.

11        So we would anticipate presenting that to the Court on

12  a stipulated basis, perhaps even later this week, but certainly

13  by next week and that would allow for the litigation to pursue

14  and be liquidated in state court.  They would have to come back

15  to bankruptcy court, obviously, if Machine Zone had any

16  remedies against the debtor.

17        THE COURT:  And is the same law firm representing the

18  debtor in the claims by Machine Works [sic] against the debtor?

19        MR. CONWAY:  There are two sets of law firms, yes.

20        So initially, the law firm was retained.  Machine Zone

21  filed the lawsuit first.  So insurance covered part of that

22  lawsuit.  That law firm is still working.  Susman Godfrey will

23  join them.  So they will both work together on both the

24  prosecution and the defense side of things.  Yeah, 'cause the

25  cases have now been consolidated.  I'm not sure if it's

1   substantive or administrative, but they're being operated

2   together.

3           THE COURT:  And does the fee agreement with the

4   special counsel for a contingency fee include the work that

5   they're doing to defend the claims against the debtor?

6           MR. CONWAY:  Yes.  Both the prosecution and defense

7   part of it, yeah.

8           THE COURT:  I'll start with Mr. Bell.

9           Does the Bank have any issue with respect to this loan

10  and what I think, what I assume is priming of the Bank's

11  position with respect to the collateral?

12          MR. BELL:  Your Honor, thank you.

13          Other than a bit of sticker shock associated with the

14  15 percent interest compounded monthly, what we're primarily

15  concerned with are the terms of the security agreement that,

16  that goes along with the loan.  We, we understand that the

17  litigation loan is necessary in order to pursue the claims of

18  the debtor and but for those claims we would have no hope of

19  being repaid.

20          So the Bank sees a whole lot of upside out of this

21  process.  So we support the loan, again don't consent just

22  merely because we don't have sufficient information.  But we,

23  we don't object specifically to the loan.

24          With regard to the security agreement, Your Honor, my

25  concerns are that the security agreement purports to give to

1    the lender some rights that are inconsistent with the interest

2    of the Bank and inconsistent with the order granting use of

3    cash collateral, particularly the replacement liens of Bank of

4    the West.  And the only, the only thing that I would point to

5    is that the security agreement grants to the lender an interest

6    in all litigation.  It's my understanding that there is a piece

7    of litigation pending in Federal Court in Portland involving

8    Travelers Insurance and it's based on a claim by the debtor to

9    a business loss over a period of time.

10                 MR. CONWAY:  That's been --

11                 MR. BELL:  I'm sorry?

12                 MR. CONWAY:  That's been dismissed.

13                 MR. BELL:  Okay.

14            Then, then I apologize, Your Honor.  That, that's not

15    at issue here, then.

16            The -- Paragraph 1 of the security agreement grants to

17    the lender the right to conduct and control the litigation.  We

18    would, of course, want that subject to this Court's approval,

19    notice to creditors, and, in particular, notice to Bank of the

20    West.

21            Paragraph 2, the Representations and Warranties

22    section, specifically Section (c) says that the collateral,

23    which means the litigation, is free and clear of liens.  That's

24    not the case.  Bank of the West has a security interest in, in

25    the litigation and the proceeds of the litigation.

1   The same is true with respect to Paragraph (g) on Page
2   3, the representation that the collateral will be kept free and
3   clear of liens and encumbrances.  Again, Bank of the West has
4   an interest and will continue to have an interest.
5   And finally, a clarification.  The Definitions section
6   of the security agreement includes definitions for just about
7   every category of collateral under the Uniform Commercial Code.
8   Specifically, though, this security agreement only grants to
9   the lender an interest in the specific litigation for which the
10  loans are being made and so long as that is the case, Bank of
11  the West has no objection.
12  THE COURT:  All right.  Thank you.
13  Before I hear from Mr. Anderson, I'll let Ms. McClurg
14  chime in and give her -- give you her -- give you --
15  MS. McCLURG:  Our position, Your Honor?
16  THE COURT:  Yeah.
17  MS. McCLURG:  Yes.  I'll be happy to do that.
18  The U. S. Trustee has a number of concerns and would
19  suggest that, perhaps, the best way to address them -- and I
20  had indicated this to Mr. Conway, although, perhaps, not
21  entirely directly -- was, perhaps, setting over the hearing on
22  this motion to allow for further notice and the opportunity to
23  form a committee in light of the onerous terms of this, this
24  proposed agreement to fund the litigation and the current
25  status of the litigation.  While I do understand the need to

1   get litigation experts in place, we're talking about funding by

2   June 30th, which is a little over two weeks from now which

3   would give them some time.  And our organizational meeting

4   isn't until June 23rd.

5        So the urgency under Rule 6003 to fund this litigation

6   on these terms, which I will go through and highlight some of

7   the additional terms that Mr. Bell didn't mention that we are

8   very concerned about, on such short notice when it doesn't seem

9   that it's necessary under the circumstances is concerning.

10  It's not entirely clear why this can't happen on 21 days'

11  notice, why the law firm can't wait an extra week, let's say

12  the first week of July, to fund the litigation experts and get,

13  hopefully, a committee onboard to review the proposal and

14  evaluate the terms of the agreement and to work out some of

15  the, you know, potential sort of logistical issues, which I'll

16  also go into, as far as how the payments are going to be

17  handled as far as paying the experts.  I understand the law

18  firm intends to do that, but it would be helpful to understand

19  how they're going to report that consistent with the

20  requirements of Section 330 and 331.

21       So first, Your Honor, we have notice concerns.  We're

22  not entirely sure that they satisfy the requirements of Rule

23  6003, especially as of today.

24       We are concerned that, that that relief not be granted

25  on an expedited basis because of onerous terms, including the

1   interest that Mr. Bell highlighted, but also a pre-payment
2   prohibition, which is contained in the -- actually, if you
3   look, it's in the secured promissory note.  And it provides
4   that there, there shall not be any prepayment without the
5   consent of the holder, which would essentially lock the debtor
6   into this particular lender and prevent the debtor or a
7   committee from shopping for better terms to be able to fund the
8   litigation.
9          So on what would be, what, two or three days' notice,
10  the debtor would be essentially locked in with this lender on,
11  you know, terms that include this 15 percent interest rate and
12  giving what seems to be, you know -- and I understand.  I don't
13  deal in this kind of litigation all the time -- pretty
14  extensive control over the litigation.  And I understand the
15  way that Mr. Conway has described that control, but if you
16  actually look at the way that it's described in the security
17  agreement it is, it is quite all encompassing, especially for
18  funding $150,000.
19         And those negative covenants, although I do understand
20  they're negative covenants, do provide that the debtor shall
21  not do a number of things, including compromising the claim.
22  And the compromise is not limited to a compromise that would
23  not pay the lender in full.  It, it provides that the debtor
24  can't compromise it without consent of the lender and it's not
25  limited to taking actions that would not otherwise prejudice

1  the rights of the lender.

2      So it's concerning that the lender would have such

3  all-encompassing rights with respect to the litigation that

4  aren't specifically tied to repayment of its loan.

5      THE COURT:  What if the, the covenant was changed so

6  that it would only kick in in the event settlement or

7  compromise was likely to lead to a result that would pay less

8  than the amount of the outstanding loan?

9      MS. McCLURG:  That would be tied to the, more tied to

10  the terms of the loan and it would, it would certainly be less

11  concerning than what is being proposed currently, so.

12      THE COURT:  Okay.

13      MS. McCLURG:  If you look at the actual covenants

14  themselves, they raise those concerns.

15      And the order itself and the documents themselves

16  don't address the privilege issues, which I did raise with

17  Mr. Conway, which I understand that they are trying to address.

18  But certainly, that is something that we'd need to get worked

19  out and, you know, additional time would help in that process

20  of trying to figure out how that is going to work.

21      The agreement itself, I had some, some issues with the

22  way that it was drafted in that it wasn't entirely clear that

23  what, the security interest that they seek at least in terms of

24  the loan and security agreement, Page 1, Paragraph 1, where it

25  says "grant of security interest," that it is specifically tied

1　to the litigation itself.  And the way that it's worded, it

2　provides that the lien extends to, and then it provides -- and

3　every one of them is, you know, all cash and currency received

4　as a result of the litigations, plural, which Mr. Bell pointed

5　out insurance proceeds as a result of the litigations, but

6　part, Subpart Roman Numeral III, "General intangibles to the

7　extent of the litigations," which would seem to extend out

8　their security interest to things that are beyond the

9　litigation.  It's not -- it --

10　　　　　　THE COURT:  Isn't -- but isn't the general intangibles

11　qualified by "to the extent of the litigations" and isn't

12　"litigations" -- I haven't read the definition of

13　"litigations," but isn't "litigations" defined as this

14　litigation?

15　　　　　　MS. McCLURG:  Well, what concerns me is it doesn't say

16　that it's -- it says "to the extent of the litigations."  It

17　doesn't tie it to the products, proceeds, or offspring of the

18　litigation, which would be less concerning than "to the

19　extent."  "To the extent" makes it sound like up to the amount

20　of the litigation or the potential claims in the litigation.

21　　　　　　So the way that the language itself is drafted could

22　use some additional clarity, especially when, when such

23　extensive, you know, terms are sought.

24　　　　　　And I also highlighted, Your Honor, our, our concerns

25　about logistics.  Nothing in the motion addresses where the

1  $150,000 is going to go.  I'm assuming it's going to go into

2  the trust account held by contingent fee counsel and then the

3  question is is what happens when that happens.  If they're

4  going to be paying and retaining these experts, is there going

5  to be some further notice that is going to go out to creditors,

6  committee, someone that says how much they're paying and have

7  them, you know, accountable for that?  Because it seems that

8  Section, you know, as far as like applying for interim

9  compensation or something to that effect would require at least

10  some form of notice with respect to these expenses, whether it

11  happens close in time to them happening, after it happens.

12  They just need to work through the logistics as to how that's

13  going to happen so it's transparent and so those funds are

14  accounted for.

15         THE COURT:  I'm not familiar with how the litigation

16  process works in California.  Is there disclosure of experts

17  that occurs?  I'd be concerned about a public notice that goes

18  out in terms of who we're paying how much to in terms of

19  experts and whether that would then become part of the public

20  record and -- I mean, I understand there's tensions, you know,

21  between how the Bankruptcy Code works and, but the last thing I

22  want to do is, you know, inadvertently put ourselves in a

23  position where, where the debtor has disclosed things that

24  would not otherwise may need to be disclosed and would be

25  prejudicial to the debtor in terms of the litigation.

1    MS. McCLURG:  I think that we could probably work --

2    THE COURT:  I mean --

3    MS. McCLURG:  -- through that --

4    THE COURT:  Just a moment.  Right.

5    MS. McCLURG:  -- you know.  They don't necessarily

6    need to disclose who the expert is and, you know, maybe they

7    could vaguely disclose what it is that they're going to be

8    doing in a very, you know, you know, some form of, of way.  But

9    certainly, you know, the monies would need to be tracked --

10   we're talking about a hundred thousand dollars -- as far as,

11   you know, being able to show that it went someplace --

12   THE COURT:  Right.

13   MS. McCLURG:  -- and that it was appropriate, so.

14   THE COURT:  Right.

15   Okay.  Is that all?

16   MS. McCLURG:  That's all I have, Your Honor.

17   THE COURT:  Okay.

18   All right.  Anybody else wish to be heard on that

19   before I go to Mr. Anderson?

20      (No response)

21   THE COURT:  Mr. Anderson, I'll invite your comments on

22   responses to the Bank's concerns and the U. S. Trustee's

23   concerns.

24   And I'll tell you.  I have some of the same concerns

25   and I understand the timing here and the sensitivity of it.  On

1  the other hand, it sounds like there's a lot of this could be

2  worked out with a committee.  And I just wonder if we can't

3  instruct the law firm to go forward and try and get as much

4  lined up as they can and come back, you know, the first week of

5  July for final approval and, hopefully, all this will be worked

6  out in a way that the U. S. Trustee's Office and any committee

7  would be satisfied with.

8       But having said that, Mr. Anderson, I'll invite your

9  comments.

10       MR. ANDERSON:  Thanks, Your Honor.

11       You know, my client is, is very supportive of the

12  company and very excited about the, the restructuring, but, but

13  just given the, the litigation risk we do need the, the terms

14  in the agreement that we've, you know, that are currently set

15  forth.  I think there might be a few clean-up changes or, you

16  know, clarifications that we can, we can discuss, but as far as

17  the, you know, the main material terms we do need those, given

18  the, the litigation risk.

19       MR. CONWAY:  And I can address the point-by-point

20  terms, if you'd like, Your Honor.

21       THE COURT:  Sure, go ahead.

22       MR. CONWAY:  Okay.

23       So, so first off, "litigation" is defined in the

24  opening Whereas paragraph and it refers to our lawsuit against

25  Machine Zone, Machine lawsuits against them.  It does include

1   anything else that might arise out of that, but it is that

2   distinct universe.  And that's the term that's then used

3   throughout the document.

4       So I -- there shouldn't be any confusion or need to

5   further clarify that aspect.  It is a, it is a loan secured by

6   the litigation to be used for the litigation.

7       If you go down to Paragraph 1, the Grant of Security

8   Interest, the comment of the U. S. Trustee, I think it says "to

9   the extent of" and I don't think there's, there's really much

10  more to be clarified there.  It's only to the extent of the

11  litigation.  Again, this revolves around the litigation.

12  Mr. Bell's point about the definitions being unnecessary is

13  accurate.  'Cause this only pertains to the litigation.

14      With respect to the, Mr. Bell and the Bank's point

15  with respect to control the litigation in Paragraph 1, that's,

16  that's a security interest.  That's a lien.  That's only if

17  they default and they have to foreclose, then they control the

18  litigation.  What we don't want to have happen is for this

19  litigation to go away.  Because, again, the Bank has a junior

20  lien on it.  They don't want this litigation to go away.

21      So we don't want the secured lender to be able to have

22  to foreclose and just get its money back and not be able to

23  continue to prosecute the litigation.  So that's why they

24  control the litigation.  It's only in the security part.  It's

25  not in the covenants part.  It's not in the other parts.  It's

1    only in the event of a default that they can actually exercise

2    that control.  That's also for the benefit of the unsecureds.

3            As a preview of what the plan's going to be, Your

4    Honor, we are going to give the unsecured creditors a piece of

5    the pie in the litigation, obviously.

6            So the waterfall in the litigation will go to repay

7    the litigation loan, repay Bank of the West, and then pay all

8    the unsecured creditors.  So they're all the beneficiaries of

9    this process.  They will also want the secured lender to still

10   believe in this litigation enough that they will control that

11   litigation and go forward.

12           Through the plan, we expect to actually create a

13   litigation trust and give the creditors' committee a seat on

14   that, on that process.  So they'll get to control the

15   litigation as well.  But right now, it's important to note that

16   this control is only in the benefit of a default, not, not

17   prior to default.

18           THE COURT:  When you say "this control," are you --

19   are you referring -- I'm not clear on what section you're

20   referring to.

21           MR. CONWAY:  It'd be Paragraph 1, Romanette (v), the

22   Right to Control, Right to Conduct and Control the Litigation.

23           So again -- and that's in part of the, what they have

24   a security interest in.  That's not part of the loan covenants

25   or any other part that would give them the present ability.

1  That's something that can only happen upon being foreclosed.

2           THE COURT:  Well, but there is still the negative

3  covenant that the debtor can't settle, compromise, dispose of,

4  make any other offer or settle or compromise or otherwise

5  dispose of the litigations without prior express written

6  consent.

7           MR. CONWAY:  That's correct, Your Honor.  And I --

8           THE COURT:  And that kicks in from the beginning,

9  right?

10          MR. CONWAY:  And, and I'd have two comments on that.

11 That does kick in from the beginning.  That is necessary.  As

12 you pointed out, that could be modified to say unless it's

13 going to satisfy the lien obligation.  Our concern throughout

14 this process is Machine Zone, are they a billion-dollar

15 company, they're, they're probably a billion dollar plus

16 company.  They would much rather pay our creditors ten cents on

17 the dollar, pay off this loan, and be done with it as opposed

18 to let us pursue this litigation.  We need to have protections

19 that let this litigation be prosecuted for the benefit for the

20 creditors and the equity of the company.  Because we believe

21 that it'll satisfy everybody, everybody'll be paid in full, and

22 we'll have an extra $50 million to operate with.  We do not

23 want Machine Zone coming in the door tomorrow and saying,

24 "Okay.  Here you go, Lender.  Here's your 150 or $200,000.

25 And, creditors, we'll give you ten cents on the dollars," and

1  then dismiss the case and we're going to settle up with

2  ourselves.

3       So that's why that protection is in there, quite

4  frankly.  Otherwise, we would agree that the, the prohibition

5  could be limited to unless the secured creditor otherwise gets

6  paid.  That's our concern.

7       I do -- I would add -- the second part of that is

8  we're in bankruptcy court.  We all know that the debtor can't

9  settle or compromise without court approval and I think that

10  the, the lender, again, is a related party.  They're very

11  interested in getting everybody paid in full.  I can't imagine,

12  practically, this becoming a problem.  We're going to be in

13  bankruptcy court presenting any settlements and compromise.

14  It's got to be approved under 9019, or whatever it is.

15       THE COURT:  Right, but wouldn't this give the lender a

16  veto over that process?

17       MR. CONWAY:  Theoretically, it'd give the lender a

18  veto over the process, yes.  Practically speaking, I don't

19  think it would, but I suspect that we could -- we would be able

20  to come up with a method that would pay the loan, discharge the

21  debt, and then settle the case.  We can always do it that way,

22  I suppose.

23       Paragraph 2(c), the no liens section raised by the

24  Bank that they have a continuing lien, that is already provided

25  in there.  The last phrase says "or any such lien shall be

1    subordinated to the liens of the secured party."

2           So we do acknowledge that there are other liens.  It's

3    just requiring that they be subordinated.  And the same thing

4    would go with the other Bank's comments there.  They are

5    recognized as having liens here, just that they'll be

6    subordinated.

7           I didn't quite catch the Paragraph (g) that the Bank

8    mentioned, but it's the -- if we need to clean up that language

9    -- but it's clearly based on 2(c).  The intent here is that

10   other liens, the Bank's liens can stay.  It would just be

11   junior.  And that's what the order says as well, Your Honor.

12          The interest rate, Your Honor, I, I think is, is

13   market rate for litigation loans, if you can even get a

14   litigation loan.  We have to keep in mind here that this

15   litigation will die.  The company will get nothing.  The

16   creditors will have no opportunity to get paid back if we don't

17   prosecute this litigation and do it in a timely manner.  There

18   is nobody else out there that we can get any money from at any

19   interest rate.  Fifteen percent is not that high and I think

20   it's a good deal for the company and it's the only deal we have

21   for the company.

22          I, I do understand the need to, to get the committee

23   involved.  I think they'll be very supportive once we do get

24   them involved.  My concern with waiting even a couple of weeks,

25   Your Honor, is what I expressed earlier, is we have to get

1   these experts lined up really quickly and I already think we're

2   at the back end of the stick as far as trying to go out and do

3   that and if we don't get to start that process for another two

4   or three weeks, that could put us at a real disadvantage.

5   We're simply asking for less than 10 percent of the full loan

6   amount right now.  The full loan amount's a million five.  This

7   is only 150.

8          So I think there'll still be plenty of time to fix up

9   the document, if people want to tweak it here, there, or

10  elsewhere.  We have a cooperative lender, not real adversarial

11  with us.  They all want to do what's best for the company, for

12  the creditors, and for the litigation.

13         THE COURT:  All right.  So is -- perhaps, this is best

14  addressed to Mr. Anderson -- is the lender willing to go

15  forward with the loan on an interim basis with the

16  understanding that all I'm approving is on an interim basis not

17  only the 150, but I'm only approving these terms on an interim

18  basis and it may be that I don't approve these terms and, going

19  forward, and that the 150,000 has been lent with these terms in

20  place, but there may not be approval of these terms going

21  forward?

22         MR. CONWAY:  Debtor's fine with that, Your Honor.

23         THE COURT:  Mr. Anderson?

24         MR. ANDERSON:  Your Honor, if -- and if the loan is

25  not approved, if the final terms aren't approved, does that

1  then unwind the transaction?

2        MR. CONWAY:  That was what --

3        THE COURT:  See, that's the, that's the problem.  You

4  say you're only asking -- Mr. Anderson's addressed the exact

5  issue.  For example, what happens if the 150,000 is loaned with

6  the, under the condition that the lender's going to, in

7  essence, have control of this litigation and I rule in early

8  July that I don't -- I'm not -- I'm not going to approve that.

9  Where, where does that leave us?

10        MR. CONWAY:  I guess --

11        THE COURT:  I, I don't know how we undo that.

12        MR. CONWAY:  Yeah.  I don't think you can undo that,

13  Your Honor, but I, I guess if the lender would consent we'd be

14  willing to modify that clause with respect to settlement for

15  the interim purposes.  'Cause I think that's the one that

16  there's a little hang-up on right now.

17        So that there won't be any settlement or compromise

18  with, unless it would pay off the lender in full or the lender

19  consents.  We'd do that on the interim basis.  We're fine with

20  that, if that's the, that's the term that's the hang-up right

21  now.

22        THE COURT:  Ms. McClurg, does -- would that change

23  your position on this?

24        MS. McCLURG:  Well, Your Honor, I highlighted a couple

25  of other terms that are of concern.

1          Prepayment is, frankly, of concern because I don't

2     quite -- I'm concerned that if that's approved, that it is

3     going to make it difficult if, if -- and I understand.  They

4     are unlikely, extremely unlikely to find financing elsewhere.

5     But as, as you will find out later this afternoon, it's not

6     entirely impossible for that to happen.

7          So with, with that said, that is another concern.

8          And frankly, if it's going to be approved on such

9     short notice, it would be helpful to have -- I'm not even sure.

10    Do we have one of the lawyers for Susman on the phone or

11    otherwise present that could explain why it's necessary to have

12    these experts super quickly instead of waiting an additional

13    week or two?  Because I'm not entirely sure what, you know, how

14    much time these experts need to prepare things.  I know there's

15    usually like a 45-day circulation requirement for expert

16    reports, but I don't know how long they need to prepare their

17    reports.  Usually, you're looking at a delay of three or four

18    months and we have that time.

19          So that's why I'm trying to understand.

20          MR. CONWAY:  Well, we don't really have that time

21    because the summary judgments are due four months from now and

22    we have to retain the experts.  There's a lot of work that

23    they've got to get up to speed on.  I mean, there's volumes and

24    volumes of data.  This is, this is a massive operation that was

25    in place with all of these servers and all of the intellectual

1  property and all the trade secrets and all the technology

2  that's involved.  It's -- I, I'm honestly concerned that we

3  shouldn't have started this two months ago.

4          THE COURT:  Ms. -- Ms. --

5          MR. CONWAY:  But -- but I am -- but I am willing to

6  also, subject to the lender's consent, have that clause also

7  sort of be put aside, the prepayment one.  'Cause I think that

8  is important on an interim basis.  You don't want to have that

9  in there.

10         So we can hold that clause till the final hearing, if

11  the lender will consent, probably will.

12         THE COURT:  Remind me when the 341(a) meeting is.

13         MS. McCLURG:  It is July 15th.

14         THE COURT:  Or, I'm sorry.  The organizational meeting

15  for the unsecured --

16         MS. McCLURG:  The organizational meeting is June 23rd.

17         MR. CONWAY:  22nd?

18         MS. McCLURG:  Is that this case?

19         MR. CONWAY:  Yeah.

20         MS. McCLURG:  No.  I have yours -- yours is on the

21  23rd.  You -- you -- we had gone back and forth.  I actually

22  officially set it for the 23rd.

23         MR. CONWAY:  Okay.

24         MS. SCHOEN:  She did.

25         MR. CONWAY:  Yep, you're right.

1           THE COURT:  Well, what I'm wondering --

2           MS. McCLURG:  I'm glad.  I'm glad.  It's, it's been a

3    challenge.

4           THE COURT:  So my schedule is I'm here on the, in the

5    late morning on the 24th through the rest of the day and, until

6    mid to late afternoon.  And then I'm here on the 27th.

7           Do we have any time on the 27th at all?

8           Then I'm out of town until July 5th.

9           So what I'm wondering is, as another alternative, is

10   if the committee's going to be formed on the 23rd, if we could

11   have a continued hearing on the afternoon of the 24th or the

12   27th, which I know puts you back a week, but that's better than

13   waiting till after the July 5th holiday.

14          MR. CONWAY:  Yeah.  I think, I think that might work,

15   Your Honor.  Yeah.

16          THE COURT:  And that would still be -- that's not the

17   full 14 days for a final hearing, but we could have a continued

18   preliminary hearing and then I would intend at that point to

19   rule on what the terms are going to be, if I approve it, and

20   that way, we don't have to kind of do a, a half-baked --

21          MR. CONWAY:  Yeah.  I --

22          THE COURT:  -- preliminary.

23          MR. CONWAY:  I think we can do that, Your Honor.

24          MS. McCLURG:  I think that would be much better.

25          THE COURT:  What's, what's my time on the 27th?  Do I

1  have any time?

2         THE COURTROOM DEPUTY:  June 27th?

3         THE COURT:  Yeah.

4     (Pause)

5         THE COURT:  Problem is that's my Chapter 13 day, so.

6     (Pause)

7         THE COURT:  Yeah.  Let's, let's do 11:00.  I'm just

8  concerned if we do it the 24th that doesn't give the committee

9  enough time to get formed and pick counsel.  The 27th is still

10 a rush, but --

11        MR. CONWAY:  Yeah, I agree.

12        THE COURT:  -- that's just the reality of --

13        MS. McCLURG:  That's --

14        MR. CONWAY:  Gives them the weekend.

15        THE COURT:  -- the world you guys live in, so.

16        MR. CONWAY:  Yeah.

17        THE COURT:  So let's do it at 11:00 a.m. on June 27th

18 for a continued preliminary hearing on the litigation loan.

19 And we'll plan to go for about an hour and a half and if we

20 need more time, we can kick it into later in the afternoon.

21        MR. CONWAY:  Hopefully, we won't.

22        THE COURT:  I'll get grumpy if I don't have lunch at

23 some point.  We don't want that.

24        MR. CONWAY:  We don't want that, Your Honor, nor do

25 the people after us.

1          THE COURT:  Yeah, exactly.  That's probably more to

2     the point.

3          All right, Mr. Anderson.  Is that acceptable to your

4     client?

5          MR. ANDERSON:  Yes, Your Honor.  That's acceptable.

6          THE COURT:  All right.

7          Well, it sounds to me like all these things are things

8     that with some additional discussion, hopefully, can be worked

9     out in a way that will be acceptable to all the parties.  If

10    it's not, then I'll plan to, to rule on the 27th in terms of

11    the issues.

12         MR. CONWAY:  Okay.  Thank you, Your Honor.

13         MS. McCLURG:  Thank you, Your Honor.

14         MR. CONWAY:  So there are three other matters, one of

15    which I've already mentioned, I'd just like to mention to the

16    Court --

17         THE COURT:  Yeah, go ahead.

18         MR. CONWAY:  -- just as a preview.

19         So we will be, hopefully, presenting a stipulated

20    relief from stay order with respect to Machine Zone litigation

21    perhaps next week now, although I'm going to have to rethink

22    that if we don't have our money lined up.

23         THE COURT:  Right.

24         MR. CONWAY:  So we may not do that after all.

25         Then there are two other motions we filed yesterday.

1  One is a motion to reject all the executory contracts and

2  unexpired leases.  We haven't done a complete analysis of who's

3  secured or not, so we're just rejecting everything without

4  determination at this point in time.  That can be set in the

5  ordinary course.

6      But we have filed a motion for relief from stay, which

7  is currently set for July 5.  According to the Rules -- it's a

8  little strange 'cause the, the debtor asking --

9      THE COURT:  It is the debtor --

10      MR. CONWAY:  -- for relief --

11      THE COURT:  -- right.

12      MR. CONWAY:  -- from stay.

13      But the goal is with people have their equipment, we

14  want them to be able to finish liquidating it.  We have some

15  vendors now.  NFS is the one that I was talking to yesterday

16  who has a buyer for the equipment.  They want to come pick it

17  up and get it to their buyer.  And they're a small mom and pop

18  outfit.  It's not like the big banks.  And we'd like to

19  accommodate these people as much as possible.

20      So we were hoping to find a way to give these people

21  relief from stay so that they can liquidate their equipment as

22  expeditiously as possible.  So, you know, I don't know if

23  there's a way we can have a quick hearing on that relief from

24  stay motion.  Or, otherwise, I guess, the option is we present

25  a series of stipulated orders granting relief from stay, but

1   that could be 27 different one of those things.

2          THE COURT:  Ms. McClurg, any thoughts in terms of

3   whether the relief from stay order or -- excuse me -- motion

4   filed by the debtor needs to run the 14 days or --

5          MS. McCLURG:  That one, that one would be much less

6   concerning.  It would, theoretically, save some money and I

7   don't know that a committee would necessarily be second

8   guessing the debtor's business judgment on that one.

9          So we would be much less concerned about shortened

10  notice under those circumstances.  And heck, I might field a

11  few less phone calls from confused creditors trying to figure

12  out if the trustee consents to them retrieving collateral.  So

13  we wouldn't object.

14         THE COURT:  Well, what if I just have the debtor --

15  what notice do you think is required or is appropriate, I

16  should say?

17         MS. McCLURG:  Well, we -- certainly, I think next

18  week.

19         Would that be --

20         MR. CONWAY:  Sure.

21         MS. McCLURG:  You think that would be --

22         MR. CONWAY:  Yeah.

23         MS. McCLURG:  You got a few more days of this, this

24  week and then -- so, perhaps, sometime early next week.  I

25  don't -- I think it might be ambitious to double set it with

1    the hearing on Monday.  Have you actually filed the motion yet?

2              MR. CONWAY:  Yes, yesterday.

3              MS. McCLURG:  Okay.

4              THE COURT:  Yeah, it was filed.

5              MR. CONWAY:  Yeah.

6              MS. McCLURG:   Well, yeah.

7              So that would give it not quite a week.  I mean, a

8    week would be better, but, you know, certainly Mr. Conway is

9    better aware as to like how important a few days is.

10             MR. CONWAY:  A week would be fine.

11             MS. McCLURG:  Yeah.

12             MR. CONWAY:  Yeah.  A week would work.

13             THE COURT:  Okay.

14             So I guess you should tender a motion order shortening

15   time --

16             MR. CONWAY:  Yeah.

17             THE COURT:  -- and then send out notice that any

18   objection should be filed -- so will that go out today?

19             MR. CONWAY:  Yes.

20             THE COURT:  All right.

21             -- so any objections will need to be filed by June

22   20th or -- excuse me.  Wrong month -- June 22nd.

23             Ms. McClurg, does that sound right to you?

24             MS. McCLURG:  Yes.  So we're, we're talking about

25   holding a hearing -- yeah.  That would make sense.

1    THE COURT:  And if there are no objections I think we

2  could just have a stipulated order tendered -- well, an order

3  tendered or do you think we need a hearing on the 27th?

4    MS. McCLURG:  I don't know how we -- I mean,

5  ordinarily, a stipulated order would work, would work pretty

6  well.  I just don't know under the circumstances --

7    THE COURT:  Well, it wouldn't be stipulated 27

8  different vendors.

9    MR. CONWAY:  Right.

10    MS. McCLURG:  Right.

11    THE COURT:  It would only be --

12    MR. CONWAY:  That'd be more.

13    THE COURT:  It would only be signed by your office

14  with no opposition, I think.  Because you don't -- I don't

15  think you stipulate to orders, but I think you --

16    MS. McCLURG:  Well, yeah.  And, and by then,

17  hopefully, we will have a committee that will -- well,

18  actually, not by the 22nd, but, but yes.  Yeah.  That process

19  would work.

20    MR. CONWAY:  So objections due by when?

21    THE COURT:  Due, due by the 22nd.

22    MR. CONWAY:  Okay.  And if there are no objections --

23    THE COURT:  No objections, I think you can --

24    MR. CONWAY:  -- then we can submit an order?

25    THE COURT:  -- upload an order.

1          MR. CONWAY:  Okay, perfect.  With the U. S. Trustee's
2   approval of the form.

3          THE COURT:  With the -- correct.

4          MR. CONWAY:  Okay.  Thank you very much.

5          THE COURT:  And, of course, you're welcome --

6          Mr. Bell, go ahead.

7          MR. BELL:  Excuse me, Your Honor.

8          But just for clarification, that's on both the motion
9   for relief and the motion to reject?

10         THE COURT:  No.

11         MR. CONWAY:  No.

12         THE COURT:  Just on the --

13         MR. CONWAY:  Just the relief.

14         THE COURT:  -- motion for relief.

15         MR. BELL:  Great.

16         THE COURT:  The motion for rejection, I think, needs
17  to run its normal course.

18         MR. CONWAY:  Yes, exactly.

19         THE COURT:  And then if there's any vendor that wants
20  quicker relief, you can always use the form stipulated order
21  with no motion or just do a stipulated order and have them sign
22  it, even though, technically, they're supposed to run it by
23  counsel.  If they just sign it on their own behalf, that's
24  fine.  I'll, I'll accept that.

25         MR. CONWAY:  Right.  Thank you.

1          THE COURT:  All right.  So we need to talk about final

2    hearing dates on the motions for authority to use cash

3    collateral and the motion for the operating loan.

4          MR. CONWAY:  So I've heard a little bit about your

5    schedule, Your Honor.  Mr. Calvert's schedule, who will be our

6    primary witness, is -- he's unavailable July 1 through 15.

7          THE COURT:  Okay.  Does that include the 15th?

8          MR. CALVERT:  Yes.

9          THE COURT:  'Cause you're not back till the 18th?

10         MR. CALVERT:  I'm looking at it right now.  One

11   second, Your Honor.

12      (Pause)

13         MR. CALVERT:  I'm back on the 17th.

14         THE COURT:  Well, I'm gone the week of the 18th.

15         So that puts us -- I mean, 'cause we don't have --

16   there's not 14 days time to have --

17         MR. CONWAY:  Does the 14 days start from when we filed

18   the motion?  'Cause that -- the 27th will be 14 days, then.

19         THE COURT:  I'm sorry.  What, what day would be the 14

20   days?

21         MR. CONWAY:  Monday, the 27th, when we have the other

22   hearing.  We filed the 13th.  Fourteen would be 27.

23         THE COURT:  Well, I think there's -- it has to be 14

24   days of the notice of the final hearing --

25         MR. CONWAY:  Of the final hearing.

1          THE COURT:  -- I think.

2          MR. CONWAY:  Okay.

3      (Pause)

4          THE COURT:  I mean, will the end of July work in terms

5  of --

6          MR. CONWAY:  Yeah, it would.  From an operations

7  standpoint, that'd be fine for us.

8          THE COURT:  All right.

9          MR. CONWAY:  Yeah.

10          THE COURT:  The other thing we could do is we could

11  set it while Mr. Calvert is gone and then, if there is a need

12  for live testimony, we could set it over.  But it sounds like

13  if the debtor can last through the end of July, we ought to

14  just do that.

15          MR. CONWAY:  That's fine.

16          THE COURT:  All right.

17      (Court confers with staff)

18          THE COURT:  How about --

19          That's a Tuesday, right?

20          THE COURTROOM DEPUTY:  Yes.

21          THE COURT:  -- Tuesday, July 26th, at 1:30 p.m.?

22          MR. CONWAY:  That works for the debtor, Your Honor,

23  yeah.

24          MS. McCLURG:  I'm out of the office, but I imagine if

25  the Court is amenable to Ms. Perkins appearing by phone, with

1   Ms. Perkins, hopefully, maybe reviewing her schedule, perhaps

2   she could appear by phone at that hearing.

3           THE COURT:  Ms. Perkins, what's your schedule?

4           MS. PERKINS:  Yeah.  I can do, I can do July 26th.

5   That's fine.

6           MS. McCLURG:  All right.

7           THE COURT:  All right.  And you're fine to appear by

8   phone.  If there are witnesses that need to be cross-examined

9   or testimony --

10          MR. CONWAY:  Your Honor?

11          THE COURT:  Yes.

12          MR. CONWAY:  Excuse me.

13          Is the 27th open instead of the 26th?  We have a

14  conflict with the 26th.

15          THE COURT:  All right.  We'll check.

16      (Court confers with staff)

17          THE COURT:  Be patient.  We're working on it.

18          THE COURTROOM DEPUTY:  How much time do you need?

19          THE COURT:  Probably, I mean, if there's a contested

20  issue, maybe two hours?

21          MR. CONWAY:  That's what I was thinking.

22      (Court confers with staff)

23          THE COURT:  All right.  So 10:30 on July 27th.

24          MR. CONWAY:  Thank you very much, Your Honor.

25          THE COURT:  And, Ms. Perkins, does that work for your

1  calendar?

2       MS. PERKINS:  I will make it work, or I will find

3  someone else in our office to cover it.  So that's, that's,

4  that's fine.

5       THE COURT:  Okay.

6       MS. McCLURG:  And Ms. Griffith may be able to cover it

7  as well.  I, I don't have access to her schedule right now.

8       THE COURT:  All right.

9       MS. McCLURG:  And she's not in the office today.

10       THE COURT:  All right.

11       So, Mr. Conway, anything else we should cover today?

12       MR. CONWAY:  Just one other, one other heads-up issue,

13  Your Honor, is Mr. Papen, in an abundance of excitement when he

14  signed all these leases, personally guaranteed them all.  We,

15  we have been working cooperatively with most of them.  There

16  was only one lawsuit filed prepetition that named him.

17       So we're hoping that everything will calm down and --

18  but if not, we will be letting the Court know that we will have

19  to come in, perhaps, to seek a temporary restraining order

20  pending confirmation.  He's very critical to not only the

21  operations, but also the litigation.

22       THE COURT:  Okay.

23       MR. CONWAY:  Other than that, nothing else, Your

24  Honor.

25       THE COURT:  Great.

```
 1              Ms. McClurg, anything else from your side?

 2              MS. McCLURG:  I don't have anything, Your Honor.

 3    Thank you.

 4              THE COURT:  Mr. Laurick, you've been quiet and

 5    patient.  Anything you want to say today?

 6              MR. LAURICK:  No.  Thank you, Your Honor.

 7              THE COURT:  All right.

 8              Mr. Bell?

 9              MR. BELL:  No, thank you, Your Honor.

10              THE COURT:  All right.

11              Anyone else wish to be heard?

12         (No response)

13              THE COURT:  All right.  Thank you very much.  We'll

14    see you on the 27th.

15              MR. CONWAY:  Thank you.

16         (Proceedings concluded at 11:30 a.m.)

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | <u>CERTIFICATE</u> |
| 2 | I, court approved transcriber, certify that the |
| 3 | foregoing is a correct transcript from the official electronic |
| 4 | sound recording of the proceedings in the above-entitled |
| 5 | matter. |
| 6 | /s/ *Janice Russell*           June 21, 2016 |
| 7 | Janice Russell, Transcriber       Date |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |